American Airlines, Inc. v. Yahoo! Inc. et al                                               Doc. 24

Ⓧ

ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Fort Worth Division**

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2008 DEC 22   PM 3: 57

CLERK OF COURT

| | |
|---|---|
| AMERICAN AIRLINES, INC., | |
| Plaintiff, | |
| -v.- | No. 4:08-CV-626-A |
| YAHOO! INC. and OVERTURE SERVICES, INC. d/b/a YAHOO! SEARCH MARKETING, | |
| Defendants. | |

**APPENDIX IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION FOR TRANSFER**

Frederick Brown (admitted *pro hac vice*)
Jason Stavers (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Phone: (415) 393-8200
Fax: (415) 986-5309

Howard S. Hogan (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539

Dee J. Kelly
State Bar No. 11217000
Dee J. Kelly, Jr.
State Bar No. 11217250
Lars L. Berg
State Bar No. 00787072
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 332-2500
Fax: (817) 878-9280

*Attorneys for Plaintiff American Airlines, Inc.*

Dockets.Justia.com

American Airlines, Inc. respectfully submits this appendix in support of its Opposition to Defendants' Motion for Transfer and Brief in Support, pursuant Local Rule 7.1(i):

| Exhibits | Pages | Description |
|----------|-------|-------------|
| 1 | App. 1-4 | Declaration of Alice Curry, dated December 18, 2008. |
| 1.A | App. 5-9 | Addendum to the ARC Reporting Agreement. |
| 1.B | App. 10-20 | Access and Use Agreement. |
| 1.C | App. 21-22 | Print-out from Yahoo!'s website. |
| 1.D | App. 23-29 | Terms of use of AA.com. |
| 2 | App. 30-31 | Declaration of John Chan dated December 18, 2008. |
| 3 | App. 32-42 | Yahoo! Terms of Service. |

December 22, 2008

Respectfully submitted,

Dee J. Kelly (State Bar No. 11217000)
Dee J. Kelly, Jr. (State Bar No. 11217250)
Lars L. Berg (State Bar No. 00787072)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 332-2500
Fax: (817) 878-9280

Frederick Brown
(admitted pro hac vice)
Jason B. Stavers (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Phone: (415) 393-8200
Fax: (415) 986-5309

Howard S. Hogan (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539

*Attorneys for Plaintiff American Airlines, Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered on December 22, 2008 to Defendant's counsel, as follows, in accordance with the Federal Rules of Civil Procedure:

***Via Hand Delivery***

David F. Chappell
(State Bar No. 04141000)
Scott A. Fredricks
(State Bar No. 24012657)
**CANTEY HANGER LLP**
600 West Sixth Street, Suite 300
Fort Worth, TX 76102

_____
Dee J. Kelly, Jr.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

AMERICAN AIRLINES, INC.,

                  Plaintiff,

   -v.-

                              No. 4:08-CV-626-A

YAHOO! INC. and OVERTURE SERVICES, INC.
d/b/a YAHOO! SEARCH MARKETING,

                  Defendants.

## DECLARATION OF ALICE CURRY

I, Alice Curry, declare that:

1.      I have personal knowledge of the facts set forth herein and if called as a witness, I could and would testify that the following facts are true and correct.

2.      I am employed by American Airlines, Inc. ("American") as Director of Distribution Strategy. From 2006 to 2008, I supervised the most significant of American's Internet advertising programs as manager of the marketing and customer service team for American's website, AA.com.

3.      Attached as Exhibit A is a true and correct copy of the terms of the American Airlines, Inc. Addendum To The Airline Reporting Corporation Agent Reporting Agreement Effective December 19, 2006 referenced at Paragraphs 151 through 157 of the Complaint in the above-captioned action (the "ARC Addendum"). The terms of the ARC Addendum are posted, among other places on American's website, AA.com. All travel agents who offer consumers the opportunity to obtain reservations and tickets for travel on American must agree to the terms of



1

the ARC Addendum. *See* Ex. A. Paragraph 11(c) of the ARC Addendum provides that each

"AGENT HEREBY SUBMITS AND CONSENTS TO THE NON-EXCLUSIVE

JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

DISTRICT OF TEXAS AND THE COURTS OF THE STATE OF TEXAS FOR ALL . . .

DISPUTES BETWEEN AMERICAN AND AGENT ARISING OUT OF THE ARC

AGREEMENT OR THIS ADDENDUM." Ex. A (emphasis in original).

4.      American is a party to at least three different agreements with Yahoo! Inc.

("Yahoo").

5.      First, American and Yahoo are both parties to an "Access and Use Agreement"

dated November 9, 2005 and signed by Yahoo's Director of Business Development and

American's Vice President for Passenger Sales. The Access and Use Agreement governs the use

of American's fare and inventory information on the "FareChase" portion of Yahoo's website.

Paragraph 20 of the Access and Use Agreement specifically provides that "Both Parties hereby

consent and submit to the jurisdiction of the state and federal courts in New York for all

questions and controversies arising out of this Agreement." Attached as Exhibit B is a true and

correct copy of the Access and Use Agreement as executed.

6.      Second, American and Yahoo are both parties to the terms of American's website,

AA.com. At least every few days, Yahoo's systems access the AA.com website to copy and

"cache" its contents so that Yahoo's search engine can include it in the body of websites that its

search engine examines to find relevant results for its users. Attached as Exhibit at C is a true

and correct copy of a printout from Yahoo's website at

http://help.yahoo.com/l/us/yahoo/search/basics/basics-09.html, setting forth the basics of its

"caching" process. Attached as Exhibit D is a true and correct copy of the terms of use of

2

AA.com as posted at http://www.aa.com/aa/i18nForward.do?p=/footer/legal.jsp (the "AA.com Terms"). The first paragraph of the AA.com Terms provides "In return for gaining access to the [AA.com] Site and using it, you agree to be bound by the following Agreement without limitation or qualification, so please carefully review this Agreement before proceeding. If you do not intend to be legally bound by these terms and conditions, do not access and use the Site." The paragraph of the AA.com Terms labeled "Forum for actions, governing law, and procedural restrictions" provides that "You agree that this Agreement is made and entered into in Tarrant County, Texas. . . . Any lawsuit brought by you related to your access to, dealings with, or use of the Site must be brought in the state or federal courts of Tarrant County, Texas."

