

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT. WORTH DIVISION

2009 SEP 23  PM 3: 46

CLERK OF COURT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

AMERICAN AIRLINES, INC.,

Plaintiff,

-v.-

YAHOO! INC. and OVERTURE SERVICES, INC.
d/b/a YAHOO! SEARCH MARKETING,

Defendants.

No. 4:08-CV-626-A

## PLAINTIFF AMERICAN AIRLINES, INC.'S MOTION FOR SANCTIONS
## FOR FAILURE TO PRODUCE AND PRESERVE DOCUMENTS
## AND BRIEF IN SUPPORT

Frederick Brown (admitted *pro hac vice*)
Jason Stavers (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Phone: (415) 393-8200
Fax: (415) 986-5309

Howard S. Hogan (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539

Dee J. Kelly
State Bar No. 11217000
Dee J. Kelly, Jr.
State Bar No. 11217250
Lars L. Berg
State Bar No. 00787072
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Phone: (817) 332-2500
Fax: (817) 878-9280

*Attorneys for Plaintiff American Airlines, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

I.      CERTIFICATION ........................................................................................2

II.     BACKGROUND ..........................................................................................2

III.    YAHOO HAS DISOBEYED THE COURT'S ORDERS. ...............................4

        A.      Yahoo Has Withheld Responsive Information. ......................................4

                1.      Impressions Information That Has Been Withheld or Destroyed. ...............4

                2.      Non-Produced Custodial Files. .............................................10

                3.      Missing Data Underlying Important Studies By Yahoo. ...........................11

                4.      User Confusion Complaints Have Been Withheld. .................................13

        B.      Yahoo Continues to Destroy Relevant Information. ..............................14

        C.      Yahoo Disobeyed the Court's Order By Failing To Review
                Its Production For Non-Responsive And Irrelevant Materials. ............................15

IV.     YAHOO'S VIOLATIONS PREJUDICE AMERICAN. .................................17

V.      YAHOO'S ABUSES WARRANT SANCTIONS. ..........................................20

        A.      The Appropriate Sanction For Yahoo's Failure to Produce
                Responsive Materials Is To Strike Part Of Yahoo's Answer. ...............................20

                1.      There Is A Substantial Relationship Between
                        the Missing Information and American's Claims. ...................................21

                2.      The Proposed Sanction Is Fair. .............................................22

                3.      The Proposed Sanction Properly Punishes
                        Yahoo For Discovery Abuses and Deters Others. ...................................23

        B.      The Appropriate Sanction For Yahoo's Violation Of This Court's Order
                To Control Its Overproduction Is To Hold Yahoo In Civil Contempt. .................23

        C.      American Seeks To Recover Its Reasonable Attorneys' Fees On This Motion. ....24

VI.     PRAYER. ...................................................................................................25

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Bayoil, S.A. v. Polembros Shipping Ltd.*,
 196 F.R.D. 479 (S.D. Tex. 2000)......................................................................21

*Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel Co.*,
 550 F.3d 465 (5th Cir. 2008) .................................................................17, 19

*Chilcutt v. United States*,
 4 F.3d 1313 (5th Cir. 1993) ...........................................................21, 22, 23

*Compaq Computer Corp. v. Ergonome Inc.*,
 387 F.3d 403 (5th Cir. 2004) ....................................................................21

*E. & J. Gallo Winery v. Spider Webs, Ltd.*,
 286 F.3d 270 (5th Cir. 2002) .................................................................17, 18

*FDIC v. LeGrand*,
 43 F.3d 163 (5th Cir. 1995) .......................................................................20

*Ins. Corp. of Ireland, Ltd. v. Compagnie Des Bauxites de Guinee*,
 456 U.S. 694 (1982)............................................................................20-21

*Kellogg Co. v. Exxon Mobil Corp.*,
 192 F. Supp. 2d 790 (W.D. Tenn. 2001)...................................................18

*Kamatani v. BenQ Corp.*,
 No. 03-cv-437, 2005 WL 2455825 (E.D. Tex. Oct. 6, 2005)....................21

*Morton v. Harris*,
 628 F.2d 438 (5th Cir. 1980) ...................................................................20

*Pebble Beach Co. Tour v. 18I Ltd.*,
 155 F.3d 526 (5th Cir. 1998) ....................................................................17

*Playboy Enters. v. Netscape Commc'ns Corp.*,
 354 F.3d 1020 (9th Cir. 2004) .................................................................18

*World Impressions, Inc. v McDonald's Corp.*,
 235 F. Supp. 2d 831 (N.D. Ill. 2002) ........................................................18

**FEDERAL RULES**

FED. R. CIV. P. 26.........................................................................................1, 20

FED. R. CIV. P. 34.............................................................................................1

# TABLE OF AUTHORITIES
## (continued)

Page(s)

FED. R. CIV. P. 37 ..................................................................................... 1, 21, 23-24

FED. R. CIV. P. 37(a)(1) ....................................................................................... 2

FED. R. CIV. P. 37(b)(2)(A)(vii) ........................................................................ 20

## LOCAL RULES

L.R. CIV. 7.1(b) .................................................................................................. 2

On August 4, this Court ordered Yahoo! Inc. and Overture Services, Inc. (together, "Yahoo") to "conduct (i) searches for responsive information through human review and produce all responsive information by August 17, 2009, and (ii) a human review of its records to locate all responsive materials and eliminate from its previously produced material nonresponsive and irrelevant materials by August 17, 2009." Dkt. 60. At Yahoo's request, the Court on August 17 extended this deadline to August 28. Dkt. 77. On August 28, Yahoo added an additional 4,992 documents to its previous productions. American Airlines, Inc. ("American") has now reviewed those productions, and it is beyond question that Yahoo did not comply with the Court's Order. *First*, Yahoo failed to produce critical evidence and Electronically Stored Information ("ESI")[1] that Yahoo's witnesses and documents confirmed were available and responsive to American's requests. *Second*, Yahoo violated the Court's Order by destroying responsive information, even after this Court ordered it to produce such information. *Third,* Yahoo failed to eliminate hundreds of thousands of "nonresponsive and irrelevant materials" from its earlier production, including most of the screenplays, tax returns, adoption records, and other highly personal and obviously irrelevant materials specifically identified in American's original motion, in violation of part (ii) of the Court's Order, and thereby burdening American with irrelevant materials. Because these violations have prejudiced American's ability to present its case, Yahoo should be sanctioned under Rules 26, 34, and 37.

---

[1]    This motion does not address Yahoo's ESI for the period from January to September 2007 that is the subject of the Court's September 11 Order, nor the destruction of additional information that is the subject of ongoing depositions and written discovery by American pursuant to the Court's Order allowing additional targeted discovery on that subject.

