FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT. WORTH DIVISION

2009 NOV -2 PM 1:55

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

AMERICAN AIRLINES, INC.,

Plaintiff,

-v.-

YAHOO! INC. and OVERTURE SERVICES, INC.
d/b/a YAHOO! SEARCH MARKETING,

Defendants.

No. 4:08-CV-626-A

## PLAINTIFF'S REPLY BRIEF RELATIVE TO ITS MOTION FOR SANCTIONS

Both before and after American filed its motion for sanctions, Yahoo represented that it had produced all documents and data (except for the missing ESI from 2007) responsive to American's discovery requests or that such documents and data did not exist. But Yahoo itself has proved its representations false by: (1) producing after its opposition brief was filed several additional very important groups of documents and data that should have been produced long ago and (2) admitting that many months of responsive non-clicked Ad Impressions Data is on back up tapes but cannot be produced in time for trial.

### A. YAHOO FAILED TO COMPLY WITH THE COURT'S ORDERS

The Court's July 14, August 4, and August 17 Orders (R. App. 1-6)[1] required Yahoo to produce by August 28, 2009 all information responsive to American's discovery requests, with the exception of the 2007 back up tapes that are to be restored by November 12, 2009.

---

[1] The citations used in this reply are: 1. (App.) refers to the appendix that American filed in support of its motion for sanctions; 2. (Resp.) refers to Yahoo's response to the motion for sanctions; 3. (Resp. App) refers to Yahoo's appendix in support of its response; and, 4. (R. App.) refers to American's appendix in support of its reply brief.

(R. App. 16). Yahoo failed to comply in several different ways, thus depriving American of significant and relevant information:

1. **Clicked Ad Impressions:** In its opposition filed October 13, 2009, Yahoo represented to the Court and American that it had produced all responsive information, except for the 2007 data that it is currently restoring from back-up tape pursuant to the Court's order. (Resp. at 8). ("Yahoo! has not withheld any responsive data or documents"). But just one week later, on October 19, Yahoo produced a massive amount of data on over 70,000 clicked advertisements displayed as part of Yahoo's Toplink advertising program in 2005 and 2006. (R. App. 20-21). This data is highly relevant because it materially increases American's damages, and because it reveals new information about the inconsistent way in which Yahoo applied its trademark policy, which is a cornerstone of its defense.

2. **Data Underlying Yahoo's Studies**: By its actions, Yahoo revealed that another of its statements in its opposition and supporting declaration was false. In response to American's claim that Yahoo failed to produce documents related to the many studies that Yahoo has conducted on matters related to this litigation, Yahoo stated that it had "searched for and produced relevant data and documents to the extent they existed." (Resp. at 15). And in reference to one of the studies, the "North Ad Click Survey Refresh," Yahoo claimed that it had "searched for, but did not locate, additional documents related to this study." (Resp. at 16; Resp. App. at 0083). Yet, within days, Yahoo produced *hundreds of pages* of data from that study, including the verbatim statements of almost 2000 consumers[2], some of which constitute highly

---

[2] Some examples of comments from this document: "Put all the ads on one side, so that they CANNOT be confused with legitimate results. Otherwise label them clearly as ads."; "Stop making the advertisements look like search results, which is deceptive and can confuse old people or the intellectually challenged." (R. App. 26, 33) (emphasis in original).

probative evidence of confusion about Yahoo's search advertisements—a central issue in this litigation. (Selected pages included at R. App. 22-34).

This highly relevant information was produced only the day before American was to take the deposition of the study's author, Mr. Ramaswamy, on October 15. (R. App. 35) Under oath, the witness admitted that Yahoo had not even asked him for study-related materials until the day it filed its opposition:

> Q. When was the first time you were asked to give to your lawyers a copy of the Excel spreadsheet, the portions of which are Exhibit 503?
>
> A. I was asked on Tuesday [October 13].
>
> \* \* \* \*
>
> Q. And before that were you ever asked to provide any information related to the American Airlines versus Yahoo! suit?
>
> A. No.

