American Airlines, Inc. v. Yahoo! Inc. et al

Doc. 171



ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2008 NOV -6  PM 4: 05

CLERK OF COURT

AMERICAN AIRLINES, INC.,

        Plaintiff,

   -v.-

YAHOO! INC. and OVERTURE SERVICES, INC.
d/b/a YAHOO! SEARCH MARKETING,

        Defendants.

No. 4:08-CV-626-A

---

**PLAINTIFF AMERICAN AIRLINES, INC.'S
MOTION TO EXCLUDE THE EXPERT REPORT OF
ISABELLA CUNNINGHAM AND BRIEF IN SUPPORT**

Frederick Brown (admitted *pro hac vice*)
Jason Stavers (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Phone: (415) 393-8200
Fax: (415) 986-5309

Howard S. Hogan (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539

Dee J. Kelly
State Bar No. 11217000
Dee J. Kelly, Jr.
State Bar No. 11217250
Lars L. Berg
State Bar No. 00787072
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Phone: (817) 332-2500
Fax: (817) 878-9280

*Attorneys for Plaintiff American Airlines, Inc.*

Dockets.Justia.com

# TABLE OF CONTENTS

Page

I. STANDARD ........................................................................................................ 2

II. BACKGROUND .............................................................................................. 2

III. ARGUMENT .................................................................................................. 3

    A. Cunningham Had No Legitimate Justification For Switching To An Internet Survey. ...................................................................................... 4

    B. The Internet Survey Failed to Sample the Appropriate Universe Of Consumers. .............................................................................................. 6

    C. Cunningham's Internet Survey Failed To Replicate Actual Market Conditions. ............................................................................................... 8

    D. The Internet Survey Was Skewed To Produce Yahoo's Desired Result. ....................................................................................................... 10

    E. Cunningham's Purported Validation Efforts Were Defective And Misleading. ............................................................................................... 11

    F. Cunningham's Opinion Would Not Assist The Jury Because She Failed To Test For The Type Of Confusion At Issue Here. ................ 12

    G. Cunningham Is Unqualified To Offer An Opinion Based On The Internet Survey In This Trademark Litigation. ................................... 14

IV. PRAYER .......................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amstar Corp. v. Domino's Pizza, Inc.,*
   615 F.2d 252 (5th Cir. 1980) ...................................................................... 6, 8

*Astrazeneca LP v. Tap Pharm. Prods., Inc.,*
   444 F. Supp. 2d 278 (D. Del. 2006) .................................................................. 5

*Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel Co.,*
   550 F.3d 465 (5th Cir. 2008) .......................................................................... 13

*Black v. Food Lion, Inc.,*
   171 F.3d 308 (5th Cir. 1999) ............................................................................ 4

*Casey v. Ohio Med. Prods.,*
   877 F. Supp. 1380 (N.D. Cal. 1995) ............................................................... 11

*Citizens Banking Corp. v. Citizens First Bancorp, Inc.,*
   No. 07-10985, 2007 U.S. Dist. LEXIS 88325 (E.D. Mich. Dec. 3, 2007) ............... 6

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993)......................................................................... 2, 10, 15

*Group Health Plan, Inc. v. Philip Morris USA,*
   344 F.3d 753 (8th Cir. 2003) .......................................................................... 12

*J & J Snack Foods, Corp. v. Earthgrains Co.,*
   220 F. Supp. 2d 358 (D.N.J. 2002) ................................................................. 15

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.,*
   No. 06 Civ. 550, 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) .......................... 5, 8

*Kinetic Concepts, Inc. v. BlueSky Med. Corp.,*
   No. SA-03-CA-0832, 2006 U.S. Dist. LEXIS 60187 (W.D. Tex. Aug. 11, 2006) .......... 7, 8, 14

*Learning Network, Inc. v. Discovery Commc'ns, Inc.*
   153 F. Supp. 2d 785 (D. Md. 2001)............................................................... 9, 13

*Malletier v. Dooney & Bourke, Inc.,*
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)......................................................... 5, 6, 15

**Table of Authorities**
**(Continued)**

*Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.,*
   No. 02 Civ. 3691 (DLC), 03 Civ. 707 (DLC), 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) ..... 9

*Moore v. Ashland Chem., Inc.,*
   151 F.3d 269 (5th Cir. 1998) ................................................................................ 2, 4

*Paz v. Bush Engineered Materials Inc.,*
   555 F.3d 383 (5th Cir. 2009) ................................................................................ 10