7. Third, American and Yahoo are both parties to a "Standstill Agreement" that was signed on December 19, 2006 by Yahoo's Senior Legal Director and American's General Counsel. The Standstill Agreement provides that American "has notified Yahoo! that a potential dispute may exist between [American] and Yahoo! relating to Yahoo!'s alleged use of [American]'s trademarks." Among other things, the parties agreed that Yahoo would not file any lawsuit related to the dispute for 97 days and American would not file any lawsuit related to the suit for 90 days. The Standstill Agreement further provided that the "running of all Limitations Periods applicable to any Claim that either Party may have against the other Party will be interrupted, suspended, and deemed to have been tolled as of" December 19, 2006. The Agreement further defined "Limitations Period" to include "any statute of limitations, statute or repose, period of prescription, laches, or any other rule or doctrine, at law or at equity, relating to the timeliness of Claims." The Standstill Agreement did not contain any provision limiting where either party could bring a lawsuit related to the dispute. By separate written agreements, the terms of the Standstill Agreement were extended from December 19, 2006 to October 15,

3

2008 (in the case of American) and October 21, 2008 (in the case of Yahoo). American filed the Complaint in this action on October 17, 2008. It is my understanding that American's position is that it is entitled to assert claims for behavior that dates back four years prior to the start of the tolling period, and, in fact, has asserted claims and by this lawsuit seeks to recover damages stemming from harms incurred from December 19, 2002 forward.

8.      I understand that Yahoo has asserted that American is required to litigate any dispute with Yahoo in a forum of Yahoo's choosing because a media analyst for Reprise Media ("Reprise") signed an insertion order to place advertising for American through Yahoo's search engine in 2006. To the best of my knowledge, no one at American is authorized to bind American to a forum selection clause without consulting with American's legal department and/or its outside attorneys. To the best of my knowledge, no one at American or any attorneys that work for or with American were consulted in connection with the insertion order on which Yahoo relies. American also has not authorized Reprise or any of its employees to sign any agreement to bind American to a forum selection clause, much less one that would cover any claims of any nature anywhere in the world, and that would contradict forum selection clauses to which American itself agreed.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Fort Worth, Texas, on December 18, 2008.


_____
Alice Curry



**AmericanAirlines**
AA.com

# Agency - AA Addendum To The ARC Reporting Agreement
*Effective December 19, 2006*

**Return to Agency Programs Index**

## American Airlines, Inc. Addendum To The ARC Agent Reporting Agreement

Your travel agency ("Agent") has entered into the Agent Reporting Agreement (the "ARC Agreement") with the Airlines Reporting Corporation ("ARC") whereby Agent has been appointed ("Agent's Appointment") to act as an agent for American Airlines, Inc. ("American") in the sale of air transportation. Effective December 19, 2006, Agent's continued sale of air transportation on American shall constitute our mutual agreement that the following shall constitute a clarification of Agent's responsibilities and duties under the ARC Agreement or additional terms and conditions.

### 1. Appointment.

American may independently review any of Agent's locations that are approved by ARC (the "Agency Locations"). The review may include on-site inspection of any Agency Location to determine that Agent's operations comply with American's requirements for its agents in the sale of air transportation. Without limitation, and in its sole discretion and at any time, American may, upon written notice to Agent, immediately terminate its appointment of any Agency Location or Agent's Appointment. If any Agency Location is terminated, Agent may not act in any agency capacity for the sale of air transportation on American from the terminated location. If Agent's Appointment is terminated, Agent may not act in any agency capacity whatsoever for the sale of air transportation on American.

### 2. Commissions.

(a) American does not currently pay base commissions to agents for the sale of air transportation. American, in its sole discretion, reserves the right to modify its commission policy at any time.

**(b) Limitations on Any Commissions.** If American chooses to pay any commissions for the sale of air transportation, American will pay commissions to Agent only in accordance with its then-current policy and only for Agent's issuance of standard tickets that show American as the ticketing carrier and that are properly issued in accordance with the ARC Agreement and this Addendum. Agent shall not be entitled to any commission for (1) tickets for which a full or partial refund is made, (2) late or unreported tickets, or (3) tickets issued to owners, officers, directors, shareholders, members, partners, or employees of either Agent or any person or entity which controls, is controlled by, or is under common control with Agent. Any commissions are based on the fare paid only, and American will not pay any commissions on governmental or similar taxes, fees, and charges, or fees or charges collected by Agent for its own account or for the account of a third party.

**AmericanAirlines**
*Agency Reference*

▸ **Home**
▸ **News**
▸ **Booking and Ticketing**
▸ **Customer Information**
▸ **Partners**
▸ **Programs**
▸ **Travel Experience**
▸ **All Topics**

**EXHIBIT**

tabbies®

**1-A**

**APP. 5**

## 3. Compliance with American's Rules and Rates.

**(a) General.** Agent shall strictly adhere to American's current instructions, rules, regulations, requirements, conditions of sale or carriage, tariffs, and procedures (the "Rules") in booking any reservation or issuing, reissuing, selling, exchanging, refunding, or reporting any ticket calling for transportation on American. Failure to comply subjects Agent to debit memos from American for an amount equal to either the cost of the ticket, the difference between the fare paid and the applicable fare, or an administrative service charge, as American deems appropriate, and termination of Agent's appointment. Agent acknowledges that American's damages for Agent's failure to comply may be uncertain or difficult to ascertain or prove and that American's administrative service charges are a reasonable estimate of American's loss due to the Agent's improper acts in these situations.