# I.    CERTIFICATION

American certifies that it has in good faith conferred in person, by correspondence, and by phone with counsel for Yahoo on several occasions over many weeks in an effort to obtain the information that is the subject of this motion, both before and after this Court entered its corrected order on American's motion to compel (Dkt. 60). Those efforts have been unsuccessful. *See* FED. R. CIV. P. 37(a)(1); L.R. CIV. 7.1(b).

# II.    BACKGROUND

In response to American's motion to compel (Dkt. 43), the Court on July 14 ordered Yahoo to "supplement their document production, admissions responses and interrogatory responses to plaintiff's discovery by delivering same to plaintiffs through its attorneys by 10 a.m. on July 24, 2009" (Dkt. 46). At Yahoo's request, that deadline was extended to July 31 by Order dated July 24. Dkt. 56. On August 4, the Court again ordered Yahoo to "conduct (i) searches for responsive information through human review and produce all responsive information by August 17, 2009, and (ii) a human review of its records to locate all responsive materials and eliminate from its previously produced material nonresponsive and irrelevant materials by August 17, 2009." Dkt. 60. After Yahoo asserted that it could not restore information on backup tapes for the period from January 1 to September 21, 2007 in time for that information to be useable at trial, the Court modified its August 4 Order on August 11 "insofar as the portion of the court's order of August 4 directing defendants to produce electronically stored information by August 10, is set aside." Dkt. 71. Also at Yahoo's request, the Court on August 17 extended the "human review" deadline to August 28. Dkt. 77.

On August 28, Yahoo produced 4,992 additional documents not previously produced and it also identified as irrelevant and non-responsive 118,445 pages of documents that it had

previously produced. American's Record Appendix in Support of its Motion for Sanctions ("R. App.") at 111-113. Yahoo's efforts did not comply with the Court's Orders.

Yahoo withheld critical evidence relevant to the core issues in the case, including:

- Impressions information, which is used by Yahoo and its customers as one measure of the value and effectiveness of advertising within Yahoo's search advertising framework;

- Information concerning the placement and appearance of advertisements on "the actual search [engine] results page that Yahoo displayed to users for each sponsor result" (Dkt. 43 at 8);

- Custodial files of 18 persons who Yahoo identified as possessing relevant information in its Interrogatory responses and whose files Yahoo represented would be searched;

- Data and documents that are needed to understand the studies that Yahoo has conducted about consumer reactions, including the confusion caused by its search results pages and the effectiveness of trademark terms in its advertising campaigns, among others; and

- Consumer inquiries showing confusion about Yahoo's sponsor results.

This is not a case of mere inadvertence. The evidence withheld goes to decisive elements of American's claims and impacts its ability to respond to Yahoo's defenses. For example, the impressions (that is, the number of times that Yahoo has displayed ads) for third parties triggered by and containing American's marks is central to American's claims that these uses dilute American's marks. According to Yahoo, American needs to show each impression, or image, for each ad to establish infringement and to counter Yahoo's fair use defense. Yahoo's failure to make any attempt either to preserve or produce these images once it entered into a litigation standstill agreement with American in 2006, or even at a minimum in the face of the Court's more recent Order, is brazen. And Yahoo's own studies of the ads in question are primary evidence of the confusion and dilution caused by Yahoo's uses of trademarks in its search advertising programs.

When Yahoo sought an exception to the Court's Order to produce responsive information, the only excuse it proffered for not being able to comply fully was that the

requested information for the period January 1 to September 21, 2007 had been rolled off its live

Sage database onto backup tapes. Dkt. 64. On September 2, Yahoo confirmed that position

when it responded to American's First Set of Special Interrogatories related to the destruction of

documents and represented that: "Yahoo is not aware of any relevant, responsive information

that it has not retained." R. App. at 183. Thus, Yahoo knew it was required by Court Order to

produce all responsive information, except for the January to September, 2007 information now

being restored to Sage, yet chose not to do so. There is no excuse for Yahoo's failure to fully

comply.

## III.     YAHOO HAS DISOBEYED THE COURT'S ORDERS.

### A.     Yahoo Has Withheld Responsive Information.

Although Yahoo was ordered to produce all responsive information by the extended

deadline of August 28, it claims to have found only 4,992 more documents. Yet there is clear

and uncontradicted evidence that Yahoo failed to produce significant additional responsive

information, despite reminders from American, including the following categories of materials

that are central to American's case.

#### 1.     Impressions Information That Has Been Withheld or Destroyed.

American alleges that Yahoo infringes and dilutes American's trademarks every time it

publishes an advertisement masked as an Internet search "result" using American's trademarks,

either as the triggering mechanism for the advertisement or in the text of the advertisement itself.

*See, e.g.,* Complaint (Dkt. 1), ¶ 87 (Yahoo infringes American's rights "by causing such Sponsor

Result advertisements to appear"); ¶¶ 124-25 (alleging dilution based on the use of American

marks as advertising "triggers" or "in the text of Sponsor Result advertisements"). These

advertisements are injurious and relevant even if the user does not "click" on them. Yahoo's

Rule 30(b)(6) testimony indicates that Yahoo tracks these advertisements, among other ways, in

4

terms of "impressions," a concept that may include both: (a) the number of times that a particular advertisement was displayed to Internet users; and (b) the appearance of the entire web page or a portion of the page that Yahoo displays for Internet users in response to a search. R. App. at 154-155 (27:10-28:20). For precision, American adopts the following terminology for impressions information that is described in Yahoo's documents and testimony:

- "Page Impression" refers to the actual image of the entire page that Yahoo displays to an Internet user in response to the user's search engine query.

- "Page Impression Data" refers to data that can be used to replicate Page Impressions (including data about the algorithmic results and Ad Impressions displayed together on the Page Impression, the location of Ad Impressions on a given Page Impression, and other HTML or Java code).

- "Ad Impression" refers to the image or text of a given sponsor result (i.e. ad) posted on a Page Impression with other Ad Impressions in response to an Internet user's search engine query (including title, description, and display URL).

- "Ad Impression Data" refers to the data collected by Yahoo for each Ad Impression, including detail such as the number of times that the Ad Impression was published to Internet users, the search terms that triggered the Ad Impression, date and time of display on Page Impressions, and location of the Ad Impression on the Page Impression.

- "Aggregate Impression Data" refers to the limited set of impressions data that Yahoo retains after 30-40 days, such as the overall numbers of Ad Impressions generated by a particular search term or for a particular advertiser (Yahoo discards the Ad Impression Data connected with particular Ad Impressions).