(R. App. 37-38).[3]

**3. Non-Clicked Ad Impression Data**: Yahoo's opposition was filed on the heels of its most dramatic late production, the disclosure of 40 days' worth of Ad Impressions Data for non-clicked advertisements. The discovery of this long-sought-after data flew in the face of months of Yahoo's denials that it maintained such data[4]:

---

[3] On October 29, the person in charge of Yahoo's document collection testified that she was not aware if Yahoo has yet even searched the files of the authors of Yahoo's several other studies for the missing underlying data from Yahoo's production. (Reply. App. 83-84).

[4] Yahoo's first admission on this point came in a footnote to the claim itself. In reference to the Ad Impressions Data that was central to American's motion, Yahoo stated that "[e]ven if Yahoo! had collected the data from the Offers table earlier in the discovery process, due to the short retention period, the data would have gone back only to the early part of this year." (Resp. at 12). Yet in a footnote to that very sentence, Yahoo admits that "the data [for prior years] is still retained on back-up tapes." *Id.* Yahoo's designee subsequently confirmed that the data for prior years remained available on tape, but testified that Yahoo has made no effort to restore the data. (R. App. 67-69).

---

- Yahoo represented on June 22 that "Yahoo does not maintain data for all bids for keywords and/or advertisements, *just clicked advertisements.*" (App. at 68) (emphasis added).
- Yahoo stated on July 29 that "if the data does not appear in the tab-delimited text file and spreadsheets we provided, *it does not exist in Yahoo's databases*" and that "Yahoo! generally *maintains data for clicked advertisements only.*" (App. at 97).

Yahoo attempts to excuse its conduct by arguing that it was under no obligation to produce responsive information in response to the Court's orders or American's discovery requests unless American's requests *specifically* used Yahoo's jargon.[5] Yahoo relies most heavily on this argument in connection with the Ad Impressions Data for non-clicked advertisements, which it maintains American has never sought. (Resp. at 10-11) (claiming that American "never *specifically* asked about it until late August. . .") (emphasis added). What American sought in February 2009, however, was simple: "All documents containing any . . . information about any sponsor results where either the sponsor result, or the search term or keyword that triggered the sponsor result included one or more American Airlines marks or terms similar to the American Airlines marks." (App. at 208). That request, served in February, makes no distinction between "clicked" and "non-clicked" advertisements, and American has consistently and repeatedly sought full compliance with this request. *See also* (App. 207) (seeking full analytics provided to any advertiser that used the American Marks). The Court's Orders also were not limited and do not allow the parsing that Yahoo now urges.[6]

---

[5] *See, e.g.*, (Resp. at 1) ("Yahoo has agreed to comply with almost every specific request"); (*id.* at 2) ("American did not specifically ask Yahoo to produce this [impression] data until recently"); (*id.*) ("American has never specifically requested [the data underlying Yahoo's studies]"); (*id.* at 9) ("American has never moved for, and the Court has never ordered, the production of this particular [non-clicked data]").

[6] Even *after* the sanctions motion was filed, Yahoo wrote on October 23 that it would not produce documents from the files of custodians with responsive information unless American identified a specific document by name. (R. App. 41-42).

Yahoo's fallback argument for not producing this non-clicked data (until recently) is that it overlaps with information already produced. (Resp. at 11-12). In support, Yahoo compares the incomplete non-clicked ad data from August 6, 2009 through September 14, 2009 to clicked ads from that same period, and then through only its outside expert declares a 78% overlap. (Resp. at 11). As explained in the declaration of Mr. Jackson that is filed in support of American's reply brief, Yahoo's analysis is seriously flawed because it makes the false assumption that Yahoo's Creative IDs are not used for more than a single ad text over time. As Mr. Jackson concludes, the same Creative IDs are re-used 66% of the time. (*See generally* R. App. 43-48; 47-48 at ¶¶ 9-12; 50-52).[7] Thus, any analysis that depends on a single Creative ID identifying a single ad is altogether flawed.[8] More fundamentally, the produced Click Data does not tell American what is most relevant to its dilution claims: the number of times that Yahoo published the ads in question to consumers. Yahoo's own witness admitted that the data produced thus far does not provide this essential information. (R. App. 72).