*Pipitone v. Biomatrix, Inc.,*
   288 F.3d 239 (5th Cir. 2002) ................................................................................ 2

*Reliance Ins. Co. v. Keystone Shipping Co.,*
   102 F. Supp. 2d 181 (S.D.N.Y. 2000) ................................................................... 11

*Sears, Roebuck & Co. v. Menard,*
   No. 01 C 9834, 2003 U.S. Dist. LEXIS 951 (N.D. Ill. Jan. 22, 2003) ..................... 13

*Simon Prop. Group, L.P. v. mySimon, Inc.,*
   104 F. Supp. 2d 1033 (S.D. Ind. 2000) ................................................................. 12

*Starter Corp. v. Converse, Inc.,*
   170 F.3d 286 (2d Cir. 1999) ................................................................................. 12

*Taylor Pipeline Constr., Inc. v. Directional Road Boring, Inc.,*
   438 F. Supp. 2d 696 (E.D. Tex. 2006) .................................................................. 14

*Univ. of Kan. v. Sinks,*
   No. 06-2341, 2008 U.S. Dist. LEXIS 23763 (D. Kan. March 19, 2008) .................. 6

*Vista Food Exch., Inc. v. Vistar Corp.,*
   No. 03-CV-5203, 2005 WL 2371958 (E.D.N.Y Sept. 27, 2005) .............................. 8

*Wallach v. Longevity Network, Ltd.,*
   No. CV 04-2404 SJO (RZx), 2006 WL 5106206 (C.D. Cal. Apr. 26, 2006) ............ 15

*Weisgram v. Marley Co.,*
   528 U.S. 440 (2000) ............................................................................................. 2

*Westchester Media Co. L.P. v. PRL USA Holdings, Inc.,*
   No. H-97-3278, 1999 U.S. Dist. LEXIS 12369 (S.D. Tex. Aug. 4, 1999) ................. 8

Page(s)

*Williamson Oil Co. v. Philip Morris USA,*
346 F.3d 1287 (11th Cir. 2003) .................................................................... 13

*Wilson v. Woods,*
163 F.3d 935 (5th Cir. 1999) ....................................................................... 14

**Other Authorities**

David S. Yeager et al., *Comparing the Accuracy of RDD Telephone Surveys and Internet Surveys Conducted with Probability and Non-Probability Samples* (Aug. 2009)...................... 5

Neil Malhotra, *Completion Time And Response Order Effects In Web Surveys,*
72 Pub. Opinion Q. 914 (2008)....................................................................... 5

Nick Sparrow, *Quality Issues in Online Research,* J. Advertising Research 179 (June 2007) ...... 5

Shari Seidman Diamond, "Reference Guide on Survey Research," *in*
FED. JUD. CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2000) ................. 11, 14

Plaintiff American Airlines, Inc. ("American") hereby respectfully submits this Motion to Exclude the Expert Report of Isabella Cunningham, and all testimony from her, concerning an Internet survey that she conducted on behalf of Defendant Yahoo! Inc. ("Yahoo"). Cunningham's Internet survey was designed to support a specific outcome favorable to Yahoo, and violates multiple basic standards of the social science research field in which Cunningham claims expertise. In particular:

- **1. <u>Cunningham unjustifiably switched methods midstream to a less-reliable Internet survey rigged to underreport the level of confusion.</u>** After Cunningham's mall survey demonstrated an actionable level of confusion, App. 8, ¶ 20; App. 14-15, ¶ 36; App. 16, ¶¶ 38–39), Cunningham switched to a survey of professional Internet users—even though such Internet surveys are inaccurate and inferior compared to traditional mall-intercept research techniques. (Part III.A.)

- **2. <u>The Internet respondents were not an accurate or representative sample of the universe of relevant consumers.</u>** Cunningham's Internet survey tested sophisticated Internet users. She did not make any attempt to ensure that typical Internet users were included among her survey population. Cunningham ignored a substantial and undisputed body of research—including Yahoo's own internal research—showing that the very confusion at issue in this case is most likely to plague inexperienced Internet users, rendering Cunningham's survey of experienced Internet users irrelevant. (Part III.B.)

- **3. <u>Use of fabricated web pages led the Internet survey to deviate sharply from actual market conditions.</u>** The online respondents were asked to react not to real or even realistic copies of Yahoo's website, but instead to a poor replica that "simplified" reality by erasing "an awful lot of advertising," App. 155-156—dooming the survey to generating results of no applicability to a case based on how consumers react to actual Yahoo pages. (Part III.C.)