**(b) AAdvantage®/Promotional Programs.** Agent agrees to comply with all Rules governing the AAdvantage® Program and other promotional programs, including the issuance of promotional certificates and tickets. Agent acknowledges that the purchase, sale, or barter of promotional or AAdvantage® awards, mileage, or tickets (other than a purchase from American) is strictly prohibited and that Agent's direct or indirect involvement in any of these activities subjects Agent to (1) debit memos for the applicable fare or any losses sustained by American due to this activity, (2) termination of Agent's Appointment, and (3) legal or equitable remedies. Agent further acknowledges and understands that any fraud or abuse concerning promotional programs or AAdvantage® awards, mileage, or tickets on the part of Agent or Agent's customers may subject Agent's customers to appropriate administrative and legal action by American, including the forfeiture of all (1) award certificates, (2) tickets issued against award certificates, and (3) accrued mileage in the member's account, as well as cancellation of the account. Agent further understands that promotional or AAdvantage® award tickets that have been purchased, sold, or bartered are void and that use of these tickets may result in the tickets being confiscated by American, the passenger's trip being stopped or interrupted, and the passenger being required to purchase a ticket to continue travel.

**(c) Hidden City, Back to Back, and Throwaway Ticketing, and Other Speculative or Abusive Booking.** Agent acknowledges that hidden city/point beyond, back to back, and throwaway ticketing, and other fraudulent, speculative, or abusive bookings, violate American's Rules. (See American's Conditions of Carriage for definitions of hidden city, back to back, and throwaway ticketing.) It is the Agent's responsibility to know its customers and to ensure that ticketing or bookings done by Agent are not for hidden city, back to back, or throwaway ticketing, or other speculative or abusive purposes. Agent acknowledges that if it engages in these practices, or sells or issues a ticket used for any of these purposes, Agent will be subject to (1) debit memos to recover the difference between the applicable fare and the fare actually used, (2) the termination of Agent's Appointment, and (3) other remedies available to American.

**(d) Ticket Fraud.** Agent shall not engage in fraudulent ticket activity, including altering flight coupons for non-qualifying discount travel, backdating tickets, or selling no-cash-value coupons, discounts, or upgrades. Failure to comply subjects Agent to appropriate debit memos and the termination of the Agency Location or Agent's Appointment by American.

**(e) Exceptions.** To be valid, any exceptions to American's Rules in the booking of any reservation or the issuance, reissuance, or refund of any ticket calling for transportation on American must be documented by American in the applicable PNR.

## 4. Use of American's Identification Plate.

American's validation plate is American's sole property, and Agent shall surrender it immediately upon demand by American or ARC. Agent shall not use American's validation plate, or the electronic equivalent, to issue tickets or any other traffic documents for transportation on any airline that has refused to transport on American on behalf of Agent. Further, Agent shall not issue tickets for transportation on American on behalf of any other travel agency location for which American has refused or terminated its appointment, including any of the Agency Locations. Agent shall not use American's validation to issue tickets for transportation on carriers that do not maintain a ticketing and baggage interline agreement with American.

**5. Debit Memos.**

**(a) Issuance of Debit Memos.** If Agent issues a ticket in violation of the ARC Agreement or this Addendum, American may issue a debit memo to Agent for any deficiency or any loss incurred by American by reason of the violation and may immediately terminate the Agency Location or Agent's Appointment upon notice to Agent. American also retains all rights and remedies available to it under the ARC Agreement or at law or in equity.

**(b) Payment of Debit Memos.** Agent agrees to pay or reconcile all debit memos issued by American within 30 days of the date of issuance. If Agent fails to do so, American reserves the right to assess, and Agent agrees to pay, interest on the past due amounts at a rate not to exceed one and one-half percent (1½%) per month, compounded monthly, or the maximum rate permitted by law, whichever is less, from the date due to the date of the payment.

**(c) Administrative Processing Fees.** American reserves the right to assess, and Agent agrees to pay, an administrative processing fee to be included as part of any debit memo issued to Agent. American also reserves the right to assess, and Agent agrees to pay, an additional administrative processing fee of at least $300.00 to cover administrative expenses in connection with an audit or review of a request by Agent for reinstatement of Agent's Appointment following termination for any reason by American. American's acceptance of any administrative fees shall not obligate American to act, or refrain from taking any action, nor shall it waive, release, amend, or modify the ARC Agreement, this Addendum, or any rights or obligations of Agent or American.

**6. Agency Free and Reduced Travel.**

Agent shall comply with American's Rules concerning Agency free travel and reduced rate travel privileges. Failure to comply subjects Agent to debit memos by American for an amount equal to either the cost of the ticket or the difference between the fare paid and the applicable fare, as appropriate, and termination of the Agency Location or Agent's Appointment.

**7. Agent Incentive, Promotional, and Override Programs.**

Agent shall comply with American's Rules and any specific contractual requirements concerning agency incentives, promotions, or overrides with American in which Agent participates or has an interest. Failure to comply subjects Agent to (1) forfeiture and repayment to American of all sums paid by American to Agent or the value received by Agent, (2) termination of Agent's right to participate in or receive all or a part of any agency incentives, promotions, or overrides, and (3) termination of Agent's Appointment.

**8. Data Ownership.**

Agent acknowledges that American content and data constitute American's valuable property and that unauthorized distribution or remarketing of American content and data is improper and unlawful. Such unauthorized distribution or remarketing of American content and data would constitute, in part: (1) accessing AA.com by the use of any automated or electronic devices commonly known in the Internet industry as robots or spiders, or by the use of other electronic search devices; (2) soliciting, facilitating, encouraging or agreeing to provide access to or otherwise remarket or redistribute, or take affirmative steps to allow or permit such access to, or remarketing or redistribution of, any American content or data to any third party, through any process, including screen scraping, spiders, web "bots" or other device, software or system; (3) licensing, selling, or otherwise providing to any person or entity any software or other device that is capable of accessing American content or data from any source; or (4) assisting, aiding, or abetting in any way the unauthorized access of AA.com, or the distribution or display of American data obtained or derived from AA.com or any other web site or any other source, by any third party. Agent shall not engage in any of

the above examples, or any other unauthorized distribution or remarketing of American content or data, without the prior written authorization of American. If Agent learns that any third party is accessing, distributing, or displaying American content or data in any way obtained via Agent, including Agent's web site, without American's written authorization, Agent shall promptly inform American and take all commercially reasonable measures, including commercial, technological, or legal measures, to prevent the unauthorized access, display, or distribution of American content or data.