- "Click Data" refers to the data that Yahoo collects when an Internet user clicks on an Ad Impression, such as amount charged to the advertiser.

These concepts are illustrated in Exhibit A of the Record Appendix, R. App. at 1, and their status as produced or not produced is summarized in Exhibit B. *Id.* at 2; *see also id.* at 164-172 (64:13 – 94:14).

Yahoo's own materials recognize the importance of Page and Ad Impressions and Data and promise to make much of the information about impressions available to its advertisers.[2] Impressions serve a variety of functions for Yahoo and its advertisers,[3] and Yahoo has touted the importance of Ad Impressions in promoting the brand identity of its advertisers. R. App. at 309-317. Yahoo and its advertisers are able to access Ad Impressions Data many different ways.[4] And Yahoo's own deponent confirmed that Yahoo itself generates Page Impressions, and that Yahoo stores the Ad Impression Data for a period of 30-40 days before culling some of it and deleting the rest. *Id.* at 166, 169-170 (70:14 – 71:15; 81:22 – 84:2; 85:15-20). Yahoo continues its practice today of destroying Page and Ad Impressions and Data on a regular basis, despite American's request for the information months ago, this Court's August 4 Order, and its clear relevance to core issues in the case. Yahoo's production of isolated spreadsheets containing

---

2   Yahoo routinely communicates that the "impressions" it creates for a given ad is a key "analytic" piece of information that allows it to determine the "success" of its ads. As Yahoo explains, "Your Sponsored Search account keeps track of the number of impressions that each of your ads receives." R. App. at 264; *see also id.* at 242 (listing impressions as one of the "analytics" that are " Key to Determining OUR OWN Success"); *id.* at 258 (explaining that "[w]e show advertisers impressions").

3   The number of impressions is a component in one of the ratios used to measure ad effectiveness, the click-through rate ("CTR"). *See, e.g.,* R. App. at 219 ("Performance information is based . . . on the click-through rate using a formula of:  Valid Clicks ÷ Impressions for the specific ad."). Also, impressions data is used in another ratio called the share of voice. *See, e.g., id.* at 36 ("We understand 'share-of-voice' to be a calculation . . . showing how many times an ad was triggered by a particular search term compared to how many times the ad was clicked.").

4   Yahoo touts its ability to present graphs of impressions data using an interface for advertisers called Dashboard. *See* R. App. at 211-212 (Dashboard—Yahoo! Search Marketing Help, *http://help.yahoo.com/l/us/yahoo/ysm/sps/screenref/16458.html.*); *id.* at 74-91, 261-262. Cheryl Dartt, senior director of Yahoo's marketplace operations team, testified that Yahoo advertisers consider impressions to be "important." *Id.* at 158-159 (186:21 – 187:2). *See also id.* at 142 (50:10-18) (advertisers ask for impressions data).

extremely limited numerical Aggregate Impressions Data not only confirms that the underlying information once existed, but also that it is responsive to American's requests. *See, e.g.*, R. App. at 326-352.

Yahoo has even used Ad Impressions Data to sell its services to American. For example, Yahoo has used the concept of "share of voice" to demonstrate to American both the number of times that American's own sponsor results have appeared in response to searches for American's key terms and the number of times Internet users have been diverted to the sponsor results of other advertisers. *See, e.g.*, R. App. at 223-225.

American has repeatedly asked Yahoo to preserve and produce Page and Ad Impressions and Data:

- *First*, in November 2008, American's counsel met with Yahoo's counsel and provided a detailed list of the information American would seek once discovery was allowed to commence, including "[d]ata" providing the "details of advertising campaigns that used [American's] marks in their campaigns." *See* Dkt. 44 at 8-9.

- *Second*, in January 2009, American's counsel sent an e-mail to Yahoo's counsel noting that "[w]e have been reading reports . . . about Yahoo's present or planned elimination of electronic information and documents" and asking for "details about the safeguards that have been put in place to assure that information relevant to the lawsuit has been and will be preserved for discovery." R. App. at 3.

- *Third*, on March 6, 2009, American's counsel sent a further letter expressing concern about Yahoo's statement that it discards data regarding Internet user search terms after 30 days and noting that those records "are important evidence of a consumer's intent," a material issue here. R. App. at 5.

- *Fourth*, on March 12, 2009, the parties filed a Joint Status Report in which American made clear that it would seek, among other things, "actual advertisements triggered by [American's] trademarks or confusingly similar words/terms"; "ESI which [Yahoo] captures, retains, and analyzes as part of its business functions and as a service to its customers"; and "the mechanisms by which Yahoo! analyzes search terms and keywords, with respect to its internet advertising programs." Dkt. 37 at 6-8.

- *Fifth*, American then served formal requests for production calling for all data associated with Yahoo's use in its Sponsor Result programs of "Terms Similar to the American Airlines Marks" in addition to Yahoo's use of American's marks themselves. R. App. at 207-208.

- *Sixth*, American has diligently pursued impressions and related information in subsequent letters and multiple meet and confer sessions over those requests for production. *See, e.g.*, R. App. at 8 (seeking information about "impressions, click though rates, click stream data, conversion rates, and other measures of effectiveness"); *id.* at 25-27 (seeking immediate production of various categories of data related to impressions, including the text of ads, share of voice data, and all other data routinely provided to Yahoo's advertisers); *id.* at 66-69 (seeking production of data collected relating to sponsor results, including data concerning the appearance of sponsor results on a Yahoo web page, share of voice data, and data related to non-clicked keywords); *id.* at 94-96 (seeking same).

- *Seventh*, American sought impressions information in its motion to compel. *See, e.g.*, Dkt. 43 at 8-9 (seeking "data that would allow American to view the actual search results page[s]" and "data related to its paid search campaigns that Yahoo routinely collects").

To date, Yahoo has not produced any set of comprehensive Page and Ad Impressions or Data for the advertisements at issue. To the contrary, Yahoo has elected to produce only information about the Ad Impressions that were triggered by American marks that were actually "clicked" on by Internet users. *See, e.g.*, R. App. at 100. In fact, Yahoo has asserted in discovery meet and confer exchanges that it does not keep Ad Impressions or data concerning Ad Impressions that are displayed but not clicked by Internet users: "Yahoo! generally maintains data for clicked advertisements only." *Id.* at 97. But according to Yahoo's own witness (deposed under the Court's Order allowing targeted depositions on the destruction of information by Yahoo), that oft-repeated representation by Yahoo, which was meant to stop American's pursuit of this crucial information, was false. *Id.* at 171 (89:6-23) (Question: "[I]s it fair to say that Yahoo keeps data concerning ads displayed but not clicked?" Answer: "Yes.").