**4. Custodial Files:** As to custodial files that Yahoo has not produced, Yahoo admits that it did not retain the laptops (or imaged copies thereof) of 16 former employees, which contradicts its response to American's First Set of Special Interrogatories: "Yahoo is not aware of any relevant responsive information that it has not retained." (App. 183). Of these 16 former employees, 13 left after the December 2006 standstill agreement was entered between American

---

[7] Furthermore, there is no support for the proposition that Ad Impression Data from 40 days of data from late 2009 can be compared to the ads that ran in 2006, 2007 and 2008, when *different advertisers* were running *different ads*. For example, in 2006 and the early parts of 2007, Orbitz and Travelocity were the largest purchasers of American Airlines marks. Yet those advertisers apparently were inactive in 2009, the period of time that Yahoo uses as its comparison period. And Yahoo radically changed its advertising system in 2007 when it rolled out the "Panama" system. (R. App. 62-63).

[8] Yahoo was responsible to fully inform its expert that a Creative ID is not static but frequently refers to changed ad text.

and Yahoo, and five left after the litigation commenced. (Resp. at 13-14). Yahoo identified these former employees as relevant custodians in mid-June, 2009 leaving serious questions about when Yahoo conducted its "diligent search" for the laptops or discovered that they were missing. (Resp. at 13). Yahoo had a duty to preserve these laptops and the documents and data contained therein. Yahoo asserts that its failure is of no moment because some of the documents from these custodians were probably produced through other sources (*e.g.*, Yahoo produced an email from the recipient's files rather than producing it from the sender's files too.). But Yahoo's explanation presupposes an unlikely proposition for which it has no evidence: that all relevant identical documents are found in the files of multiple persons. In fact, Mr. King, an ex-employee of Yahoo is a good example of the specious nature of that proposition. Mr. King responded to a subpoena from American by producing 40,000 pages of documents not produced by Yahoo. (R. App. 54-55) Accordingly, American has been deprived of its right to discovery of an untold number of relevant documents from over a dozen former Yahoo employees and many current employees. (R. App. 41-42). The same is true for current employees as was revealed in testimony on October 30 by Yahoo's Vice President of Search Advertising, Mr. Pann, who admitted that *he was not even interviewed nor were his custodial files reviewed for responsiveness until October 28.* (R. App. 80-81). Those documents have not been turned over to American even though Mr. Pann's deposition was taken on October 30.

On October 30, after the close of business, Yahoo produced another 100,000 plus pages of custodial documents without explaining why they were not provided earlier as required by the Court's orders and without advising as to which request they responded. (R. App at 76). This late production additionally harms American because these documents were produced after most of the depositions have been concluded.

5. **Yahoo's Human Review**: On August 4, 2009, the Court ordered Yahoo to conduct "a human review and eliminate from its previously produced material non-responsive and irrelevant materials." (R. App. 3-4). Yahoo attempts to excuse its flawed human review by claiming it was asked to do too much.[9] But its argument, and the supporting declaration from outside counsel, constitutes nothing more than an admission that its initial document production was bloated and unacceptable. Yahoo argues that its human review was expensive and concedes that its human review identified 68,500 non-responsive documents in its production.[10] (Resp. at 18). The adequacy of Yahoo's compliance with the Court's Order, however, is not measured by how much it spent, but on the results. And as American explained in detail in its motion, Yahoo's results were unacceptable: *hundreds of thousands of non-responsive documents* remain in Yahoo's production. The 200 examples (and there are *many* more like them) provided by American demonstrate that Yahoo's human review was flawed. Yahoo cannot seriously contend that a qualified human reviewer looked at any of the tax returns, adoption records or other clearly irrelevant documents, even for a moment, and determined they were responsive to American's requests. And Yahoo's declarations suggest that Yahoo did not itself engage in any meaningful quality control of its production, either initially or after a further review by its domestic and foreign-based sub-contractors. If Yahoo had been sufficiently engaged in any part of the review,