- **4. <u>The Internet survey was designed to minimize the number of links respondents would select.</u>** Cunningham's questions effectively directed respondents to connect only a minimal number of Yahoo's advertisements to American. (Part III.D.)

- **5. <u>Cunningham did not properly validate the results.</u>** Instead, she added what she called a "validation" question, App. 9, ¶ 22), the effect of which was to further depress the reported confusion. (Part III.E.)

- **6. <u>The survey did not fit the legal theories at issue.</u>** Cunningham failed to ask even a single question to measure confusion related to endorsement or initial interest—issues central to this case. (Part III.F.)

Cunningham's conclusion is as flawed as the Internet survey behind it. Her conclusion is not only flatly inconsistent with, but fails to take *any* account of, Yahoo's damning admissions that it has strived to redirect customers away from algorithmic links and instead get them to click on the "Sponsor Results." *See* App. 158-163 (Cunningham knew nothing of Yahoo's own studies regarding the consumer confusion it causes or of third-party research showing the same).

## I. STANDARD

Expert testimony can be "quite misleading" to the jury "because of the difficulty of evaluating it," so district courts must act as gatekeepers by making a preliminary assessment of whether an expert's opinion is admissible under Federal Rule of Evidence 702 and not unfairly prejudicial under Rule 403. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993); *see, e.g., Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276, 279 (5th Cir. 1998). Expert testimony is "admissible only if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). As the proponent of Cunningham's testimony, Yahoo bears the burden of proving that *Daubert*'s "exacting standards" are met. *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).

## II. BACKGROUND

Yahoo designated Cunningham as its trademark infringement expert. Cunningham began her research in this case with a traditional mall survey conducted in eight cities. App. 8, ¶ 20; App. 14-15, ¶ 36. She hired a service to show consumer respondents a screenshot of a Yahoo page that contained several Sponsor Results. App. 6, ¶ 14. When asked to identify the links they would select if they "wanted to purchase a ticket *directly* from American," 44.7% of respondents either selected *only* a non-American link (17.2%), or clicked on a non-American link in addition to an American link (27.5%). App. 16, ¶ 38.

Without any scientifically-acceptable reason, Cunningham then abruptly ended her mall survey and opted for an Internet survey. The mall and Internet surveys differed sharply. For example:

- While the mall survey appeared to survey a representative sample of the population of consumers at issue in this case, the Internet survey went out only to people who take Internet surveys in exchange for compensation—*i.e.*, professional Internet users.

- The Internet survey included a new question specifically focusing respondents on American's website. *Compare* App. 39 *with* App. 58.

- The Internet survey included a new instruction focusing respondents on the need to purchase "***directly***" from American. App. 41 (emphasis added).

- In the mall survey, Cunningham could make sure respondents were only looking at the screens being tested. In the Internet survey, Cunningham had no way to see if respondents were doing their own Internet searches or using other means to look for the "right" answer to the questions posed.

- In the mall survey, respondents were free to click on as many links as they liked. In the Internet survey, respondents had to ignore Cunningham's instructions if they deemed it necessary to click on more than one link in response to Question 1 and were limited to identifying two links as responsive to Question 2.

Surprising no one, the Internet survey results conflicted with the mall survey results. For example, in the mall survey, where the respondents could, in fact, select more than one link, 55% of the respondents selected more than one link when asked "which of these links would purchase directly from American." In the Internet survey, by contrast, a mere 5% of the respondents offered multiple links in response to this question.[1]

## III. ARGUMENT

Cunningham's testimony concerning her so-called Internet study should be excluded under Rule 702 because her findings are demonstrably unreliable and irrelevant, and are unlikely

---

[1] The figures used in this comparison emerged from a review of the survey data underlying Cunningham's report. Cunningham did not dispute them. *See* App. 153.

to assist the jury. Even if minimal relevance is assumed, the probative value of her evidence is far outweighed by its prejudicial effect, warranting exclusion under Rule 403.