## 9. American's Intellectual Property.

Solely in connection with displaying that Agent is an authorized agent of American, American grants Agent a limited, royalty free, non-transferable, non-exclusive permission to use certain American intellectual property, specifically the trademarks AMERICANAIRLINES, AA, AMERICAN EAGLE, and AMERICANCONNECTION and the American Airlines trade dress (the "American Marks"). Agent agrees that American owns the American Marks, and that it will not harm the American Marks or American's ownership of the American Marks or in any way contest or deny the validity of, or the right or title of American in or to, the American Marks. Agent understands that it has no right or permission to use the American Marks for any purpose not expressly stated in this Addendum, and that any unauthorized use of the American Marks will constitute an infringement of American's rights in and to the American Marks. Agent understands that it has no right or permission pursuant to this Addendum to use any other intellectual property owned by American or its affiliated entities; nor does Agent have permission to use or distribute the American Marks for any purpose other than as stated in this Addendum. Agent further agrees not to use any intellectual property confusingly similar to the American Marks. Agent agrees that it will comply with American's trademark usage guidelines found at www.aadams.com. Agent will reproduce the design and appearance of the American Marks from reproduction art obtained from American. Agent agrees that it will not (1) alter the American Marks in any way; (2) use any partial American Marks or fragments thereof; (3) display the American Marks without the appropriate trademark or copyright designation, as specified by American; (4) use the American Marks in any manner that would diminish their value or harm the reputation of American; (5) purchase, use, or register any domain names or keywords or search terms that are identical or similar to, or contain (in whole or in part), any of the American Marks; or (6) superimpose any image or content upon the American Marks. Agent understands that it has no rights in the American Marks, nor can continued use of the American Marks ever give it any rights in the American Marks. Therefore, Agent's use of the American Marks (or any demand by American that Agent cease using the American Marks) can never form the basis of any claim by Agent for legal relief against American. Agent acknowledges that a breach of this paragraph will cause American significant, irreparable injury and that American's legal remedies for a breach will be inadequate. Agent will provide examples to American's counsel of all proposed uses of the American Marks and will obtain American's written authorization (e-mail will suffice) before any use of the American Marks. Agent agrees to send one copy of the finalized material on which the American Marks appears to the following address:

Trademark Administrator
American Airlines, Inc.
Legal Department
P. O. Box 619616, MD 5675,
DFW Airport, TX 75261-9616
Phone: 817.067.3761
Fax: 817.963.1489
E-mail: IP.Administrator@aa.com

Agent agrees that upon receiving written notice that American has revoked this permission to use, Agent will immediately stop using the American Marks in any form, including not distributing any previously printed material(s) bearing the American Marks.

## 10. Right to Inspect and Audit.

American shall have the right to enter any Agency Location upon reasonable notice to: (1) inspect Agent's books and records relating to air transportation sold on American and to ensure Agent's compliance with the provisions of the ARC Agreement and this Addendum; and (2) audit Agent's books and records to detect or establish Agent's abuse of, or failure to comply with, any of

American's Rules concerning sale of travel on American, Agency free and reduced rate travel, Agency Incentives, promotional or override programs, or Agent ticket fraud. Agent agrees that American may use information obtained from ARC to evaluate the credit-worthiness of Agent and Agent's employees and owners.

**11. Miscellaneous.**

**(a) Prior Agreements.** The provisions of this Addendum supersede any prior addenda and any inconsistent provisions of the ARC Agreement. Except as specifically indicated by this Addendum, the terms and conditions of the ARC Agreement shall remain in full force and effect.

**(b) Waiver.** Any waiver or modification of any of the terms of this Addendum must be in a writing from American. American may amend or modify this Addendum at any time. Agent agrees that failure of or delay by American to require strict performance or to enforce any provision of the ARC Agreement or this Addendum, or a previous waiver or forbearance by American, shall in no way be construed as, or constitute, a continuing waiver by American of any Rule or any provision of the ARC Agreement or this Addendum.

**(c) APPLICABLE LAW.** THE LAWS OF THE STATE OF TEXAS AND THE UNITED STATES OF AMERICA SHALL GOVERN ANY DISPUTES BETWEEN AMERICAN AND AGENT ARISING OUT OF THE ARC AGREEMENT OR THIS ADDENDUM. AGENT HEREBY SUBMITS AND CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS AND THE COURTS OF THE STATE OF TEXAS FOR ALL THESE DISPUTES.

Updated December 19, 2006

Information contained on this web site is subject to change at any time without notice. American Airlines shall not be liable for any consequences resulting from your reliance on the information.













B

# ACCESS AND USE AGREEMENT

This Access and Use Agreement (this "**Agreement**") is entered into effective as of November___, 2005 (the "**Effective Date**"), by and between American Airlines, Inc., a Delaware corporation located at 4333 Amon Carter Boulevard, MD 5357, Fort Worth, TX 76155 ("**American**") and Yahoo! Inc., a Delaware corporation located at 701 First Avenue, Sunnyvale, CA 94089 ("**Vendor**"). American and Vendor are referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS Vendor operates a consumer website currently located at http://www.farechase.yahoo.com/ (the "Vendor Website"); and

WHEREAS Vendor owns and operates travel search software (currently known as "FareChase"), made available through the Vendor Website, that enables users to search for airline, hotel or car rental offers made available by multiple travel providers with a single search query; and

WHEREAS Vendor desires to obtain American's permission to access American's fare and inventory information ("Fare Content") from American's website currently located at http://www.aa.com/ ("AA.com") and other third parties for use on the Vendor Website; and

WHEREAS American has agreed to allow Vendor to access certain Fare Content from AA.com and other third parties pursuant to specific terms and conditions and for certain specified purposes, all as set forth in this Agreement.

NOW, THEREFORE, in exchange for good and valuable consideration, which the Parties hereby acknowledge, the Parties agree as follows.

## AGREEMENT

1.  <u>Access and Use of Fare Content</u>. Subject to the limitations and restrictions contained in this Agreement, American grants to Vendor the following rights to access and use Fare Content:

    (a)  Subject to the terms of this Agreement, American hereby grants to Yahoo and its affiliates a worldwide, non-exclusive, non-transferable, limited, revocable, royalty-free permission during the Term to use, display, transmit, and modify (solely for formatting purposes) Fare Content solely for the purpose of providing travel information to individual consumers of the Vendor Website in connection with non-scraping searches by the consumer conducted using FareChase; and Vendor agrees that it shall not otherwise sell, distribute, advertise or transfer the Fare Content to any third party.