Further, as American explained in moving to compel production, Yahoo has produced none of the Page Impressions themselves, and very little of the Page Impression Data. Yahoo cannot deny that each of the Page Impressions (and thus the Ad Impressions too) displayed in response to a consumer's search query were in Yahoo's possession, custody, or control when Yahoo displayed them to consumers. Yet, according to Yahoo's meet and confer representations "Yahoo has not maintained screen shots, html code, or other data that would allow American to

view the actual search results page that Yahoo displayed to users for each sponsor result . . . .

[which has] effectively prevented American from replicating the precise images that Yahoo

displayed to its users when Yahoo presented them with the search 'results' at issue in this case."

Dkt. 43 at 8.[5]

Yahoo's documents tell a far different story and indicate that Ad Impressions and Data,

and the Page Impressions, are not only generated by Yahoo's servers when they are viewed by

consumers, but much of that information is retained for varying periods by Yahoo through its

data warehouses, which store information from Yahoo's search advertising programs:

- Yahoo's documents show that its Sage, POW, and Edward warehouses and its Cheetah data "pipeline" all contain data regarding impressions or the impressions themselves. R. App. at 244, 301.[6]

- Huiming Li, a specialist in Yahoo's databases, testified that Yahoo maintains copious amounts of impressions data for a period of at least thirty days and then in reduced form for much longer. *Id.* at 169-170 (81:22 – 84:2; 85:15-20).

- Keith Slusser, a Yahoo employee with direct contact with American, also testified that impressions information is available to Yahoo employees on Yahoo's intranet and on the

---

[5] American has repeatedly requested such Page Impression Data as "the identity of" other "sponsor links and 'algorithmic links' that Yahoo posted on the same results page," Dkt. 43 at 8, and also information about the location of specified Ad Impressions on a search results Page Impression. *See* R. App. at 94-95 (requesting that Yahoo adhere to its representation that it would provide information from which it "determine[s] not only the order in which advertisements were listed on a search results page, but also whether a particular sponsor result was published on the 'North,' 'East' or 'South' side of the page ([using what is] often referred to as 'DUDE' data)." In addition, Yahoo has failed to produce the complete text for the advertisements responsible for 1.5 million "clicks" for which Yahoo has produced other data. *Id.* at 92-93. Of course, the entire problem of reconstructing pages shown to Internet users would have been avoided had Yahoo produced images of each page shown in response to a search for American's marks or confusingly similar terms.

[6] The "Grid" too may hold impressions data. R. App. at 245 (Grid "holds data from POW and SAGE dumped periodically."); *id.* at 145 (80:2-8) ("the size of the data and the interest of the data determines what stays on the Grid"). Yahoo has identified other "data collection points" that may also collect impressions data. *Id.* at 246.

Internet to Yahoo's advertisers for at least 13 months. R. App. at 178-180 (44:15-46:15) (Yahoo keeps impressions information for at least 13 months).

And yet, Yahoo has withheld even the Ad and Page Impressions triggered by American's trademark terms that Yahoo in 2007 itself acknowledged were most important to prevent diversions. *See, e.g.*, R. App. at 225 (June 2007 presentation of share-of-voice data for American listing "american airline"; "aa"; "aa.com" and seven similar terms). Yahoo even withheld this information for the marks specifically listed in the Complaint. *See* Dkt. 1, ¶ 22; R. App. at 171 (89:18-25). Yahoo's refusal to produce this information violates this Court's orders.[7]

### 2. Non-Produced Custodial Files.

Yahoo has also failed to produce a single custodial document for 18 employees who Yahoo has previously identified as relevant in Yahoo's interrogatory responses and for whom Yahoo represented that it would engage in a computer search of their records. *See* R. App. at 32, 41-64, 188-195, 355. Yet neither Yahoo's computer searches nor the Court-ordered human search has resulted in the production of a single document from the files of those custodians. For example, Yahoo has offered no explanation for its failure to produce *any* of the documents that resided in the files of Bradley King, who was the "category director" of Yahoo's travel vertical and had repeated, direct contact with American. *Id.* at 136 (37:3-6). Mr. King, who left Yahoo's employment in 2009, *himself* produced over 40,000 pages of documents to American on September 4, 2009 pursuant to a subpoena, but Yahoo has produced no documents from its custodial files for Mr. King. Mr. King apparently did not himself keep any of his e-mails from

---

7  Although Yahoo can be expected to argue that it does not have the capacity to retain all Page and Ad Impressions and Data for all searches on its systems, it has not provided any indication of its efforts to save, and produce the much smaller subset of this information related specifically to the American terms at issue. Nor did Yahoo seek agreement from American or a protective order from the Court to allow it to destroy relevant evidence.

his time as a Yahoo employee, and neither he nor Yahoo has produced his e-mails, even though Mr. King was employed there until months after this lawsuit was filed and for two years after the standstill agreement was signed by Yahoo in December 2006.[8] Yahoo's failure to produce *any* documents from the custodial files of these individuals belies its representations that it has retained and produced all responsive information.

### 3. Missing Data Underlying Important Studies By Yahoo.

Yahoo conducted scores of tests on the effectiveness of its advertising systems, the use of trademarks to capture consumers' attention, where Ad Impressions should be placed on the search results Page Impression to earn the most money for Yahoo, how consumers understood or were confused by the results they were seeing, and other topics that will assist American to prove liability against Yahoo. But Yahoo has withheld data and documents supporting its many studies, including:

- "How Does a Search Engine Work," a study prepared to assess how users "tell if something is commercial," R. App. at 279-280, and which concluded that 40% of consumers do not identify Ad Impressions on Yahoo's search results Page Impression as paid advertisements. *Id.* at 281-282.

- "Sponsored Links: User Experience Survey Results," which is described as "user surveys that investigated user attitudes towards sponsored links." *Id.* at 265.

- "United/Yahoo Search Review," a "Major Airline Brand Search Test," designed to "show how a major airline's participation in their brand term search marketplace presents an

---

[8] Other examples of such employees include 1) Gil Brown, who represented Yahoo with one of Yahoo's large customers to whom it sold American's marks (Expedia), R. App. at 325; 2) Dorothy Buechel, who was involved in the sale of Yahoo's advertising programs in the travel industry, including American, *id.* at 303; and 3) Kamie Cicinelli, who worked on Yahoo's travel accounts and who identified herself in correspondence as having primary responsibility for the American account, *id.* at 237. *See also id.* at 190, 192 (identifying King, Brown, Beuchel, and Cicinelli); 51, 56-57 (same). Yahoo's failure to produce documents for these three employees is exacerbated by the fact that Yahoo failed to issue a litigation hold notice to any of them. *See id.* at 184-185.

impactful lift in Share of Clicks garnered directly to their site relative to click share of Aggregators, Travel Comparison Sites, etc." *Id.* at 319-320.