---

[9] Yahoo complains that American is to blame because it served too much discovery. (Resp. at 3-4). In support, Yahoo reports that American has served 120 document requests, 25 Rule 30(b)(6) deposition topics and 24 interrogatories. *Id.* However, Yahoo apparently failed to review its own discovery before launching this attack, because Yahoo itself had served, at the time it filed its opposition, 123 document requests, 37 Rule 30(b)(6) topics, 22 interrogatories, *and 485 requests for admission.* Such discovery is consistent with the nature of this case involving complex issues and high stakes.

[10] Yahoo falsely claims that it completed this review by the Court's deadline of August 28. (Resp. at 18-19). Not true. Yahoo identified only half of the non-responsive documents it found in the human review on August 28. It did not notify American of the remaining documents until September 9. Then on September 18, in response to a notification from American, Yahoo identified hundreds more documents as privileged. (App. 120-31).

how does Yahoo explain the hundreds of pages of privileged documents that Yahoo produced but did not identify in its human review?

### B. YAHOO FAILED TO PRESERVE PAGE IMPRESSIONS

Yahoo also has no legitimate excuse for failing to retain the infringing Page Impressions from the date it signed the Standstill in 2006 or even after the Court's Orders that Yahoo produce all responsive information. A Page Impression is the actual image of the entire page that Yahoo displays to an Internet user in response to the user's search engine query. Page Impressions are presented via a Yahoo generated computer code (*e.g.*, html or Java script).[11] American has long sought all of the relevant Page Impressions from Yahoo. Yahoo asserts that it chooses not to capture Page Impressions "in the regular course of business;" and, therefore, Yahoo incorrectly claims that it is not required to retain them.[12]

Yahoo further seeks to defend its failure by claiming that "there was nothing to prevent American from capturing as many Yahoo! screenshots as it wished." But this statement is misleading. When Yahoo generates these Page Impressions and publishes them to Internet users, they vary the selection of "Sponsor Results" (i.e., the Ad Impressions that are the subject of this suit) by geography, by time of day, by day of the week, and by the agreed advertising

---

[11] That computer code is like the negative of a photograph and the page impression itself is like a developed photo. Yahoo has essentially failed to develop and produce the photo (i.e., the Page Impression) and has apparently destroyed the negative (i.e., the html or Java script).

[12] Yahoo misstates Fed. R. Civ. P. 37(e) by claiming the Rule protects it from sanctions "for merely continuing to operate its database in accordance with Yahoo!'s ordinary business practices." (Resp. at 12). If this were the case, Rule 37(e) would swallow the entire duty to retain documents in anticipation of litigation. It does not. Rather, in order for a party to take advantage of the rule, the party "needs to act affirmatively to prevent the system from destroying or altering information, even if such destruction would occur in the regular course of business." *Doe v. Norwalk Comm. College*, 248 F.R.D. 372, 378 (D. Conn 2007); *see also* Adv. Comm. Notes ¶ 3, FED. R. CIV. P. 37 (2006 Amendment, Subdiv. (f)). Yahoo's obligation to preserve relevant information began when it signed the Standstill on December 19, 2006 (*see* Moving Brief at 14; Dkt. 80 at 4-5; Dkt. 43 at 7-8; R. App. 73-75), and Rule 37(e) provides it no recourse for all data which it allowed to be destroyed, or to become inaccessible, since that time.

expenditures of Yahoo's advertisers, thus generating millions of uniquely infringing documents. And as Yahoo's designee has subsequently testified, *only* Yahoo and the user to which the Page Impression is published have access to it. Contrary to Yahoo's representation to the Court, American cannot take screenshots of the millions of infringing Page Impressions displayed by Yahoo to users searching for American Airlines.