## A. Cunningham Had No Legitimate Justification For Switching To An Internet Survey.

None of the reasons Cunningham offers for switching from a mall survey to an Internet survey are supported by the record. In particular, Cunningham identifies no specific evidence that her mall survey did not capture "realistic conditions," that the questions were not "clearly stated," or that there was any problem involving "extraneous factors." App. 7, ¶ 17. Cunningham vaguely refers to the need to "avoid . . . specific interviewing biases[,]" App. 7-8, ¶ 18), but nothing in her reports identifies any particular bias in the mall survey. Nor did Cunningham's deposition testimony shed any light on the point: Although she testified that she wanted to "eliminate th[e] artificial situation" present in the mall survey because the survey investigators sat with respondents and recorded their actions as they viewed the sample pages on a computer screen (App. 136), she again did not offer any basis for concluding that an Internet survey would produce superior results. Furthermore, Cunningham did not personally observe the conduct of the mall survey (App. 135), so she apparently had no basis other than her own "personal" intuition for speculating about the precise conditions under which the survey was conducted. App. 136-137.

This kind of guesswork or intuition does not satisfy Rule 702, which mandates "some objective, independent validation of the expert's methodology." *Moore*, 151 F.3d at 276; *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999) (expert's self-proclaimed accuracy is inadequate). Cunningham's assertion that the Internet survey would be more realistic and less biased than the mall survey is directly contrary to published social science research, which has identified serious flaws in Internet panel surveys when compared to traditional

research techniques.[2]  Indeed, in a study of Internet users Cunningham conducted before this

case, she concluded that because Internet-based surveys "have less control over the condition of

the search and may even be influenced by others within their search environment," such research

is best "done in a laboratory setting where the computer monitor size, font setting size, keyword

selection and environment are designed consistently among all participants." App. 74.

Because of those known defects in Internet surveys, they are properly excluded under

Rules 702 and 403, particularly where (as here) the expert departs from generally-accepted social

science research principles by using an unrealistic format, asking "impermissibly leading"

questions, and "us[ing] improper stimuli." *See Kargo Global, Inc. v. Advance Magazine

Publishers, Inc.*, 2007 WL 2258688, **7, 12 (S.D.N.Y. Aug. 6, 2007); *see also Astrazeneca LP

v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 292 (D. Del. 2006) (courts do not rely on

Internet surveys "so lacking in reliability as to be effectively meaningless").  Moreover, when an

expert conducts a survey and then discards it in favor of a later one benefiting the sponsoring

party, the later survey is properly rejected as unreliable.  Thus, in *Malletier v. Dooney & Bourke,

Inc.*, 525 F. Supp. 2d 558, 612 (S.D.N.Y. 2007), the court excluded the survey and expert

---

[2]  *See* App. 83 (David S. Yeager et al., *Comparing the Accuracy of RDD Telephone Surveys and Internet Surveys Conducted with Probability and Non-Probability Samples*, at 3 (Aug. 2009)) (noting research finding that Internet panel survey respondent pool was "less representative of the population in terms of demographics" and tended to "over-represent people with high interest in the topic of the survey" when compared to traditional telephone poll); App. 97-98 (Neil Malhotra, *Completion Time And Response Order Effects In Web Surveys*, 72 Pub. Opinion Q. 914, 915 (2008)) (Internet survey respondents "satisfice," or "minimize effort in responding to surveys and simply provide the appearance of compliance," and at best only most extreme "panelists who produce 'junk' data" are excluded from data collection); App. 105 (Nick Sparrow, *Quality Issues in Online Research*, J. Advertising Research 179 (June 2007)) (noting "significant and disturbing" differences between Internet surveys and traditional methods "that seem to arise largely because" Internet "panel members are primarily motivated to participate in surveys by the money they hope to earn, and in some cases seem to expend little time and energy doing so").

testimony based on it, holding that while "'[i]t is legitimate to run a pilot survey for purposes of improving a study . . . in this case the circumstances hint at a darker purpose'" behind the switch—that is, the expert's improper desire to reach a conclusion more favorable to the sponsoring party. Here, as in *Malletier*, Cunningham pointed to no objective flaws in the mall survey that would have lead an expert in social science research to discard it. The absence of any legitimate social science justification for the switch, combined with the fact that the design and results of Cunningham's later survey were more favorable to Yahoo than those of her prior survey, warrant the conclusion that the later survey was legally unreliable.[3]

## B. The Internet Survey Failed to Sample the Appropriate Universe Of Consumers.

"[T]the adequacy of the 'survey universe,'" the Fifth Circuit has explained, is "one of the most important factors in assessing the validity of a [survey]," meaning that "the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) (internal citations omitted).