    (b)  Vendor agrees that it shall not bias the display of fare and inventory information on standard search results on the Vendor Website to favor any one or more airlines; provided, however, that (i) Vendor may provide functionality for the user to display search results by price, vendor name, flight time, flight class, or other characteristics selected by the user, and (ii) Vendor may include paid placements such as featured results and other advertisements on the same page as the standard search results

1

on the Vendor Website, so long as such paid placements are visually separated from the standard results section.

(c)    Vendor agrees that it shall not use, or permit any third party to access or use, Fare Content for any purpose other than as ancillary to the booking of tickets for air travel, including transferring, selling or distributing Fare Content to any third party, or otherwise permit any third party, except consumers, to access Fare Content. Vendor shall take reasonable steps to prevent use of the Vendor Website by known unauthorized third parties.

(d)    Prior to the initial display of Fare Content on the Vendor Website, Vendor shall provide American with information detailing the method by which fare and inventory information, including Fare Content, is sorted and displayed on the Vendor Website. Vendor agrees that any search that would return a valid itinerary on American or its code-share airlines will include a search of Fare Content.

(e)    Vendor shall not charge American any fee in connection with the access or use of Fare Content pursuant to this Agreement, including but not limited to any fee related to the booking of tickets for air travel using the Fare Content.

(f)    Unless otherwise mutually agreed by the Parties, Vendor shall comply with any parameters governing the volume and frequency of searches performed on AA.com as established by American from time to time. Vendor shall be responsible for metering such search volumes and frequencies to ensure conformance with such parameters, and shall upon reasonable request provide reports to American detailing the volume and frequency of searches performed on AA.com by Vendor. Notwithstanding the foregoing, if at any time American determines that Vendor's access of AA.com could or does impact the performance or potential performance of AA.com, Vendor agrees that it will fully cooperate with American to immediately implement any measures requested by American to alleviate such concerns, including but not limited to the discontinuation of searches on AA.com.

(g)    Vendor agrees that it, through the Vendor Website, will access AA.com only using the IP address(es) and from the domain names set forth below:

     68.142.230.{70-121}

     209.73.169.{64-121}

In the event Vendor desires to change such IP address(es) or domain name(s), or add additional IP address(es) or domain name(s), Vendor shall provide American with not less than 15 days prior written notice of such change or addition, and Vendor shall provide an updated list of IP addresses and domain names upon request by American.

(h)    American shall have the right to review all aspects of the Vendor Website to ensure compliance with the requirements contained in this Agreement.

2.    Limitations and Restrictions.

(a)    Vendor agrees that it will not use any masking or proxy feature that would hide, suppress or otherwise conceal its identity when accessing any Fare Content.

(b)    With respect to the access of Fare Content by Vendor from third parties, Vendor agrees that the following shall apply:

Confidential

(i) American grants to Vendor permission to access Fare Content from all websites owned or operated by Cendant Corporation that have lawful access to Fare Content (including but not limited to Orbitz.com, cheaptickets.com, lodging.com, ebooker.com, and octopus.com) provided that Cendant has provided Vendor with permission to access its websites, and to use and display such Fare Content in the same manner as Fare Content obtained from AA.com pursuant to this Agreement. Vendor shall obtain the express written approval (which may be by e-mail) of American and any such third party prior to accessing Fare Content from any additional third party websites.

(ii) Vendor shall be solely responsible for ensuring compliance with any access or use limitations related to or imposed by any such third party.

(c) Except as specifically authorized by Section 1, Vendor agrees that the Vendor Website, FareChase, and derivatives thereof, will not access AA.com by use of any automated, electronic device or means, including electronic devices or means commonly known in the industry as robots or spiders. In addition, Vendor agrees that, during the Term, it will not sell, license or otherwise distribute to any third party FareChase or any derivatives thereof designed to access or scrape Fare Content from AA.com or third party travel websites by use of any automated, electronic device or means, including electronic devices or means commonly known in the industry as robots or spiders, without the prior written approval of American. For avoidance of doubt, nothing herein prohibits or prevents Vendor from enabling users to locate AA.com through a standard web search conducted on any Vendor site. Further, the Parties agree that nothing in this Agreement shall be construed or interpreted as affecting or altering the Settlement Agreement in *American Airlines, Inc. v. Farechase, Inc.*

3. **Liaisons**. Each Party will appoint a liaison who will be responsible for developing the ongoing working relationship between the Parties and acting as the first point of contact for resolution of any issues related thereto. The Parties designate the following as the initial liaisons:

> For Vendor: Lior Delgo
> For American: Chris Degroot

Either Party may designate a substitute liaison at any time by providing the other Party with not less than 10 days notice.

4. **Term and Termination**.

(a) The term of this Agreement shall commence on the Effective Date and shall continue thereafter for a period one year (the "Initial Term"). Thereafter, this Agreement shall renew for successive one year periods (each, a "Renewal Term") unless either Party notifies the other Party of its intent to not so renew not less than thirty days prior to the end of the then-current Term. The Initial Term and any Renewal Terms are collectively referred to herein as the "Term".

(b) Either Party may terminate this Agreement in the event the other Party fails to cure a material breach within 10 days after notice thereof by the other Party.

(c) Either party may terminate this Agreement at any time and without cause by providing the other party thirty (30) days prior written notice.

Confidential

APP. 12

5. **Confidentiality**

(a) For purposes of this Agreement, "Confidential Information" means any confidential or proprietary information of a Party that is disclosed in any manner to the other Party in connection with or as a result of discussions related to this Agreement, and which at the time of disclosure either (i) is marked as "Confidential" or "Proprietary", (ii) is otherwise reasonably identifiable as the confidential or proprietary information of the disclosing Party; or (iii) under the circumstances of disclosure should reasonably be considered as confidential or proprietary information of the disclosing Party. Confidential Information includes the terms and conditions of this Agreement.