- "North Ad Click Survey Refresh," a survey concluding that "[l]ess than 50% of users on average consider" Yahoo sponsor results to be "a form of advertising." R. App. at 283-284.

- "The Role of Search in the Travel Research Cycle, Nov 05 US Travel Web Searches," a survey concluding that 56% of users "[l]ooked at a site I didn't intend to because it was one of the first few results." *Id.* at 247, 253.

- "Ad Copy Analysis," a study that includes a table of data apparently showing the studied impact of the presence of trademarks in sponsor results. *Id.* at 353.

- "Travel Consideration Process Study: What Consumers Do Before They Book," a study of "28,000 online travel bookers from October 2006," which focused on the use of trademarks in travel-related search behavior. *Id.* at 322, 324.

- "Trademark Analysis," a review of 20,000 searches from October of 2007 that determined how often trademark owners' advertisements were displayed in response to searches for their trademark terms. *Id.* at 235-236.

- "Calibration Test Analysis," a test of Yahoo's internal team that approves advertisements, including a finding that "[t]here still appears to be significant confusion around what constitutes sufficient content for branded terms." *Id.* at 226-227.

- "Field Study Report for Page X3 and Smart Summaries," a "field study" to understand "how users perceive advertisements on a search result page," which found that "[n]ovice users . . . tended to mistake the north ads for organic results." *Id.* at 254-255.

Yahoo captures and maintains for some time the raw data relevant to its studies. R. App. at 156-157 (59:15-60:15). Yet Yahoo has produced virtually none of the data that was gathered and analyzed in these studies, and no documents related to the planning, development, and execution of these studies and no discussions of their results except the high-level presentations listed here. Without this information, American has been denied the opportunity to test the conclusions of Yahoo or come to its own conclusions based on the results of these studies.

Furthermore, Yahoo has failed to produce custodial documents from employees tasked with the development and analysis of these studies. Documents produced by Yahoo show that Prasad Kantamneni, for example, is a key figure in Yahoo's analysis of its advertisements and

the consumer confusion they generate. *See, e.g.*, R. App. at 254-255 ("Field Study Report for Page X3," authored by Kantamneni, finding that "[n]ovice users . . mistake the north ads for organic results"), *id.* at 298 ("Prasad is our eye-tracking expert on Search"). Yahoo has not identified Kantamneni in its interrogatory responses, has not indicated that it has searched his files, has not listed him as the recipient of a hold notice and has not produced his custodial files. *Id.* at 41-64, 184-185.

These studies, and Yahoo's analysis thereof, are directly relevant to American's allegations of the likelihood of confusion and to the issue of Yahoo's knowledge and intent regarding that confusion. American has sought production of documents related to these studies, including any test materials, underlying data, results, or analysis. R. App. at 13, 28, 202-205. But Yahoo has failed to produce most of its survey-related documents, without any explanation or even acknowledgment of this failure to American.

4.     **User Confusion Complaints Have Been Withheld.**

Yahoo's own help page states one of Yahoo's most frequently asked questions is, "Where are sponsor results shown on the Search results page?" R. App. at 221. Such inquiries are clearly indicative of the confusion caused by Yahoo's display of advertisements. And yet, as American has previously informed Yahoo, "there is no indication that Yahoo has produced any user complaints related to confusion." R. App. at 102. While Yahoo has stated that it is still "checking with the appropriate Yahoo custodians for any documents pertaining to this FAQ," *id.* at 118, Yahoo was compelled by Court Order to complete its production weeks ago. Further, Yahoo's representation is belied by the fact that for at least one employee whom American has been able to determine was central to Yahoo's management of American's trademarks, Rebecca Nevers, Yahoo has not disclosed her existence in any formal manner, nor claimed to have

searched her files. *Id.* at 275 (identifying Nevers as the employee responsible for identifying and removing advertisements which infringed on American's trademarks). The only possible conclusion from this evidence is that responsive documents were either not retained or that Yahoo has failed to produce them in violation of the Court's Order.

**B.    Yahoo Continues to Destroy Relevant Information.**

Yahoo ignored its discovery obligations from the start. Yahoo's obligation to preserve information attached no later than December 2006 when the parties executed the standstill/tolling agreement concerning litigation shortly after the general counsel of American contacted his counterpart at Yahoo about the likelihood of a lawsuit if Yahoo did not immediately halt its infringement. *See* Dkt. 80 at 4-5; Dkt. 43 at 7-8. But according to Yahoo's own Rule 30(b)(6) designee on preservation and production issues, Yahoo "does not take any steps to preserve information when litigation is threatened." Dkt. 43 at 7. Another Yahoo Rule 30(b)(6) witness testified that she was not asked to retain information relevant to the threatened litigation even though she was informed of the threat itself. R. App. at 160 (214:2-19).

Now, even after a Court order to produce all responsive information, Yahoo continues to reject its responsibilities by continuing to destroy valuable and responsive information. R. App. at 118 (Yahoo only "maintains some data regarding non-clicked impressions for a short period of time (currently 40 days)"). Indeed, Yahoo's witness Huming Li testified that Yahoo continues today to regularly destroy impressions information. *Id.* at 169, 171, 173-174 (81:22 – 83:6; 89:11 – 90:11; 100:20 – 101:14) (Yahoo has "chosen not to store" impressions information beyond 30-40 days). Catherine Cameron, Yahoo's Rule 30(b)(6) witness on database issues, also confirmed that Yahoo generally followed this regular destruction process despite its litigation obligations. *Id.* at 143-144, 146-150 (69:10-70:19, 148:4-150:4:, 175:24-176:3)

(Yahoo allowed "data relevant to American Airlines" to "roll . . . off"). In the face of this Court's August 4 Order, there is no explanation for Yahoo's contumacious conduct.

### C. Yahoo Disobeyed the Court's Order By Failing To Review Its Production For Non-Responsive And Irrelevant Materials.