### C. AMERICAN FULFILLED ITS MEET AND CONFER OBLIGATIONS

American satisfied its meet and confer requirements with respect to this motion; the extensive correspondence between the parties is discussed in its moving brief at pp. 7-8. Ignoring this record, Yahoo simultaneously exaggerates and downplays the importance of a meeting between outside counsel by claiming that it was the sole meet and confer related to the issues raised in American's motion, and then by describing it as "a conversation lasting about two minutes" and claiming that American did not "clearly explain what their issues were, let alone seek resolution of them." (Resp. at 7).

At the Court-ordered face-to-face meeting concerning discovery, American discussed the issue of "missing data" with Yahoo's representatives. Indeed, "missing data," impressions, and non-clicked ads are identified in the agenda for the meeting. (R. App.57-58). Yahoo describes this meeting as "a conversation lasting about two minutes" and claiming that American did not "clearly explain what their issues were, let alone seek resolution of them." (Resp. at 7). What Yahoo omits is that the overall meeting lasted several hours. When American raised the subject of impressions, American asked the consultants to leave the room so that the parties could privately discuss the destruction or non-production of information. During that private discussion, Yahoo's representative said (i) she did not want to hear what American had to say and (ii) she knew a motion would be filed and she would wait to read the motion. In a follow-up

conversation initiated by Messrs. Brown and Berg minutes later, Yahoo's outside counsel was informed that American believed that Yahoo was destroying or hiding impressions and that violated basic rules governing discovery and the Court's orders. Yahoo's counsel responded that Yahoo's conduct was defensible, it had no intention of changing its production, and that American should read Yahoo's many letters on impressions.[13]

D.     **AMERICAN'S PROPOSED SANCTIONS ARE APPROPRIATE**

Yahoo failed to preserve and produce key evidence and played games with American and the Court to improperly conceal the existence of important evidence. Such conduct warrants the severest of sanctions, including default judgment. But that is not what American seeks. Rather, American asks the Court to order: (i) certain facts established by striking parts of Yahoo's answer and eliminating two of Yahoo's affirmative defenses; and (ii) award expenses and attorneys' fees. In this case, such sanctions do not equate to a default judgment because Yahoo will still be able to present its case in chief. *See Chilcutt v. United States*, 4 F.3d 1313, 1320 n. 17 (5th Cir. 1993) ("[D]eeming the establishment of certain facts is one of the least harsh sanctions available to courts [and] is only more severe than the granting of expenses and attorneys' fees."). The default judgment and dismissal cases cited by Yahoo are not applicable here because they evaluated sanctions more serious than what American reports. For the reasons recited above, moreover, Yahoo's conduct was and continues to be willful and in bad faith. *See Chilcutt*, 4 F.3d at 1320.

---

[13] Moreover, Yahoo failed to raise its claims about the meet-and-confer process for almost three weeks after the sanctions motion was filed and on the last business day before its response was due. American's lead counsel immediately arranged a call to hear Yahoo's concerns. In that call, Yahoo demanded that American's motion be withdrawn and rejected all parts of the relief American sought. A follow up request by American for Yahoo to reconsider its position was also rejected by Yahoo. (R. App. 59-60).

---

Respectfully submitted,

*[signature]*

Dee J. Kelly (State Bar No. 11217000)
Dee J. Kelly, Jr. (State Bar No. 11217250)
Lars L. Berg (State Bar No. 00787072)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 332-2500
Fax: (817) 878-9280

Frederick Brown (admitted *pro hac vice*)
Jason Stavers (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Market Street, Suite 3000
San Francisco, CA 94105
Phone: (415) 393-8200
Fax: (415) 986-5309

Howard S. Hogan (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539

*Attorneys for Plaintiff American Airlines, Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered on November 2, 2009 to Defendant's counsel, as follows, in accordance with the Federal Rules of Civil Procedure:

David F. Chappell
Scott A. Fredricks
CANTEY HANGER LLP
Cantey Hanger Plaza
600 West Sixth Street, Suite 300
Fort Worth, Texas 76102
*(via hand delivery)*

Michael A. Jacobs
Lynn M. Humphreys
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
*(via overnight delivery)*

/s/ Lars L. Berg
Lars L. Berg