By Yahoo's own admission, less-experienced Internet users frequently mistake Sponsor Results for organic results. *See, e.g.,* SJ Opp'n App. 1746-55; 1901-1906; 2064-2078.[4] Indeed, in Cunningham's ***own previous academic research***, she concluded, among other things, that the

---

[3] Internet surveys have been admitted on occasion, but under conditions tellingly absent here. *See Univ. of Kan. v. Sinks*, 2008 U.S. Dist. LEXIS 23763, **2-3, 18-19 (D. Kan. March 19, 2008) (availability of rebuttal expert at trial reduced risk that flaws in Internet survey would lead to jury confusion); *Citizens Banking Corp. v. Citizens First Bancorp, Inc.*, 2007 U.S. Dist. LEXIS 88325 (E.D. Mich. Dec. 3, 2007) (District Court, sitting as trier of fact at preliminary injunction stage could consider Internet survey, *i.e.*, even where such may have confused jury).

[4] Citations to documents included in American's appendix in opposition to Yahoo's motion for summary judgment (Dkt. 138) are subject to Yahoo's motion to seal (Dkt. 140). Once the Court has ruled on Yahoo's motion to seal, American will submit a replacement version of the appendix for this motion that also includes these documents either under seal or in the public file in accordance with the Court's ruling on that motion to seal.

amount of previous "average daily use of the Internet" effects how a person views ads on the Internet. App. 75-76, 78 (accounting for Internet user experience by grouping research subjects "on the basis of their average daily use of the Internet"). Inexperienced Internet users therefore *must* be accounted for in any survey testing confusion generated by the Sponsor Results advertisements.

Far from adjusting her sample to ensure inclusion of inexperienced Internet users, Cunningham exclusively surveyed respondents who had signed up online with companies known as "Market Tools" and "Toluna." App. 132-134. These Internet-savvy panelists were compensated through receipt of "points" that incentivize respondents to participate in as many surveys as possible. App. 109; App. 130. In order to remain eligible to participate as respondents in Internet surveys, the Internet panelists are required to complete a certain number of online surveys over a particular period of time. Thus, the respondents who participated in Cunningham's Internet survey were not only persons who frequently take surveys online, but also persons with a much higher comfort level on the Internet. And yet, Cunningham did not even attempt to make sure that the Internet experience of these panelists reflected the characteristics of the population in general. App. 154.

Courts in this district have recognized that when an expert witness uses a convenient body of respondents for a survey, the expert must take "[s]pecial precautions" that are "*required* to reduce the likelihood of biased samples." *Kinetic Concepts, Inc. v. BlueSky Med. Corp.*, 2006 U.S. Dist. LEXIS 60187, *12 (W.D. Tex. Aug. 11, 2006) (emphasis added). In *Kinetic Concepts*, because the defendant's wound care products were marketed primarily to healthcare professionals, the disputed survey appropriately sampled the universe of purchasers by concentrating on doctors and nurses, allowing the survey to be admitted under *Daubert. See id.*

at **17–19. Cunningham's Internet survey, in contrast, was conducted under precisely the *opposite* conditions. Not only is it evident that she took none of the requisite "[s]pecial precautions," but by targeting only a set of Internet savvy respondents—panelists compensated by outside survey companies for their effort in taking surveys—she completely omitted from the sample the very persons most likely to be confused by the Sponsor Results advertisements. It therefore is clear "that the proper universe was [not] examined," *Amstar Corp.*, 615 F.2d at 264, rendering the survey results unreliable as a matter of law.

## C. Cunningham's Internet Survey Failed To Replicate Actual Market Conditions.

A survey is not probative when it fails to "accurately replicate the marketplace." *Westchester Media Co. L.P. v. PRL USA Holdings, Inc.*, No. H-97-3278, 1999 U.S. Dist. LEXIS 12369, *98 (S.D. Tex. Aug. 4, 1999), *aff'd in part on other grounds*, 214 F.3d 658 (5th Cir. 2000). Thus, to be admissible, the survey must "compare the impressions the marks have on potential customers under marketplace conditions." *Kargo*, 2007 WL 2258688, *7 (excluding trademark survey that failed to "approximate real world conditions"); *Vista Food Exch., Inc. v. Vistar Corp.*, 2005 WL 2371958, **5–7 (E.D.N.Y Sept. 27, 2005) (same). Cunningham's Internet survey flunked the marketplace conditions test.