(b) Each Party agrees to (i) hold in strict confidence all Confidential Information which it received from the other Party prior to, or in the course of, this Agreement, (ii) use the Confidential Information solely to perform or to exercise its rights under this Agreement, and (iii) not to transfer, display, convey or otherwise disclose or make available all or any part of such Confidential Information to any third party. Each Party shall take all measures necessary to protect against the disclosure or use of the Confidential Information as it takes to protect its own proprietary or confidential information (but in any case no less than reasonable measures).

(c) The term "Confidential Information" shall not include information that is:

(i) in the public domain through no fault of the receiving Party or of any other person or entity that is similarly contractually or otherwise obligated;

(ii) obtained independently from a third party without an obligation of confidentiality to the disclosing Party and without breach of this Agreement; or

(iii) independently developed by the receiving Party without reference to the Confidential Information of the disclosing Party.

(d) The receiving Party may disclose the Confidential Information of the disclosing Party in response to a valid court order, law, rule, regulation or other governmental action provided that (i) the disclosing Party is notified in writing prior to disclosure of the information, and (ii) the receiving Party assists the disclosing Party, at the disclosing Party's expense, in any attempt by the other to limit or prevent the disclosure of the Confidential Information.

(e) Each Party agrees that the other Party may have no adequate remedy at law if there is a breach or threatened breach of this Section 5 and, accordingly, that either Party shall be entitled (in addition to any legal or equitable remedies available to such Party) to seek injunctive or other equitable relief to prevent or remedy such breach.

(f) Neither Party or its agents will issue a press release, advertisement or public statement concerning the existence of this Agreement, its contents or the transactions contemplated by it without the express written consent (which may be in the form of email) of the other Party.

6. **Intellectual Property.**

(a) American acknowledges and agrees that all ownership and title in and to the Vendor Website and FareChase remains with Vendor, and that nothing contained herein will convey any ownership or title therein to American.

Confidential

(b)    Solely in connection with the display of Fare Content on the Vendor Website pursuant to this Agreement, American grants Vendor a limited, royalty free, non-transferable, non-exclusive right to use American's trademarks, tradenames, service marks, logos, symbols, images and trade dress set forth in Exhibit 1 ("American Marks") for the purpose of referring to American in any search results or for the purpose of including American in a list of suppliers offering travel products through the Vendor Website, provided that Vendor shall obtain American's express written authorization (which may be in the form of email) prior to any such use. Vendor agrees that American owns the American Marks, that Vendor shall not permit any third party to use the American Marks, and that Vendor shall not in any way contest or deny the validity of, or the right or title of American in or to, the American Marks. Vendor understands that it has no right or permission to use the American Marks for any purpose not expressly stated in this Agreement, and that any unauthorized use of the American Marks shall constitute a material breach of this Agreement and an infringement of American's rights in and to the American Marks. Vendor shall reproduce the design and appearance of the American Marks from reproduction art obtained from American. Vendor agrees that it shall not (i) alter the American Marks in any way without American's prior approval; (ii) use any partial American Marks or fragments thereof; (iii) display the American Marks without the appropriate trademark or copyright designation, as specified by American; (iv) utilize the American Marks in any manner that would diminish their value or harm the reputation of American; or (v) use or register any domain names that are identical or similar to, or contain any of the American Marks.

7.    <u>Data Ownership</u>

(a)    **American.**

(i)    For purposes of this Agreement, "<u>American Data</u>" includes (1) Fare Content, and (2) all data collected on or through AA.com, including but not limited to passenger data, flights or itineraries, reviewing, scheduling, booking, or delivery of American or American affiliated flights, or interim, processed, compiled, summarized or derivative versions thereof, (a) submitted to Vendor by or on behalf of American, (b) obtained, developed, produced, generated or gathered by Vendor in connection with this Agreement, or (c) to which Vendor has access in connection with this Agreement. For the avoidance of doubt, American Data includes all PNR data, customer and sales data, ticket information, inventory, fares, schedules and other information relating to American products and services, as well as data produced or created by Vendor or through Vendor Website under the Agreement utilizing, based upon or derived from Fare Content. (ii)    As between American and Vendor, all American Data is, or upon creation will be, and shall remain the property of American. American Data shall not be (i) used by Vendor or Vendor's agents except in compliance with this Agreement, and (ii) disclosed, sold, assigned, leased or licensed or otherwise provided or made available to any third parties except consumers by or through Vendor or Vendor's agents. Any archival tapes or records containing American Data shall be used by Vendor and Vendor's Agents solely for back-up purposes. Vendor hereby irrevocably assigns, transfers and conveys, and shall cause Vendor's Agents to assign, transfer and convey, to

Confidential

11/09/05 14:40 P.006/012
PAGE. 5

972 425 4457

YAHOO!, INC.

AA SALES PLANNING

13:53 (MON) 09 09 NOV

408 349 3917

American without any requirement of further consideration all of its and their right, title and interest in, to and under American Data.

(ii) Vendor shall use commercially reasonable security measures to protect the American Data that is not intended for consumer access under this Agreement from unauthorized access, destruction, use, modification, or disclosure. Without limiting or affecting American's rights under this Agreement, in the event Vendor or Vendor agents discover or are notified of a breach or potential breach of the foregoing, Vendor shall promptly (A) notify American of such breach or potential breach and (B) if the applicable American Data was in the possession of Vendor or Vendor agents at the time of such breach or potential breach, Vendor shall promptly (1) investigate and use commercially reasonable efforts to remediate the effects of the breach or potential breach and (2) provide American with assurance satisfactory to American that such breach or potential breach will not recur. All notifications to American customers of security breaches involving American Data will be handled exclusively by American and Vendor may not under any circumstances contact American customers relating to such security breach.

(iii) Upon request by American at any time and upon expiration or termination of this Agreement, Vendor shall promptly destroy all American Data in Vendor's or Vendor Agents' possession or control, and deliver to American written certification of such destruction.