While Yahoo continues to destroy important information, it simultaneously seeks to bury American under an avalanche of irrelevant material. *See* Dkt. 43 at 11-12; Dkt. 45 at 247-66. As a result, the Court's August 4 Order directed Yahoo to conduct "a human review . . . and eliminate from its previously produced material nonresponsive and irrelevant materials," Dkt. 60 at 2, and on August 17 the Court extended the deadline to August 28 at Yahoo's request. Dkt. 77. On August 28, Yahoo provided American with a list of 37,129 documents that it identified as non-responsive. However, on September 9, Yahoo conceded that it had failed to comply with the Court's deadline by delivering a second list of 31,514 documents that it admitted were also non-responsive. Yahoo failed to seek permission from the Court or offer any explanation or excuse for its late response. But even had Yahoo identified the 68,643 documents included in its two lists by the court-ordered deadline, its response would still be entirely inadequate. In the 1,004,744 documents produced by Yahoo as of September 9, American has identified *hundreds of thousands* of non-responsive documents, many of which are so obviously non-responsive that no good-faith human review would find them otherwise:

- In the original motion to compel, seeking the human review, American provided the Court and Yahoo with sixteen examples of non-responsive documents. American's Motion to Compel Appendix (Dkt. 45 at 247-66). Only *three* of these documents were included in Yahoo's August 28 list, and none on the September 9 list. The other thirteen include a screenplay, an employee's personal income tax form, a picture of a Bruce Springsteen album cover, and a copy of "The Gift of Stitching Magazine." Dkt. 45 at 249, 252-53, 255, 264. Yahoo cannot seriously contend that these documents are responsive to American's requests, yet its purported human review did not identify them as non-responsive, even though American had already pointed them out to Yahoo.

- Submitted *in camera* with this motion as American's Appendix of Illustrative Nonresponsive and Irrelevant Materials ("Junk App.") are two hundred documents that

demonstrate the inadequacy of Yahoo's purported human review. These documents are emblematic of thousands more just like them. Despite their obviously irrelevant and improper nature, none of these documents were identified by Yahoo as non-responsive. Included in this list are: a flyer promoting the appearance of the author of "Putting on the Blitz: The Football Book for Women," prominently featuring a photo of the book cover; adoption records related to a search for birth parents; a picture of a Yahoo employee sharing a motorcycle with American Idol contestant William Hung; email correspondence between a Yahoo employee and her tax preparer; another employee's tax return; and 195 other documents that no good-faith human review could possibly have identified as responsive to American's requests. Junk App. 44, 120-127, 152, 202, 494, 500. These examples are but a small sampling of Yahoo's totally incompetent review.

- Yahoo also failed to identify hundreds of privileged documents that it produced to American. Since Yahoo was ordered to conduct its re-review, American has continued to find more documents which appear to be subject to attorney-client privilege. *See* American's Motion to Compel Appendix (Dkt. 44-45) at 111-25, 156-57; R. App. at 114-116. None were identified as privileged by Yahoo's human review and only seven were identified as non-responsive. Yet, by letter of September 18, 2009 responding to American's earlier letter informing Yahoo that it had again produced a wealth of privileged information and offering to return it, Yahoo acknowledged the inadequacy of its review by claiming "inadvertence." *Id.* at 120.

- Despite the Court's Order, Yahoo has not mended its ways even with subsequent productions. American has reviewed approximately 46,000 documents produced by Yahoo since the Court's August 4 Order and has identified more than half of them as non-responsive. These include: a CNN story about a member of the band The Beastie Boys; a blank W-2 form; and an employee's automobile proof of insurance. As in prior productions, all these documents were designated as "Confidential Information." Junk App. 510-515, 526-526, 573-576. Indeed, Yahoo concedes that it has continued to produce non-responsive information because it has itself already identified over 600 documents produced on August 26 as non-responsive.

Yahoo apparently did not concern itself with evaluating whether any of these documents were, in fact, responsive to American's actual requests for production. Apart from a limited set produced between the original court-ordered deadline and the extended August 28 deadline, Yahoo has refused to identify which of the remaining documents respond to which requests. At the very least, this refusal to link the remaining documents with any particular requests for production is meant to make it extraordinarily difficult for the Court or American to evaluate whether Yahoo even made a good faith effort to comply with the Court's Order for a "human review" of its production.

16

## IV. YAHOO'S VIOLATIONS PREJUDICE AMERICAN.

To prove trademark infringement, American must show that Yahoo's use of its trademark creates a likelihood of consumer confusion. *Pebble Beach Co. Tour v. 18I Ltd.*, 155 F.3d 526, 537 (5th Cir. 1998). To prove trademark dilution, American must show that Yahoo's use of its marks is likely to dilute those trademarks "by either (1) blurring, a diminution in the uniqueness or individuality of the mark, or (2) tarnishment, an injury resulting from another's use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with the plaintiff's mark." *See E. & J. Gallo Winery v. Spider Webs, Ltd.*, 286 F.3d 270, 279 (5th Cir. 2002) (internal quotation marks omitted and punctuation altered).

Yahoo's nominative fair use defense to these claims cannot succeed if its use "creates a likelihood of confusion as to source, sponsorship, affiliation, or approval." *Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 488 (5th Cir. 2008). And Yahoo's statutory fair-use defense can only succeed if it merely used American's marks in a descriptive sense, to describe its own goods or services. *Pebble Beach Co.*, 155 F.3d at 545 n.12. That is, if Yahoo's Ad Impressions use American's name "as a mark," Yahoo's statutory fair use defense cannot succeed. *Id.* Yahoo's failure to preserve and/or produce the missing information affects American's ability to present its case on all of these issues.

*First,* as to its dilution claims, American alleges that its marks are being blurred by Yahoo's systematic unlicensed use of American's marks in connection with the Ad Impressions displayed on Yahoo's Page Impressions. Each time Yahoo posts an Ad Impression for companies other than American that includes an American mark or otherwise in response to a search for one of the American marks, the "uniqueness or individuality" of these marks are diminished because the evident overall message presented by Yahoo is that the other company,

not American, is associated with the marks. *See, e.g., E. & J. Gallo*, 286 F.3d at 279. When a mark is used to promote "a plethora of different goods and services," it "rais[es] the possibility that the mark will lose its ability to serve as a unique identifier of the markholder's product." *World Impressions, Inc. v McDonald's Corp.*, 235 F. Supp. 2d 831, 838, 847 (N.D. Ill. 2002) (internal quotation marks and punctuation omitted).

Yahoo's discovery strategy has impaired American's ability to prove those dilution theories: Without Ad Impression Data indicating the number of times the Ad Impressions connected to the infringement were shown to Internet users, or the Page Impressions and Page Impression Data that illustrate how those Ad Impressions were shown (where they appeared on the page, next to what algorithmic links, etc.), American is limited in gauging the effect of those ads on the "uniqueness or individuality" or on the strength of the connection the Internet user may have drawn between American's marks and the lower-quality services of third-party advertisers.[9] Again, Yahoo itself treats this information as vital to advertiser understanding of ad effectiveness (Part III.A.1, *supra*); Yahoo tries to get advertisers to "[d]rill down on numbers (impressions, CTR, CPC, etc.)" to "sell" them on "the branding value of search," by "get[ting] in front of marketers who care about awareness or brand identity." R. App. at 256-257. And Yahoo's internal studies relating to consumer reactions to its search advertising likewise are relevant to the question of whether they are likely to draw dilutive associations from Yahoo's uses of American's mark, because those studies too concern "the branding value of search."