In particular, Cunningham's "Internet" study *did not* attempt to replicate real Internet search conditions. Rather, Respondents viewed *fabricated* pages that "simplified" the presentation of Sponsor Results and organic links by omitting "an awful lot of advertising" that would normally appear, App. 155-156. Among other changes:

- Users did not engage in a real search using Yahoo's search engine; they instead were shown an automated questionnaire with a box labeled "Yahoo!" instead of an image of the website that Internet users usually see when they do a Yahoo search. Also, the flow of results was intentionally interrupted by intervening instructions. App. 36-39.

- Rather than show respondents a complete search engine results page, Cunningham's study framed the results page with a question, App. 145-146, highlighting the artificiality of the exercise.

- Cunningham took an advertisement for American's official site, AA.com, and put it at the top of the page used in the survey, even though it appeared off to the side in the original screen shot. App. 147-148.

- Cunningham also replaced the non-paid, or natural links that normally appear on the first page of a Yahoo search for "American Airlines" with text for links that happen to be for Yahoo's advertisers—with no regard to whether such links would actually appear on the *first* page delivered in response to such a search. Cunningham "just trusted that—the fact that [links to OTA sites] appeared as organic site[s] was relevant to me." App. 138-141.

Because Cunningham's Internet survey bore little resemblance to a Yahoo page that a consumer would actually encounter if they entered "American Airlines" into a Yahoo search page, Cunningham's report offers little probative value and should be excluded. *See Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, 2004 WL 326708, *9–10 (S.D.N.Y. Feb. 23, 2004) (excluding Internet survey that bore "little resemblance to the . . . decision-making process that occurs in the real world"); *see also Learning Network, Inc. v. Discovery Commc'ns, Inc.*, 153 F. Supp. 2d 785, 790–91 (D. Md. 2001) (elimination of the title bar in a manufactured screenshot provided to survey respondents was not equivalent to the "information that would be available to a real world consumer").

Worse, by inserting a link to the official American website in the top spot of her survey page, Cunningham distorted the results of her survey by driving a large number of respondents to click on the American link rather than the link to Yahoo's other advertisers. Indeed, Cunningham's previous academic research has recognized that when a "search ad" is placed in the "first ranking position" at the top of a page, it "appears to receive more attention" from users and users are more likely to click on it. App. 77; App. 126. And this selective placement purposefully avoided testing for one of the key forms of confusion at issue in the case.

American's complaint alleged that Yahoo infringes its rights by forcing American to buy its own marks to attain the top position, and specifically addressed the confusion caused when Yahoo permits other advertisers to take that top spot. App. 148-149. Although Cunningham admits that the "question of what the level of confusion would be if American did not buy the top spot on the Yahoo search results page" is "relevant," App. 149-150, Cunningham inexplicably asserted that she did not believe "it was necessary to test" for this confusion, App. 150. Research based on such a subjective determination is unreliable as a matter of law. *See, e.g., Paz v. Bush Engineered Materials Inc.*, 555 F.3d 383, 388–90 (5th Cir. 2009) (noting that expert testimony cannot be based on "subjective belief or unsupported speculation," and affirming exclusion of opinion "fundamentally based on insufficient information") (quoting *Daubert*, 509 U.S. at 590).

## D. The Internet Survey Was Improperly Skewed To Produce Yahoo's Desired Result.

The Cunningham survey is also unreliable because it appears designed to minimize confusion by restricting the number of links that a respondent would identify as associated with American. In particular, the survey confronted respondents with a series of instructions and questions that emphasized that respondents were being asked to find the "right" link for American:

- First, the Cunningham survey asked respondents to identify the link "to the American Airlines' [sic] website," App. 39, implying there is only one such link;

- Second, an instruction emphasized that respondents were to "click on your **first** choice," and then "click on the red button in the lower-right corner." *Id.* (emphasis in original). When the respondent clicked on the red button, the respondent was taken to a new screen with the following question and instruction: "Why did you click on that link? When you are finished typing, please click on the red button." *Id.* Clicking on the red button advanced the survey to the *next* question. *See id.* Cunningham admitted that respondents would need to "ignore" these instructions to select more than one link for going "to the American Airlines' [sic] website." *See* App. 152.

- Third, before respondents advanced to the "next question," they were confronted with an instruction focusing on the need to purchase "**directly**" from American. App. 41 (emphasis in original).