(b) **Vendor.** For purposes of this Agreement, "Vendor Data" includes all statistics and information collected by or on behalf of Vendor pertaining to usage of the Vendor Website, but does not include any information pertaining to usage of AA.com. As between American and Vendor, all Vendor Data is, or upon creation will be, and shall remain the property of Vendor. Vendor Data shall not be (i) used by American or American's agents except as approved in advance in writing by Vendor, or (ii) disclosed, sold, assigned, leased or licensed or otherwise provided or made available to any third parties. Any archival tapes or records containing Vendor Data shall be used by American and American's Agents solely for back-up purposes. American hereby irrevocably assigns, transfers and conveys, and shall cause American's Agents to assign, transfer and convey, to Vendor without any requirement of further consideration all of its and their right, title and interest in, to and under Vendor Data. Upon request by Vendor at any time and upon expiration or termination of this Agreement, American shall promptly destroy all Vendor Data in American's or American's Agents' possession or control, and deliver to Vendor written certification of such destruction. Notwithstanding the foregoing, Yahoo will not sell or distribute to any third party any Vendor Data collected in connection with this Agreement pertaining to usage of the American Data or Fare Content on the Vendor Website.

8. Representations and Warranties.

(a) Vendor represents and warrants to American that (i) Vendor is a corporation, duly organized, validly existing and in good standing under the laws of Delaware, and has all rights and power necessary to execute, deliver and perform its obligations under this Agreement, including the right to grant the licenses and provide the services granted and provided hereunder; (ii) the execution, delivery and performance of this

6

Confidential

APP. 15

Agreement by Vendor (A) has been approved by any necessary company action and (B) is not contrary to, or in conflict with, the formation and governance documents of Vendor or any agreement by which Vendor is bound; (iii) Vendor will use commercially reasonable efforts to prohibit the use of the Vendor Website and FareChase by any third party user in a manner inconsistent with the terms of this Agreement, (iv) any and all personally identifiable information collected by Vendor on the Vendor website pertaining to users of the Fare Content will be used in compliance with Vendor's privacy policy and applicable law; (v) Vendor will not collect any information once the customer is delivered to AA.com and; (vi) any and all personally identifiable information provided to Vendor by American pertaining to any activities of American customers on AA.com will comply with the AA.com privacy policy and applicable law.

(b) American represents and warrants to Vendor that (i) American is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware and has all rights and power necessary to execute, deliver and perform its obligations under this Agreement, including the right to grant the licenses and provide the services granted and provided hereunder; (ii) the execution, delivery and performance of this Agreement by American (A) has been approved by any necessary company action and (B) is not contrary to, or in conflict with, the formation and governance documents of American or any agreement by which American is bound; and (iii) any and all personally identifiable information collected by American on AA.com pertaining to American customers will comply with the AA.com privacy policy and applicable law.

(c) Vendor and American warrant that they have used commercially reasonable efforts to ensure that they will not introduce any computer virus into the other Party's computer systems or websites. Each Party shall promptly advise the other, in writing, upon reasonable suspicion or actual knowledge that a virus has been so introduced. Each Party shall use commercially reasonable efforts, at no charge to the other Party, to assist in reducing the effects of any such virus and, if such virus causes a loss of operational efficiency or loss of data, to use commercially reasonable efforts to assist the other Party to the same extent to mitigate and restore such losses.

9. Indemnification.

(a) **Mutual Indemnification.** Each Party shall indemnify, defend and hold harmless the other Party and its officers, directors, employees and agents (collectively, the "Indemnified Parties") from and against any third party claims, demands, proceedings, suits and actions, including any related liabilities, obligations, damages, fines, judgments, settlements, costs and expenses ("Claims"), incurred by, borne by or asserted against any of the Indemnified Parties to the extent such Claims in any way relate to, arise out of or result from: (i) any intentional willful, or gross negligent breach of this Agreement by any employee or agent of the Indemnifying Party; or (ii) breach Section 7 or 8 by either Party.

(b) **Yahoo Indemnification.** Yahoo shall indemnify, defend and hold harmless American and its officers, directors, employees and agents (collectively, the "American Indemnified Parties") from and against any third party claims, demands,

Confidential

proceedings, suits and actions, including any related liabilities, obligations, damages, fines, judgments, settlements, costs and expenses ("Claims"), incurred by, borne by or asserted against any of the American Indemnified Parties to the extent such Claims in any way relate to, arise out of or result from any claim or allegation that Vendor infringes or misappropriates any patent, copyright, trademark, trade name, trade secret or other proprietary or intellectual property right of any third party.

(c)    **American Indemnification.** American shall indemnify, defend and hold harmless Yahoo and its officers, directors, employees and agents (collectively, the "Yahoo Indemnified Parties") from and against any third party claims, demands, proceedings, suits and actions, including any related liabilities, obligations, damages, fines, judgments, settlements, costs and expenses ("Claims"), incurred by, borne by or asserted against any of the Yahoo Indemnified Parties to the extent such Claims in any way relate to, arise out of or result from any claim or allegation that American infringes or misappropriates any patent, copyright, trademark, trade name, trade secret or other proprietary or intellectual property right of any third party.

(d)    **Indemnification Process.** Promptly after any Indemnified Party seeking indemnification under this Section 9 obtains knowledge of the existence or commencement of any Claim, the Indemnified Party shall notify the Party from whom indemnity is sought of such Claim in writing; provided, however, that any failure to give such notice will not waive any rights of the Indemnified Party except to the extent that the rights of the indemnifying Party are actually prejudiced thereby. The Indemnifying Party shall assume the defense and settlement of such Claim at the Indemnifying Party's sole risk and expense upon the Indemnifying Party's written acknowledgement of its obligations to indemnify; provided, however, that the Indemnified Party (i) may join in the defense of such Claim and employ counsel at its own expense, (ii) shall reasonably cooperate with the Indemnifying Party in the defense of such Claim, and (iii) upon the Indemnifying Party's written request and at no expense to the Indemnified Party, the Indemnified Party will provide the Indemnifying Party with all available information and assistance reasonably necessary for the Indemnifying Party to defend the Claim. The Indemnifying Party will not enter into any settlement or compromise of the Claim without the Indemnified Party's prior written approval.