---

[9]  Courts have specifically recognized the importance of impressions in a dilution case involving search engine advertising. *See Playboy Enters. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1023, 1029 (9th Cir. 2004). Indeed, the "number of customers exposed to [an] allegedly diluent mark" is a "key variable necessary for determining whether dilution occurs." *See, e.g., Kellogg Co. v. Exxon Mobil Corp.*, 192 F. Supp. 2d 790, 807 (W.D. Tenn. 2001).

Yahoo "always suggest[s] that search is a natural complement to any branding campaign because people will search on something *if another advertisement has piqued their interest.*" *Id.* at 258 (emphasis added).

*Second*, Yahoo's own statements make unmistakably clear that the missing information is highly relevant to the question of whether Yahoo's use of the marks is likely to cause confusion and whether Yahoo's use of the marks was fair. Indeed, Yahoo has taken the position that it is American's burden to prove likelihood of confusion and defeat nominative fair use on an *Ad Impression by Ad Impression basis.* On that score, Yahoo's failure to produce the overall Page and Ad Impressions of the advertisements in question, the Page Impression Data that would at least allow American to reconstruct part of the detail of those Page Impressions, the Ad Impression Data that would allow American to connect the behavior of individual Internet users, or the documents related to Yahoo's own studies of consumer reaction and confusion is clearly prejudicial. Further, without the Page Impression itself, the trier of fact will be handicapped in deciding whether the advertiser and Yahoo used American's marks "fairly and in good faith." *Smack Apparel*, 550 F.3d at 489. Similarly, the data underlying Yahoo's empirical studies, custodial documents, and user confusion reports and complaints, all wrongfully withheld, directly bear on both the question of whether consumer confusion is likely and Yahoo's intent to "capitalize on consumer confusion."

*Third*, Yahoo has also withheld impressions information that will allow American to challenge its statutory fair use defense: Without the Page and Ad Impressions displayed to users or the Data sufficient to recreate aspects of such images, American is deprived of the totality of factors determining which Ad Impressions used American's name "as a mark." And the absence of the other missing discovery will prejudice American's ability to prove that Yahoo's conduct

19

was intentional—which would defeat the "good faith" requirement of the statutory defense.

*Fourth,* American has been forced to incur attorney review and data processing and storage costs and, more importantly, lost time preparing for trial in wading through Yahoo's bloated and abusive production. Yahoo estimated that it would cost $1.2 million to conduct a human review of its documents. Dkt. 48 at 7. By Yahoo's own estimate, for this issue alone, American has been prejudiced in the amount of at least $1.2 million, not to mention an irreparable amount in time lost.

## V.    YAHOO'S ABUSES WARRANT SANCTIONS.

The appropriate sanction for the violations described above is to strike part of Yahoo's Answer, to hold Yahoo in civil contempt and require it to compensate American for the failure to review documents for nonresponsiveness, and to award American its expenses in bringing this motion. This Court has authority to award appropriate sanctions up to and including an order determining issues of liability or eliminating defenses. *See, e.g., Morton v. Harris*, 628 F.2d 438, 440 (5th Cir. 1980) (affirming sanctions where "tactics and gamesmanship constituted a willful effort to both evade and frustrate discovery"); Adv. Comm. Notes ¶ 1, FED. R. CIV. P. 26 (1983 Amendment, Subdiv. (g)) (Rule 26 "curb[s] discovery abuse by explicitly encouraging the imposition of sanctions."). A finding of civil contempt requires that (1) a court order was in effect; (2) the order required certain conduct by the responding party; and (3) that the responding party failed to comply with the court's order. *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); FED. R. CIV. P. 37(b)(2)(A)(vii).

**A.    The Appropriate Sanction For Yahoo's Failure to Produce Responsive Materials Is To Strike Part Of Yahoo's Answer.**

This Court has authority to strike or negate appropriate contentions and defenses from Yahoo's answer. *See Ins. Corp. of Ireland, Ltd. v. Compagnie Des Bauxites de Guinee*, 456 U.S.

694, 707-08 (1982) (sanction properly negated defense of lack of personal jurisdiction); *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 414 (5th Cir. 2004) (sanction properly negated denial of alter ego liability); *Chilcutt v. United States*, 4 F.3d 1313, 1320-25 (5th Cir. 1993) (sanction properly negated denial of prima facie liability); *Bayoil, S.A. v. Polembros Shipping Ltd.*, 196 F.R.D. 479, 482-83 (S.D. Tex. 2000) (striking disobedient party's defenses of lack of personal jurisdiction and improper forum); *Kamatani v. BenQ Corp.*, No. 03-cv-437, 2005 WL 2455825, *14-15 (E.D. Tex. Oct. 6, 2005) ("strik[ing] any defense" related to licensing agreement at issue in discovery abuses).

In *Chilcutt*, the Fifth Circuit set forth the appropriate standard for striking a defense for discovery abuses. 4 F.3d at 1320-23. Here, American proposes that the Court strike Yahoo's response to American's infringement and dilution claims, Dkt. 95 Ex. A, (¶¶ 85-138), and its fair use and nominative fair use affirmative defenses, *id.* (p. 23). Such a sanction is appropriate here, where there is: (1) a "substantial relationship between the sanction and the claim"; (2) a sanction would be just and fair in that the producing party had "ample warning" that discovery violations would result in sanctions, made "empty promises" of compliance that went unfulfilled, and its conduct was intentional; and (3) the sanction meets "the Rule 37 goals of punishing the party which has obstructed discovery and deterring others who would others be inclined to pursue similar behavior." *Id.* Those standards are satisfied here.

### 1. There Is A Substantial Relationship Between the Missing Information and American's Claims.

A "substantial relationship" exists between Yahoo's misconduct described above and American's ability to present its case as to the claims and defenses covered by the proposed sanction. *Chilcutt*, 4 F.3d at 1321. As set forth above, the missing Page and Ad Impressions and Data, studies of consumer reactions, and consumer inquiries go to the heart of American's

infringement and dilution claims. And Yahoo's failure to preserve Page and Ad Impressions and Data regarding infringing advertisements since being put on notice of American's claims—let alone since insisting that American produce such Impressions to prove its case—goes right to the core of Yahoo's fair use and nominative fair use defenses.

## 2. The Proposed Sanction Is Fair.

The proposed sanction must be fair. *Chilcutt*, 4 F.3d at 1321-22.