As a result, the Internet survey was rigged to cause respondents to select fewer links than they did in the mall survey. In essence, by structuring this question as she did, Cunningham created a demand effect whereby the survey respondents where deterred from selecting more than one link in subsequent questions.[5]

## E. Cunningham's Purported Validation Efforts Were Defective And Misleading.

Cunningham also artificially depressed the level of confusion found in her survey by using a "validation" question that was designed to weed out and exclude the most confused respondents. Under well-established standards for survey research, a survey should be "validated" by having an independent party test "whether the initial interviews took place and to determine whether the respondents were qualified to participate in the survey." Shari Seidman Diamond, "Reference Guide on Survey Research," *in* FED. JUD. CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 267 (2d ed. 2000). Cunningham did not, however, perform any independent validation with the Internet survey respondents, rather she relied on the word of her vendors that her participants were who they said they were. App. 129-130.

Instead, Cunningham made up her own form of "validation" which is actually nothing of the sort. App. 127. She asked the respondents to "state what they had been asked . . . ." App. 128; *see* App. 49 ("Which of the following were you asked")). If a respondent did not answer

---

[5] The Cunningham survey also suffers from the fact that it has no effective control. As Cunningham testified, the purpose of an experimental control is to measure as a baseline the reactions of respondents who are not exposed to "the elements that are considered to be infringing." App. 151. But rather than test for confusion where no infringing conduct was present, Cunningham instead inserted a different type of infringing conduct: ads that were designed to appear among the algorithmic links rather than the designated sponsor results. Cunningham testified that she was not aware of these allegations. App. 141-144. Cunningham's failure to include a valid control group in her Internet survey renders it legally unreliable and therefore excludable. *See, e.g., Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995); *Reliance Ins. Co. v. Keystone Shipping Co.*, 102 F. Supp. 2d 181, 191 (S.D.N.Y. 2000).

this question "correctly[,]" Cunningham excluded this person's responses from the overall results of the Internet survey. App. 8, ¶ 19. Importantly, because respondents needed to be able to distinguish between "purchas[ing] a ticket directly from American Airlines" and purchasing "from any of the links," App 49, Cunningham excluded consumers who manifested the confusion most at issue in the case—confusion between links to American and links to Yahoo's other advertisers.[6]

Cunningham's "validation" therefore reduces her survey to little more than a "memory test," which courts have routinely found are of little probative value. *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999); *see also Simon Prop. Group, L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1045 (S.D. Ind. 2000) (rejecting proposed survey that "amounts to little more than a meaningless word association or memory exercise").

## F.  Cunningham's Opinion Would Not Assist The Jury Because She Failed To Test For The Type Of Confusion At Issue Here.

If the expert's opinion is not "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving [the] factual dispute," it does not "fit" the case and is inadmissible. *Daubert*, 509 U.S. at 591; *see, e.g., Group Health Plan, Inc. v. Philip Morris USA*, 344 F.3d 753, 760–61 (8th Cir. 2003). Similarly, where an expert's opinion is based on an erroneous legal

---

[6] In addition, Cunningham's "validation" question did not even accurately quote the language from the previous question in the survey. The previous question asked: "If you *wanted to purchase* a ticket directly from American Airlines, which of these links would you click on?" App. 8, ¶ 19 (emphasis added). The "validation" question did not provide this option. Instead, respondents were asked whether they previously had been asked "*to purchase* a ticket directly from American Airlines," "*to purchase* an American Airline ticket form any of the links," or "*to purchase* a ticket from any airline." App. 49 (emphases added). As Cunningham herself admits, the previous question did not ask respondents "to purchase" a ticket—it asked "[i]f you *wanted* to purchase a ticket . . . ." App. 157 (emphasis added). There is simply no telling how many respondents selected an answer Cunningham considered "wrong" because there was no option that tracked the actual previous question asked.

standard, the expert's opinion is not helpful to the trier of fact and, thus, is inadmissible. *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1322–23 (11th Cir. 2003).

The legal theories at the heart of this case concern confusion associated with the false perception of affiliation, endorsement, or sponsorship, and initial interest confusion. *See, e.g.,* First Amend. Compl. (Dkt. 98) ¶ 63 (alleging that significant share of consumers "are likely to believe falsely that it was American Airlines who 'sponsored' the link that appears alongside the purportedly 'natural' search engine results"). In utter disregard of the issues in this case, Cunningham failed to ask the Internet respondents any questions that would gauge affiliation, endorsement, or sponsorship confusion. *See* App. 124. She also failed to ask any question that would measure initial interest confusion. *See* App. 125, 131. *See generally Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 488 (5th Cir. 2008) (a nominative fair use "cannot be one that creates a likelihood of confusion as to source, sponsorship, affiliation, or approval") (internal quotation marks omitted).