10.    <u>Limitation of Liability.</u> EXCEPT WITH REGARD TO CLAIMS ARISING UNDER THE INDEMNIFICATION OBLIGATIONS CONTAINED IN SECTION 9, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY (OR THE INDEMNIFIED PARTIES OF SUCH PARTY) FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING (WITHOUT LIMITATION) LOSS OF PROFIT, INCOME OR SAVINGS, EVEN IF ADVISED OF THE POSSIBILITY THEREOF.

11.    <u>Survival.</u> The following provisions shall survive the expiration or termination of this Agreement: Sections 2(a), 5 through 12, and Sections 15 through 21.

12.    <u>Independent Contractor.</u> Nothing in this Agreement is intended or shall be construed to create or establish any agency, partnership or joint venture relationship between the Parties. The Parties expressly disclaim such relationship, agree that they are acting solely as independent contractors hereunder and agree that the Parties have no fiduciary duty to one another or any other special or implied duties that are not expressly stated herein. Neither Party

11/09/05 14:42 P.009/012
PAGE. 6
972 425 445?

YAHOO!, INC.

☎ 408 349 3817

APP. 17

has no authority to act as agent for, or to incur any obligations on behalf of or in the name of, the other Party.

13. **Compliance with Law.** Each Party agrees to comply with all federal, state and local laws and regulations applicable to this Agreement. Nothing herein shall be construed to constitute waiver or forfeiture of a Party's rights under applicable federal, state, and local laws, regulations and court rulings. Each Party represents and warrants that it is qualified to do business in the geographies in which it will perform its obligations under this Agreement, and will obtain all necessary licenses and permits, and satisfy any other legal, regulatory, and administrative requirements, necessary to its performance hereunder.

14. **Force Majeure.** Neither Party shall be liable for delay or failure in its performance hereunder to the extent that such delay or failure is caused by an act of God, war, natural disaster, strike, lockout, labor dispute, work stoppage, fire, third-party criminal act, quarantine restriction or act of government, or any other event beyond the reasonable control of that Party (an "Excusable Delay"). In the event an Excusable Delay continues for 30 days or longer, the other Party shall have the right, at its option, to immediately terminate this Agreement by giving the Party whose performance has failed or been delayed by the Excusable Delay written notice of such election to terminate.

15. **Successors and Assigns.** This Agreement shall be binding upon, and shall inure to the benefit of, the permitted successors and assigns of each Party hereto. Either Party may assign this Agreement to any affiliate or successor in interest to all or part of such Party's operations, so long as the assignee agrees in writing to be bound by the terms and conditions of this Agreement.

16. **Notices.** All notices and other communications required or permitted hereunder to be given to or made upon a Party in writing, shall be addressed as provided below and shall be considered as properly given if: (a) sent by an express courier delivery service which provides signed acknowledgments of receipt; or (b) deposited in the U.S. certified or registered first class mail, postage prepaid, return receipt requested. All notices shall be effective upon receipt. For the purposes of notice, the addresses of the Parties shall be as set forth below; provided, however, that either Party shall have the right to change its address for notice hereunder to any other location by giving not less than 5 days' prior written notice to the other Party in the manner set forth above.

If to American:

American Airlines, Inc.
4333 Amon Carter Boulevard, MD 5357
Fort Worth, TX 76155
Attn: Vice President, Passenger Sales

If to Vendor:

Yahoo! Inc.
701 First Ave.
Sunnyvale, CA 94089
Attn: Chief Operating Officer (email: danr@yahoo-inc.com)
Attn: General Counsel (email: callahan@yahoo-inc.com, fax: (408) 349-3400)

Confidential

17.     **Severability.**  If any one or more of the provisions of this Agreement, or the application thereof in any circumstance, is held to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision(s) in every other respect and the remaining provisions of this Agreement shall be unimpaired; and this Agreement shall continue in full force and effect, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions hereof.

18.     **Entire Agreement; Amendment; Waiver.**  This Agreement and all Exhibits hereto constitute the entire agreement between the Parties with respect to the subject matter and supersede any prior or contemporaneous agreement or understanding, whether written or oral, if any, between the Parties with respect to such subject matter.  This Agreement shall be construed as if both Parties had equal say in its drafting, and thus shall not be construed against the drafter.  This Agreement may be modified only by a further written agreement signed by all of the Parties hereto.  No waiver of breach of any provision of this Agreement by either Party shall constitute a waiver of any subsequent breach of the same or any other provision, and no waiver shall be effective unless made in writing and signed by an officer of the waiving Party.

19.     **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be an original, and such counterparts together shall constitute one and the same instrument.  Execution may be effected by delivery of facsimiles of signature pages (and the Parties shall follow such delivery by prompt delivery of originals of such pages).

20.     **Governing Law; Interpretation.**  This Agreement shall be governed by and construed in accordance with the laws of the Southern District of New York, excluding its choice of law provisions.  Both Parties hereby consent and submit to the jurisdiction of the state and federal courts in New York for all questions and controversies arising out of this Agreement.  Nothing herein will question or impact the validity of the court's Order or the Settlement Agreement in *American Airlines, Inc. v. FareChase, Inc.*

21.     **Headings.**  The headings appearing in this Agreement are inserted for convenience only and shall not be used to define, limit or enlarge the scope of this Agreement or any of the obligations herein.

        **THE PARTIES HERETO** have caused the Agreement to be executed by their duly authorized representatives as of the Effective Date.

| AMERICAN AIRLINES, INC. | YAHOO! INC. |
|---|---|
| By: | By: |
| Name: David Cush | Name: CTOR DELGO |
| Title: VP Passenger Sales | Title: Director Business Development |
| Date: 11/9/05 | Date: 11/09/05 |

11/09/05  14:43  P.011/012
PAGE. 10
714 925 4497
YAHOO!, INC.
714 349 3917
☎408 349 3917

APP. 19

**EXHIBIT 1**
**AMERICAN MARKS**

American Marks:

"AmericanAirlines"

"AA w/ Scissor Eagle"

"American Eagle"

"AA.com"

11

Confidential

PAGE. 11

11/09/05 14:43 P.012/012

914 425 4457

YAHOO!, INC.

408 349 3917

APP. 20