*First,* Yahoo had "ample warning" that discovery violations would result in sanctions: This Court's July 14 Order on American's motion to compel squarely alerted the parties to the prospect of sanctions for discovery violations (Dkt. 46 at 2), and this Court's remarks in the August 11 telephonic hearing confirmed it. *See* Dkt. 78 at 6:1-2.

*Second,* Yahoo has made its own bed. Throughout the history of this case, Yahoo has repeatedly asserted that it was producing all relevant information while hiding the fact that it was allowing relevant data to be lost or converted into an inaccessible format. For example, Yahoo represented in April that it would "produce all data in its possession, custody, and control responsive to the remaining subcategories (f) through (m) [of American's Request 53]." R. App. at 10. Yahoo subsequently asserted that the spreadsheets it was producing "contain the vast majority of the data responsive to AA's Request 53." *Id.* at 18.[10] Yahoo even made incorrect claims about the completeness of its production on July 29, after this Court's July 14 Order compelling it to produce such information when it stated:

---

10 By stating that the data produced included "click through rates" (R. App. at 18, 36-37) and "click stream data" (*id.* at 34), Yahoo implied that it had either provided impressions data, or that at the very least the number of impressions could be determined through simple math (based on the relationship between number of clicks and the click-through rate).

- "if the data does not appear in the tab-delimited text file and spreadsheets we provided, it does not exist in Yahoo's databases"; and

- "Yahoo! generally maintains data for clicked advertisements only."

R. App. at 97.

These statements are inaccurate. *See, e.g., id.* at 171 (89:6-23) (Question: "[I]s it fair to say that Yahoo keeps data concerning ads displayed but not clicked?" Answer: "Yes."). These recited instances are too repeated to be anything but a developed litigation strategy.

*Third*, the requested sanction is not the most severe available to the Court because it leaves Yahoo free to contest American's remaining claims and damages case, and it is narrowly tailored to match the scope of the substantive prejudice effected by Yahoo's discovery abuses—a moderate and proportional response to the misconduct at issue.

### 3. The Proposed Sanction Properly Punishes Yahoo For Discovery Abuses and Deters Others.

The proposed "sanction [would also] meet the Rule 37 goals of punishing the party which has obstructed discovery and deterring others who would otherwise be inclined to pursue similar behavior." *Chilcutt*, 4 F.3d at 1321. The proposed sanction will clarify for litigants in other cases that when they have a clear threat of litigation, they must preserve relevant information, and when ordered to produce it, they must do so rather than destroy it or convert it to an inaccessible format.

### B. The Appropriate Sanction For Yahoo's Violation Of This Court's Order To Control Its Overproduction Is To Hold Yahoo In Civil Contempt.

This Court's August 4 Order required Yahoo to conduct a human review of its documents. There can be no real dispute that Yahoo failed to comply with the Court's Order. How can Yahoo seriously argue that a good faith "human review" of its production for "unresponsive and irrelevant materials" would fail to identify such nonsensical items as a draft

screenplay, an album cover, employee tax returns, adoption records, and clearly marked privileged material to name just a few examples?  Yahoo failed to eliminate hundreds of thousands of pages of such irrelevant material, yet suggests that it complied with the Court's Order.  *See, e.g.,* Junk App., *passim.*

Because Yahoo has not undertaken to adequately review its own production, it has, in violation of the Court's Order, shifted that burden to American.  American has thus been forced to incur costs in processing and storing this irrelevant data, and by hiring attorneys to review and categorize it.  By Yahoo's own admission, the cost of that burden was approximately $1.2 million.  Dkt. 48 at 7.  The only fair remedy at this point is to hold Yahoo in contempt, and award American $1.2 million to defray the human review cost borne by American.

## C. American Seeks To Recover Its Reasonable Attorneys' Fees On This Motion.

Finally, under Rule 37, American is entitled to the expenses "incurred in making" its successful motion to compel, including reasonable attorneys' fees.  Fed. R. Civ. P. 37(a)(5)(A); Dkt. 60 (Order granting American's Motion to Compel).  Moreover, if this Court grants the instant motion and sanctions Yahoo for its discovery failures, American will be entitled to additional reasonable expenses, including attorneys' fees, "caused by the failure[s]."  Fed. R. Civ. P. 37(b)(2)(C).  In that regard, American's expenses are not only the costs of preparing this motion and the preceding motion to compel, but also the substantial effort it had to invest from November 2008 to August 2009 in grappling with this ESI dispute—which would have been avoided had Yahoo complied with its discovery obligations—at the expense of pursuing other lines of inquiry necessary to prepare for trial.

## VI.   PRAYER

For the foregoing reasons, American respectfully requests that the Court issue an order

finding that Yahoo has violated the Court's August 4, 2009 Order and awarding appropriate

sanctions.  Specifically, American respectfully requests the Court enter an order sanctioning

Yahoo for those violations by:  **(i)** striking paragraphs 85-138 and the Second (Nominative Use)

and Third (Fair Use) Affirmative Defenses of Yahoo's Answer (Dkt. 35), and the corresponding

paragraphs of any amended answer; **(ii)** finding Yahoo in contempt of this Court's Order to

conduct a human review of the documents produced, and ordering Yahoo to pay American $1.2

million; and **(iii)** awarding American its reasonable expenses in bringing this motion as well as

the motion to compel.

Dated:  September 23, 2009

Respectfully submitted,

Frederick Brown (admitted *pro hac vice*)
Jason Stavers (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Phone:  (415) 393-8200
Fax:  (415) 986-5309

Howard S. Hogan (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone:  (202) 955-8500
Fax:  (202) 467-0539

Dee J. Kelly
State Bar No. 11217000
Dee J. Kelly, Jr.
State Bar No. 11217250
Lars L. Berg
State Bar No. 00787072
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX  76102
Phone:  (817) 332-2500
Fax:  (817) 878-9280

*Attorneys for Plaintiff American Airlines, Inc.*

## CERTIFICATE OF CONFERENCE

I certify that counsel for American conferred with counsel for Defendants, but agreement as to the relief requested in this motion was not reached. Therefore, it is presented to the Court for determination.

_____
Lars L. Berg

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered on September 23, 2009 to Defendants' counsel, as follows, in accordance with the Federal Rules of Civil Procedure:

David F. Chappell
Scott A. Fredricks
CANTEY HANGER LLP
Cantey Hanger Plaza
600 West Sixth Street, Suite 300
Fort Worth, Texas 76102
(via hand delivery)

Michael A. Jacobs
Lynn M. Humphreys
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
(via Federal Express)

_____
Lars. L. Berg