In another case where a party failed to "ask respondents a very important question[,]" the court found that the survey "did not accurately gauge likelihood of confusion" and excluded the survey "under Rule 403 because the results are likely to create unfair prejudice, confuse the issues, waste time, and most importantly, mislead the jury." *Sears, Roebuck & Co. v. Menard*, 2003 U.S. Dist. LEXIS 951, *9–11 (N.D. Ill. Jan. 22, 2003); *see also Learning Network, Inc.*, 153 F. Supp. 2d at 790 (granting plaintiff's motion to exclude defendant's expert where the expert's "survey was severely defective by virtue of its failure to ask any question that would test the critical question of what website it is that the subject thought they had seen"). Likewise here, given Cunningham's failure to ask a single question addressing the types of confusion at issue in

this case, this Court should exclude her testimony and report because none of her findings would be helpful to the trier of fact.

## G. Cunningham Is Unqualified To Offer An Opinion Based On The Internet Survey In This Trademark Litigation.

It is well-settled that "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *See Taylor Pipeline Constr., Inc. v. Directional Road Boring, Inc.*, 438 F. Supp. 2d 696, 705 (E.D. Tex. 2006). The court must determine whether a proffered expert "is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *See id.* (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).

In that regard, Cunningham lacked qualifications in the field of Internet survey research: She has not received any academic grants to perform Internet surveys, App. 112, and does not conduct Internet surveys for her academic research, *id.* Before this case, Cunningham had never (i) conducted a survey testing trademark confusion, App. 112-113; (ii) published any articles regarding trademark confusion, App. 113-114; (iii) testified in a trademark case, App. 115-119; or (iv) conducted a trademark survey for use in litigation, App. 120. Moreover, Cunningham had never heard of basic trademark concepts at issue in this case, including "sponsorship confusion," App. 123, or read any articles on another key concept, "initial interest confusion" in the trademark context, App. 125. This is not surprising because Cunningham does not stay informed about legal developments regarding the admissibility of surveys in court, App. 122, and she was not familiar with the "Reference Guide on Survey Research," by Shari Seidman Diamond, published by the Federal Judicial Center as part of the REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2000), App. 121-122, even though that source is widely cited by courts in examining trademark surveys in particular, *see, e.g., Kinetic Concepts*, 2006 U.S. Dist. LEXIS

60187, **12, 22–23; *Malletier*, 525 F. Supp. at 562 n.11, 595, 596, 602, 604, 611, 615, 629; *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 370 n.11 (D.N.J. 2002).

Based on that acknowledged lack of relevant experience and knowledge "in the relevant field, [Cunningham's] testimony as to [confusion] cannot be considered reliable as required by [Federal Rule of Evidence] 702, *Daubert*, and *Kumho Tire Co.*" *See Wallach v. Longevity Network, Ltd.*, 2006 WL 5106206, *2 (C.D. Cal. Apr. 26, 2006) (rejecting as unqualified expert whose "lack of experience in the trademark infringement field makes him an inappropriate witness").

## IV. PRAYER

For the reasons provided above, American respectfully requests that the Court enter an order prohibiting Yahoo from offering into evidence either the expert report or testimony by Isabella Cunningham concerning the Internet study she performed in this case.

Dated: November 6, 2009

Respectfully submitted,

_(signature)_

Frederick Brown (admitted *pro hac vice*)
Jason Stavers (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Phone: (415) 393-8200
Fax: (415) 986-5309

Howard S. Hogan (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539

Dee J. Kelly
State Bar No. 11217000
Dee J. Kelly, Jr.
State Bar No. 11217250
Lars L. Berg
State Bar No. 00787072
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Phone: (817) 332-2500
Fax: (817) 878-9280

*Attorneys for Plaintiff American Airlines, Inc.*

## CERTIFICATE OF CONFERENCE

I certify that counsel for American conferred with counsel for Defendants, but agreement as to the relief requested in this motion was not reached. Therefore, it is presented to the Court for determination.

_(signature)_

Dee J. Kelly, Jr.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered on November 6, 2009

to Defendant's counsel, as follows, in accordance with the Federal Rules of Civil Procedure:

David F. Chappell
Scott A. Fredricks
CANTEY HANGER LLP
Cantey Hanger Plaza
600 West Sixth Street, Suite 300
Fort Worth, Texas  76102
(via hand delivery)

Michael A. Jacobs
Lynn M. Humphreys
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
(via Federal Express)

_____
Dee J. Kelly, Jr.