American Airlines, Inc. v. Yahoo! Inc. et al

Doc. 220



FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT. WORTH DIVISION

2009 NOV 25  PM 1: 30

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

AMERICAN AIRLINES, INC.,

          Plaintiff,

    -v.-

YAHOO! INC. and OVERTURE SERVICES,
INC. d/b/a YAHOO! SEARCH
MARKETING,

          Defendants.

Case No. 4:08-CV-626-A

## DEFENDANTS' OPPOSITION TO PLAINTIFF AMERICAN AIRLINES' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. ISABELLA CUNNINGHAM

Dockets.Justia.com

# TABLE OF CONTENTS

      **Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 3

LEGAL STANDARD.............................................................................................................. 4

ARGUMENT ........................................................................................................................... 5

I.      AN INTERNET SURVEY IS RELIABLE AND ADMISSIBLE..................................... 5

II.     DR. CUNNINGHAM'S SURVEY UNIVERSE — INTERNET USERS — WAS
       APPROPRIATE TO THIS CASE ................................................................................... 9

III.    DR. CUNNINGHAM'S SURVEY USED PROPERLY DESIGNED STIMULI........... 12

        A.    Relevant Sponsor Results ...................................................................... 12

        B.    Other Technical Complaints .................................................................. 14

IV.   DR. CUNNINGHAM'S SURVEY TESTED FOR CONFUSION IN A MANNER
       CONSISTENT WITH AMERICAN'S THEORY OF THE CASE .............................. 16

V.     DR. CUNNINGHAM'S SURVEY RESULTS WERE VALIDATED AND THE
       METHODOLOGY USED TO COMPLETE EACH SURVEY IS SOUND ................. 18

VI.   DR. CUNNINGHAM APPROPRIATELY AVOIDED TRICK QUESTIONS
       ABOUT WHETHER AMERICAN ENDORSED OR APPROVED OF ITS OWN
       AGENTS' WEBSITES.................................................................................................. 20

VII.  AMERICAN'S PERSONAL ATTACK ON DR. CUNNINGHAM'S
       PROFESSIONAL AND ACADEMIC CREDENTIALS IS UNFOUNDED ................. 22

CONCLUSION...................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**C**ASES

*1-800 Contacts, Inc. v. WhenU.com,*
    309 F. Supp. 2d 467 (S.D.N.Y. 2003), *rev'd on other grounds*, 414 F.3d 400 (2d Cir.
    2005) ................................................................................................................6

*AstraZeneca LP v. Tap Pharm. Prods.,*
    444 F. Supp. 2d 278 (D. Del. 2006) .........................................................................6

*Bach v. Forever Living Prods. U.S., Inc.,*
    473 F. Supp. 2d 1110 (W.D. Wash. 2007) ..............................................................6

*Citizens Banking Corp. v. Citizens First Bancorp, Inc.,*
    No. 07-10985, 2007 U.S. Dist. LEXIS 88325 (E.D. Mich. Dec. 3, 2007) ..........6, 18

*Designer Skin, LLC v. S&L Vitamins, Inc.,*
    560 F. Supp. 2d 811 (D. Ariz. 2008) ...............................................................17 n.7

*Empresa Cubana Del Tabaco v. Culbro Corp.,*
    70 U.S.P.Q.2d 1650 (S.D.N.Y. 2004) .....................................................................6

*Group Health Plan, Inc. v. Philip Morris USA,*
    344 F.3d 753 (8th Cir. 2003) ...........................................................................22 n. 11

*Harold Stores, Inc. v. Dillard Dep't Stores, Inc.,*
    82 F.3d 1533 (10th Cir. 1996) ...............................................................................16

*Indianapolis Colts v. Metropolitan Balt. Football Club Ltd. P'ship,*
    34 F.3d 410 (7th Cir. 1994) .....................................................................................5

*Johnson v. Big Lots Stores, Inc.,*
    No. 04-3201, 2008 U.S. Dist. LEXIS 35316 (E.D. La. Apr. 29, 2008)...............6, 16

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.,*
    No. 06 Civ. 550 (JFK), 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)..................6, 18

*Kinetic Concepts, Inc. v. BlueSky Med. Corp.,*
    No. SA-03-CS-0832, 2006 U.S. Dist. LEXIS 60187 (W.D. Tex. Aug. 11, 2006) .......... *passim*

*Kis, S.A., PMI Photomagic, Ltd. v. Foto Fantasy, Inc.,*
    204 F. Supp. 2d 968 (N.D. Tex. 2001) ....................................................................5

*Learning Network, Inc. v. Discovery Commc'ns, Inc.,*
    153 F. Supp. 2d 785 (D. Md. 2001) .................................................................22 n. 11

D**EFENDANTS'** O**PPOSITION TO** P**LAINTIFF'S** M**OTION TO** E**XCLUDE THE** E**XPERT** R**EPORT OF**
D**R.** I**SABELLA** C**UNNINGHAM**

Page ii

*Mary Kay, Inc. v. Weber,*
    601 F. Supp. 2d 839 (N.D. Tex. 2009) .........................................................2, 21, 22

*Scott Fetzer Co. v. House of Vacuums Inc.,*
    381 F.3d 477 (5th Cir. 2004) .................................................................................5

*Sears, Roebuck and Co. v. Menard,*
    No. 01 C 9843, 2003 U.S.Dist.LEXIS 951 (N.D. Ill. January 24, 2003) .................17, 22 n. 11

*Simon Prop. Group L.P. v. MySimon, Inc.,*
    104 F. Supp. 2d 1033 (S.D. Ind. 2000)...........................................................17, 18

*Univ. of Kan. v. Sinks,*
    No. 06-2341-JAR, 2008 U.S. Dist. LEXIS 23763 (D. Kan. Mar. 19, 2008)...........................6

*Wallach v. Longevity Network, Ltd.,*
    No. CV 04-2404 SJO .............................................................................................24

*Williamson Oil Co. v. Philip Morris USA,*
    346 F.3d 1287 (11th Cir. 2003) ..............................................................22 n. 11

## OTHER AUTHORITIES

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition Litig.,*
    § 32:163.50 (4th ed 2009).........................................................................................8
    § 32:178 (4th. ed. 2009)............................................................................................5

Shari Seidman Diamond, *Reference Guide on Survey Research,* published in the Federal
    Judicial Center's Reference Manual on Scientific Evidence (2d ed. 2000) .................8, 11, 15

# INTRODUCTION

Dr. Isabella Cunningham designed and conducted a survey to investigate empirically American's theory in this case: that Internet users trying to find American Airlines' official website are confused by advertising on Yahoo!'s search results page into clicking on another advertiser's website instead. (First Am.Compl. (Dkt. No. 89) ("FAC") at 5.) American contends that its trademarks are infringed as soon as a consumer first clicks on a third-party advertiser's link. (*Id.*; Opp. App. 005-06 (Goodstein ¶ 111-112).) Although this theory ignores how most people use the Internet (they press the "Back" button if the first link leads to a website they are not interested in), Dr. Cunningham understood the allegations and designed a survey to assess American's theory.

Dr. Cunningham asked a representative population of survey respondents to view a representative sample of accused advertisements and found that consumers were not confused. When asked to identify a link to American Airlines' website, they properly identified one of several links to AA.com. (Appendix in Support of Plaintiff American Airlines, Inc.'s Motion to Exclude the Expert Report of Isabella Cunningham ("App.") (August 16, 2009 Expert Report of Dr. Isabella Cunningham ("Cunningham Rpt.") ¶¶ 41-42).) They also properly chose AA.com when asked which link would allow them to purchase a ticket directly from American Airlines. (*Id.*) Dr. Cunningham's survey thus squarely refutes American's allegations.

Recognizing the devastating impact of Dr. Cunningham's survey, American has attacked it from several angles. Indeed, on the theory that the best defense is a good offense, American attacks most vociferously on points where its own survey evidence is weak. American argues that Dr. Cunningham should not have conducted a survey about Internet advertising over the Internet; she should have confined herself to shopping malls as did American's expert,

Dr. Englis. (Plaintiff American Airlines, Inc.'s Motion to Exclude the Expert Report of Isabella Cunningham and Brief in Support (Dkt. 171) ("Mot.") at 4-5.) On this point and on the other issues American raises, there are no grounds for excluding the testimony of Dr. Cunningham. In particular:

- An Internet survey is superior to a mall-intercept survey in this case because it more closely approximates the experience of Internet searching and the universe of Internet searchers. Dr. Cunningham's pilot efforts to test her survey approach in the mall did not suggest otherwise. (Section I.)

- There is no evidence that Dr. Cunningham's survey universe is more sophisticated about Internet advertising than are typical Internet users, but even if there were such evidence, the demographic profile of those who use AA.com is also more educated and affluent than typical Internet users. (Section II.)

- The screen displays in Dr. Cunningham's survey accurately replicated the marketplace at issue here. They included on the Experimental page third party advertisements taken directly from American's Complaint and an otherwise similar Control page without those third party advertisements. A Sponsor Result for American was properly included on both pages because such an advertisement appeared on the screenshot in American's Complaint as well as in Dr. Cunningham's 2009 search. (Section III.)

- American's objections that Dr. Cunningham focused on respondents' initial responses and limited their ability to select multiple links ignores a fundamental premise of this case: if a consumer clicks on the "right" link to AA.com the first time, he or she is not confused by the third party advertisements. (Section IV.)

- Dr. Cunningham's inclusion of a validation question in her survey ensured that respondents had paid attention and understood the question posed such that their responses were reliable. The companies providing Internet panels also validated the participants. (Section V.)

- American complains that Dr. Cunningham's survey did not ask about endorsement, sponsorship, or affiliation, but that question makes no sense in this case because most of the advertisers *were* affiliated with and endorsed by American Airlines. They were American's appointed agents, authorized to sell American Airlines travel under the American Airlines name. Even for unauthorized sales, "responses of interviewees who believed affiliation existed solely because the website sells [the trademarked product or service] are inadmissible." *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2nd. 839, 849 (N.D. Tex. 2009). Thus, Dr. Cunningham's survey assessed the only type of confusion that makes sense in this case. (Section VI.)

- Contrary to American's assertions, Dr. Cunningham is well-qualified to offer an opinion in this case. She has a Ph.D. in marketing and over thirty years experience in marketing research; she is the Chair of her department at the University of Texas; and she has conducted numerous surveys relating to consumer perceptions and responses to advertising. (Opp. App. 233-46 (Cunningham Rpt. Excerpts).) (Section VII.)

## FACTUAL BACKGROUND

As set forth in her August 16, 2009 Expert Report, Dr. Isabella Cunningham, the Ernest A. Sharpe Centennial Professor in Communication and Department Chair at the University of Texas at Austin, conducted an Internet survey of thirteen hundred and seventeen (1,317) subjects drawn from two large Internet research panels. Dr. Cunningham first screened potential respondents to weed out those who would not use the Yahoo! search engine to obtain information about products or services, and would not consider purchasing an American Airlines ticket over the Internet. (App. 9 (Cunningham Rpt. ¶ 22).) Respondents who met the screening criteria were asked to conduct a search on a simulated Yahoo! search page using the term "American Airlines" and then to review a resulting Yahoo! search results page.

Respondents were then asked (1) "If you wanted to go to the American Airlines' website, which of these links would you click on?" (the "Go To Question") and (2) "If you wanted to purchase a ticket directly from American Airlines, which of these links would you click on"? (the "Purchase Question"). (App. 3-4, 6 (Cunningham Rpt. ¶¶ 6, 13).) Respondents' "clicks" on particular links were recorded by the survey instrument, but the clicks did not take survey respondents to the corresponding websites. Rather, after each question, respondents were asked to provide the reasons for their selections. (App. 20-50 (Cunningham Rpt. Ex. 1).)

The respondents in the Cunningham survey were divided into two groups. One group, the Control Group, was asked to complete these tasks while looking at a Yahoo! Search results page that displayed only an American Airlines-sponsored advertisement along with "organic"

search results. (*Id.*) The other group, the Experimental Group, was asked to complete the same tasks while looking at a Yahoo! Search page similar to the Control except that it also displayed several third-party Sponsor Results taken directly from a screenshot American had included in its Complaint as representative of Yahoo!'s alleged infringement. (*Id.*) The "organic" results for both the Control and the Experimental pages were the same. They included links to American Airlines sites as well as third-party websites, distilled by Dr. Cunningham from multiple pages of actual Yahoo! search results for "American Airlines."

The results of Dr. Cunningham's research were overwhelming. In response to the Go To Question, in the Experimental treatment, 92.3% of the respondents clicked only on a link to the American Airlines site. Only 6.5% of the respondents clicked on non-American links only and 1.2% clicked on both an American and a non-American link. (App. 10 (Cunningham Rept. ¶24).)

Similarly, in Response to the Purchase Question, 95.9% of Respondents clicked only on an American Airlines link. Only 4% clicked only on a link or links other than an American Airlines link, while .2% clicked on both an American Airlines link or links and a non-American Airlines link or links.

These numbers are convincing, even before one subtracts out any potential confusion shown in the Control results. Comparing to the control group only confirms that almost none of the survey respondents were confused about the source of the advertisement as a result of the presence of sponsored search advertising.

## LEGAL STANDARD

American has accurately set forth the legal standard that governs this motion. Expert testimony must be "both relevant and reliable" to be admissible (Mot. at 2 (citing *Pipitone v.*

*Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)), and the Court should exclude survey evidence whose "serious flaws … make any reliance on that survey unreasonable." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004) (internal citation omitted). On the other hand, technical or methodological deficiencies of the type American charges against Dr. Cunningham's survey, even if substantiated, bear on a survey's weight, not its admissibility. *Kis, S.A., PMI Photomagic, Ltd. v. Foto Fantasy, Inc.*, 204 F. Supp. 2d 968, 973 (N.D. Tex. 2001). "The proper approach is to view [surveys] with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out of hand." 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition Litig.*, § 32:178 (4th ed. 2009). As one court has succinctly stated: "Trials would be very short if only perfect evidence were admissible." *Indianapolis Colts v. Metropolitan Balt. Football Club Ltd. P'ship*, 34 F.3d 410, 416 (7th Cir. 1994).

## ARGUMENT

## I.  AN INTERNET SURVEY IS RELIABLE AND ADMISSIBLE

American objects that a survey designed to assess how Internet users conduct Internet searches to gather information or make a purchase over the Internet should not be conducted over the Internet. American prefers that the survey be conducted in a mall. American inaccurately represents legal authority, incompletely portrays the state of social science research, and misleadingly quotes from Dr. Cunningham's deposition testimony in attempting to make its case.

American argues that because of "known defects in Internet surveys, they are properly excluded under Rules 702 and 403." (Pl's Mot. at 5.) But American cites not a single case in which a court refused to admit an Internet survey on the basis that it was conducted over the

Internet. Contrary to American's representation, *AstraZeneca LP v. Tap Pharm. Prods.*, 444 F.

Supp. 2d 278 (D. Del. 2006), makes no statement of any kind about the reliability of Internet

surveys. There was no Internet survey in *AstraZeneca*. The case involved a *mall survey* that

asked respondents to look at an advertisement that had previously appeared on the Internet.

(Opp. App. 274-75 (*AstraZeneca* case brief ¶6).) The other case on which American relies,

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Civ. 550 (JFK), 2007 WL

2258688, at *8 (S.D.N.Y. Aug. 6, 2007), does not support the claim because that survey had a

"major flaw" unrelated to the fact it was administered over the Internet.

Other cases have endorsed Internet surveys and admitted them into evidence. *See, e.g.,*

*Johnson v. Big Lots Stores, Inc.*, No. 04-3201, 2008 U.S. Dist. LEXIS 35316, at *6 (E.D. La.

Apr. 29, 2008) ("wider-reaching survey" over the Internet would have been preferable to in-

person interviews); *1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467, 479-81, 499-501

& n.54 (S.D.N.Y. 2003), *rev'd on other grounds*, 414 F.3d 400 (2d Cir. 2005) ; *Kinetic*

*Concepts, Inc. v. BlueSky Med. Corp.*, No. SA-03-CS-0832, 2006 U.S. Dist. LEXIS 60187 (W.D.

Tex. Aug. 11, 2006); *Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1110, 1116

(W.D. Wash. 2007); *Univ. of Kan. v. Sinks*, No. 06-2341-JAR, 2008 U.S. Dist. LEXIS 23763 (D.

Kan. Mar. 19, 2008); *Citizens Banking Corp. v. Citizens First Bancorp, Inc.*, No. 07-10985, 2007

U.S. Dist. LEXIS 88325 (E.D. Mich. Dec. 3, 2007); *Empresa Cubana Del Tabaco v. Culbro*

*Corp.*, 70 U.S.P.Q.2d 1650, 1672-73 (S.D.N.Y. 2004).

The social sciences also supports reliance on Internet surveys. As Dr. Cunningham

testified, the Department she chairs at the University of Texas, "the number one department in

advertising and public relations in the nation," uses an online virtual panel for some of its

academic research. (Opp. App. 233-46 (Cunningham Rpt. Excerpt); Opp. App. 015-16

(Cunningham Depo. at 109:10-110:20).)  Others support the conclusion that "Internet-based survey produce data that are at least as reliable, valid, and of equal quality as data obtained in more traditional survey methodologies."  (Opp. App. 064 (Cunningham Decl., Ex. 7 at 107-08).)

Indeed, American's own survey expert has written, "Conversion from mail, telephone, or direct interviewing survey techniques to a Web-based format has several compelling advantages."  (Opp. App. 100 (Michael R. Solomon et al. (including Basil Englis), *The Virtual Mall: Using the Internet to Configure the Ideal Shopping Environment*, 9 J. of Shopping Center Research 27, 30 (Spring/Summer 2002)).)  Enumerating the many advantages of Internet-based surveys, Dr. Englis and his co-authors observed, "[t]he researcher has the capability of reaching a larger and more diverse subject population," and, "[s]ince data collection is automated and coding errors all but eliminated, data costs per respondent are considerably lower."  *Id.*[1]

Finally, American complains that Dr. Cunningham "switched" from a mall survey to an Internet survey without justification, but American ignores the reasons Dr. Cunningham gave for what she did.  (Mot. at 1.)  Dr. Cunningham testified that she intended from the outset to conduct an Internet survey (Opp. App. 014 (Cunningham Depo. 103:14-18)), but first tested her survey in shopping malls as a pilot effort.  In reporting on her pilot survey, Dr. Cunningham has exceeded all standards of transparency, as "[i]t is not usual practice for survey experts to disclose or discuss in the expert report the existence or scope of pilot testing."  6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition Litig.*, § 32:163.50 (4th ed 2009).  American

---

[1] *See also* Karin Braunsberger et al., *A comparison of reliability between telephone and web-based surveys*, J. of Bus. Research, 60 (2007), 758-764 (benefits of Internet surveys include that they are free from interviewer bias and misbehavior and are likely to reduce certain types of response errors).  Note also that the potential issues with Internet-based surveys that American cites (Mot. at 5, n.2) are addressed by validation reviews that the survey company undertakes. (*See* (Opp. App. 077-78; 081-96  (Cunningham Decl., Exs. 10, 12, 13, 14).)

is simply wrong that Dr. Cunningham's pilot efforts demonstrated actionable levels of confusion. (Mot. at 1.) Her pilot efforts involved a small sampling and demonstrated only that there were several ways the survey needed to be improved.

In making changes to her survey design as a result of the pilot, Dr. Cunningham was following respected survey practice. American's cited reference manual on survey research (Mot. at 11, 14) explains, "[P]ilot work can improve the quality of a survey" and changes to a survey after piloting "may indicate informed survey construction rather than flawed survey design." (Opp. App. 141 (Shari Seidman Diamond, *Reference Guide on Survey Research*, published in the Federal Judicial Center's Reference Manual on Scientific Evidence (2d ed. 2000) ("Diamond Article") at 249).)

American is particularly disingenuous in attributing Dr. Cunningham's decisions on survey design to "personal intuition" (Mot. at 4), as Dr. Cunningham relied on academic experience that American chose to overlook. American ignores portions of Dr. Cunningham's deposition where she explained her department's commitment to studying "new media" and the faculty's conclusion "that Web research is a very appropriate tool when dealing with Web users." (Opp. App. 015-16 (Cunningham Depo. at 109:10-110:20).) American also discounts Dr. Cunningham's explanation in her report for why an Internet survey would be superior (App. 7-8 (Cunningham Rpt. ¶ 18)), even though problems in administering Dr. Englis's mall survey show that her concerns about interviewer bias were well-founded. (Dr. Englis found that some interviewers took more than half an hour to administer his survey, while others processed

respondents in as little as 3-4 minutes. (Opp. App. 047-49 (Cunningham Decl., Ex. 4); Opp. App.180-187 (Englis Depo. 198:18-200:17; 205:12-22; 206:24-207:24; 209:18-210:19).)[2]

In sum, American is wrong to ask that this Court penalize Dr. Cunningham's use of a pilot survey to improve her survey approach. Her Internet survey should be judged on its own merit, and admitted into evidence.

## II. DR. CUNNINGHAM'S SURVEY UNIVERSE — INTERNET USERS — WAS APPROPRIATE TO THIS CASE

American is right that courts must be exacting in their review of the adequacy of the survey universe (Mot. at 6), but wrong in its criticism of Dr. Cunningham's Internet panels as unrepresentative. The Market Tools and Toluna survey panels are recognized and relied on by industry leaders (including, for example, many Fortune 500 companies), and American has no evidence that they are not representative, either of Internet users generally or of AA.com's target audience in particular.

American has no evidence that Internet survey panelists are unusually "Internet-savvy" or have "a much higher comfort level on the Internet" than average Internet users. American assumes that respondents who have taken a handful of Internet surveys over the course of preceding months have an advantage in interpreting search engine results, but there is no evidence for this assumption.

In any event, the data show that AA.com users as a group may be more sophisticated than average Internet users. They are at least better educated and more affluent. Dr. Englis'

---

[2] American also misrepresents one of Dr. Cunningham's academic articles, which did *not* conclude that Internet surveys were "best 'done in a laboratory setting....'" (Mot. at 5.) The particular article American cites involved laboratory research regarding how people "surf" the Internet, rather than a survey administered over the Internet of consumer's response to a survey stimulus. (App. 74).

demographics source, Quantcast, shows that 45 percent of AA.com website visitors have some college education and an additional 21 percent have attended graduate school as well, numbers that exceed the proportion of all Internet users in these two categories by 8 percent and 44 percent, respectively. (Opp. App. 073-74 (Cunningham Decl., Ex. 8)); *see also* Opp. App. 200, 202 (Englis Rpt. 8 n. 28, 10 n.34) (relying on Quantcast data on AA.com users).) Similarly, 65 percent of AA.com visitors make more than $60,000 a year, and 35 percent earn more than $100,000 per year, which again exceeds the representation of these high-income groups among all Internet users. (*Id.*) American's own documents confirm that those who purchase airline tickets online are better educated and more affluent than average Internet users. (Opp. App. 189 (AAG-00210123).)

American's statistics indicate that AA.com Internet users actually have more education and higher income than the average Internet user. Thus, if Internet survey respondents have a higher level of sophistication than the average Internet user—something that American has offered no evidence to prove—that would make the respondents an even more representative sampling of the relevant consumers. (Certainly, Dr. Cunningham' sample is a much closer approximation of the appropriate survey universe than Dr. Englis's. Dr. Englis rounded up survey participants in the shopping mall, and his survey universe included respondents who had never been on the Internet and respondents who had no intention of using a Yahoo! search results page to purchase airline travel. (*See* Opp. App.199-200 (Expert Witness Report of Basil Englis, ¶28; Opp. App.187.1-187.4 (Englis Depo. at 274:11-277:4.).)

American cites *Kinetic Concepts,* 2006 U.S. Dist. LEXIS 60187 for the proposition that Dr. Cunningham's sampling methodology requires "[s]pecial precautions" (Mot. at 7), but there the unsolicited email survey was admitted into evidence, and here Dr. Cunningham took similar

care in defining her sample. In *Kinetic Concepts*, the survey was emailed only to doctors and

nurses, where the relevant universe was medical professionals. *Kinetic Concepts*, 2006 U.S.

Dist. LEXIS 60187, at *7. In this case, the Internet survey respondents had to pass a set of

screening questions designed to ensure they would use the Yahoo! search engine and fly

American Airlines.[3]

Finally, American's criticism of Yahoo!'s survey universe is completely at odds with the

opinion of American's own survey expert, and with the approach endorsed by the Federal

Judicial Center's Reference Manual on Scientific Evidence. American's expert, Dr. Basil Englis,

has criticized mall surveys for the bias inherent in their sampling. Where a survey is conducted

by trolling for respondents in a shopping mall, "[a]ny resulting sample is, at best, representative

of those who shop in malls and not of the [relevant] population," Dr. Englis explained. (Opp.

App. 191 ("Exhibit 21" – critique of Deborah Jay's report at 4).) Here, the relevant population is

not "those who shop in malls," but those who purchase airline tickets over the Internet. Thus, an

Internet survey is particularly appropriate. "If the target population consists of computer users,

the bias may be minimal" in an Internet survey, according to Sheri Seidman Diamond in the

*Reference Guide on Survey Research.* (Opp. App. 156 (Diamond article at 264).)

Dr. Cunningham's survey is admissible because the survey universe appropriately represents the

target population.

---

[3] There is also no basis to conclude that compensating the Internet survey respondents
somehow taints the results. Respondents were paid $30 to $100 to participate in the unsolicited
email survey in *Kinetics Concepts*, and that survey evidence was admissible. 2006 U.S. Dist.
LEXIS 60187, at *7. And mall survey participants, including presumably those who participated
in American's survey, are routinely paid in cash. (Opp. App. 020 (Cunningham Decl. ¶9).)

## III.    DR. CUNNINGHAM'S SURVEY USED PROPERLY DESIGNED STIMULI

American complains that Dr. Cunningham's Internet survey failed to "accurately replicate the marketplace," but American's complaints say more about the artificiality of its allegations in this case than about Dr. Cunningham's survey.  It is true that "[u]sers did not engage in a real search" (Mot. at 8), in which they would have been allowed to click on links and then return to the search results page.  It is also true that Dr. Cunningham had to distill down multiple pages of search results to present representative advertisements and organic results in a survey of manageable size.  But these accommodations are irrelevant in assessing the validity of the survey, and American is flat wrong that "Cunningham's Internet survey bore little resemblance to a Yahoo! page that a consumer would actually encounter."  (Mot. at 9.)

### A.    Relevant Sponsor Results

Dr. Cunningham's survey screenshots carefully copied the format of the Yahoo! search results page, including elements such as the layout, search bar, colors, text fonts, and relative sizes of objects and text.  (*See* Opp. App. 022-24 (Cunningham Decl., Ex. 1).)  Most importantly, the particular Sponsor Results ads Dr. Cunningham selected for the Experimental survey screenshot were copied from a screenshot American itself put in its Complaint as representative of Yahoo!'s alleged infringement.  (*See* Opp. App. 018, 022-24 (Cunningham Decl. ¶3, Ex. 1).)  Thus, Dr. Cunningham effectively allowed American to select the Sponsor Results for her experimental stimulus, which included, *inter alia*, Sponsor Results for Orbitz.com, Kayak.com, and Cheaptickets.com – all major advertisers at issue in this case.[4]

---

[4] By contrast, in preparing his imitation Yahoo! search results page, Dr. Englis began with a screenshot from a Yahoo! search sometime in August 2007, at a time when Orbitz, Expedia, Travelocity, CheapTickets, and other major advertisers had promised American they would no longer bid on "American Airlines" or similar keywords.  Thus, Dr. Englis's survey screenshots did not include Sponsor Results for *any* of the major advertisers, those that account

(Footnote continues on next page.)

Dr. Cunningham's survey screenshots also imitated a typical Yahoo! search results page in including American's advertisement as the first of its Sponsored Search advertisements. (Opp. App. 025-26 (Cunningham Decl., Ex. 2).) American objects, even as it is compelled to acknowledge that a very similar American Sponsor Result, including the same "Official Site" language, also appeared at the top right position (another prominent position) on the screenshot in American's Complaint. (Opp. App. 022-24 (Cunningham Decl., Ex. 1).) American alleges that leading with the American advertisement "distorted the results" of Dr. Cunningham's survey by "driving a large number of respondents" to click on the American Sponsor Result, rather than on the links for Yahoo!'s other advertisers. But it is American that is proposing to distort the marketplace.

First, because American's advertisement often appears first among the Sponsor Results, whatever effect it had on survey respondents is no distortion. It is an accurate portrayal of real-world search results.

Second, the actual survey data refutes American's claim about what drove respondents correctly to identify a link to American's website. The Experimental page displayed the sponsored American link *and* several organic American links. In response to the first survey question (the "Go To" question), of the 601 respondents who clicked only on one or more American links, approximately two-thirds clicked on the American Sponsor Link, but only a small fraction of those people said that they did so because of its position on the page. (Opp. App. 018 (Cunningham Decl., Ex. ¶3).) Rather, the majority of their verbatim responses

---

(Footnote continued from previous page.)

for the vast majority of American's damages claim. (Opp. App. 223-26 (Englis Rpt., Ex. I).) Therefore, Dr. Englis's survey, not Dr. Cunningham's, is the one that does not accurately replicate the marketplace of advertisements about which American has sued.

identified the "Official Site" language as the reason for their selection. Moreover, in response to the first "Purchase" question, of the 624 Respondents who clicked only on one or more American links, almost half clicked on the American organic result, not on the Sponsored link at all. (Opp. App. 019 (Cunningham Decl. ¶5).) And those who chose American's Sponsor Result again explained their choice based primarily on the language — "Official Site." (Opp. App. 027-046 (Cunningham Decl., Ex. 3).)[5]

Thus, Dr. Cunningham accurately replicated the marketplace by including the American Sponsor Result in her survey screenshots (unlike Dr. Englis who omitted American Sponsor Results from his Test and Control screens (Opp. App. 223-26 (Englis Rpt., Ex. I))).

**B.     Other Technical Complaints**

American also objects that Dr. Cunningham's Control page included non-American organic links, although American acknowledges that such links were displayed as part of the organic search results in the July 2009 search Dr. Cunningham conducted. (Mot. At 9.) (Opp. App. 025-26 (Cunningham Decl., Ex. 2).) Dr. Cunningham chose to include organic results for third-party sites CheapFlights, Orbitz, and Expedia because without them there would have been no non-American links on the Control page. *Any* answer given to questions about links to American Airlines would arguably have been "right," and there would have been no way to measure baseline confusion. That would not have been an effective Control. Dr. Cunningham

---

[5] Examples of respondents' answers to the "Why?" question include: "Official website of American Airlines"; "because it takes me directly to aa.com"; "Because is the official site of American Airlines and offers a full menu of options on the site"; "Because it said the official American Airlines website and the address underneath it read aa.com"; "It was the airline's official site – chose the sponsored link vs. the one further down (just because it was less scrolling)"; "The description claimed that it was the official American Airlines site, then I looked at the url to confirm"; "It states it is the official website of the airline, appears at the top of the list, and I recognize the website address".

created a Control distilled from an actual search results page whose only difference from the Experimental page was that it lacked third-party Sponsor Results – the precise infringement alleged by American.[6]

(By contrast, for his survey, Dr. Englis created a Control page out of whole cloth. He re-arranged the format of the Yahoo! search results page to "hide" the Sponsor Results in the lower right hand corner. With numerous graphical and textual differences between his Control and Test screens, the Englis survey Control is improper. It does not show that any difference in consumer responses between the Control and Test screens are attributable only to the presence of allegedly infringing Sponsor Results. ((Opp. App. 150) (Diamond article at 258).)

American also criticizes the input box where respondents typed, the survey's "flow," and other aspects of the "artificiality of the exercise." For example, American complains that Dr. Cunningham "'simplified' the presentation of Sponsor Results and organic links by omitting 'an awful lot of advertising' that would normally appear." (Mot. at 8.) This claim is entirely based on American's misquote of Dr. Cunningham. In deposition she was shown a page where survey respondents type in "american airlines" in order to begin the survey. (App. 155, Opp. App. 025-26 (Cunningham Decl., Ex. 2).) This was not the screenshot where Sponsor Results and organic links appear, and not the page about which Respondents were questioned.

Similarly, American objects that Dr. Cunningham's study "framed the results page with a question, … highlighting the artificiality of the exercise." (Mot. at 9.) American cannot have it

---

[6] Such alleged infringement based on third-party Sponsored Results was the entire basis of American's original Complaint – and is still the basis for its damages claim. That American's First Amended Complaint, filed weeks after the expert reports were exchanged, adds additional allegations does not change the fact that Dr. Cunningham's Experimental and Control survey pages properly measured any confusion arising from the appearance of third-party Sponsored Results.

both ways. Elsewhere in the motion, American decries surveys that are "little more than a 'memory test.'" (Mot. at 12.) Here, by displaying the question at the top of the survey search results pages, Dr. Cunningham simply allowed Respondents to read – and re-reread – the survey questions while deciding which links to click.

Not only are American's criticisms of the survey design and appearance unfounded, its complaints do not form a basis for excluding Dr. Cunningham's report. "[T]echnical and methodological deficiencies . . . bear on the weight, not the admissibility of the survey" *Harold Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 & n.9 (10th Cir. 1996); *see also Johnson,* 2008 U.S. Dist. LEXIS 35316. American's criticisms do not bear here on the admissibility of Dr. Cunningham's report.

## IV. DR. CUNNINGHAM'S SURVEY TESTED FOR CONFUSION IN A MANNER CONSISTENT WITH AMERICAN'S THEORY OF THE CASE

American complains that Dr. Cunningham's survey "minimize[s] confusion by restricting the number of links that a respondent would identify as associated with American" (Mot. at 10), but Dr. Cunningham's survey is entirely consistent with American's theory of the case. Under American's theory, the only choice that matters is the consumer's first choice. American contends that people who type "American Airlines" into a search engine are looking for the American Airlines website, and that they click on another advertiser's link only if "confused." American challenges consumers' reactions only to the Sponsor Results as they appear on the search results page, not what happens once a Respondent clicks through to a corresponding website.

If the consumer is right and the chosen link takes him or her to AA.com, then the consumer was not – and will never be – confused by non-American Sponsor Results. If the consumer goes to AA.com and then clicks back to the search results page and clicks on

something else, that must be because AA.com was not what the consumer wanted. Therefore, American's objection that Dr. Cunningham's survey measured only Respondents' first choices is misplaced. Dr. Cunningham measured whether consumers respond to the search results page in the way American alleges.[7]

American objects that Dr. Cunningham's Internet survey suffers from a "demand effect" because Respondents were "deterred" from selecting more than one link in subsequent questions. (Mot. at 11.) In fact, it is the Englis survey that suffers from a demand effect because he asked too many questions. After asking Respondents which "Which link or links, if any, do you think would take you to an American Airlines company website?," Dr. Englis used a second question in order to increase the number of clicks on non-American websites: "Now please look at the links *that you did not mention*. Which link or links, if any, do you think are endorsed by American Airlines?" (Opp. App. 205 (Englis Rpt. ¶ 52 (emphasis added)).) As the Court noted in *Sears, Roebuck and Co. v. Menard*, No. 01 C 9843, 2003 U.S. Dist. LEXIS 951 (N.D. Ill. January 24, 2003) (cited in Mot. at 13), a question that "suggest[s] the similarity to respondents rather than testing whether respondents perceived it themselves" creates an "improper 'demand effect.'" *See also*, *Simon Prop. Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1048 (S.D. Ind. 2000) ("demand effects" bias a survey "by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not have even occurred to the vast majority of consumers who see the

---

[7] Some courts might term confusion of the sort American alleges "initial interest" confusion. *See Designer Skin, LLC v. S&L Vitamins, Inc.*, 560 F. Supp. 2d 811, 818 (D. Ariz. 2008). Dr. Cunningham's lack of fluency with this legal terminology (Opp. App. 013 (Cunningham Depo. at 58:6-11).) has no bearing on the question of whether her survey appropriately measures such confusion, however. Dr. Cunningham's survey tested for *any* confusion over the source of Sponsor Results, whether or not such confusion would resolve as soon as the respondent saw the linked-to website.

items"); *Kargo Global,* 2007 WL 2258688 (plaintiff's survey excluded, in part because it was leading to ask questions about whether there was a "connection," "relationship," or "sponsorship").

Given American's theory that "confusion" must be assessed based on which link on the search results page the Internet user *first* clicks, the demand effect in this case comes from asking survey respondents to evaluate too many links, including links they initially declined to identify. Dr. Cunningham did not make that mistake.

## V. DR. CUNNINGHAM'S SURVEY RESULTS WERE VALIDATED AND THE METHODOLOGY USED TO COMPLETE EACH SURVEY IS SOUND

American's objections based on "validation" appear to be two-fold: (1) Dr. Cunningham included a validation question at the end of the survey to ensure that Respondents had understood the question posed; and (2) Dr. Cunningham did not perform any "independent validation" of the survey respondents but rather "relied on the word of her vendors that her participants were who they said they were." (Mot. at 11.) Neither of American's objections is warranted.

First, as explained more fully in her report, Dr. Cunningham introduced the validation question because, during her review of initial responses to the Mall pilot survey, she discovered that a number of respondents did not remember or understand the question presented, "If you wanted to purchase a ticket directly from American Airlines, which of these links would you click on?" (App. 8 (Cunningham Rpt. ¶ 19).) As Dr. Cunningham explained, survey participants may appear confused for reasons that have nothing to do with the material they are being asked to evaluate. The validation question was designed to minimize bias due to respondents' inability or unwillingness to focus on and remember the questions they were asked by the interviewers. (App. 15 (Cunningham Rpt. ¶ 37).)

To that end, Respondents were asked, immediately after completing the survey, "Which of the following were you asked?" They were given four possible answers to choose among: "to purchase a ticket directly from American Airlines"; "to purchase an American Airline ticket from any of the links"; "to purchase a ticket from any airline"; or "Don't Know/Don't Recall."[8] American complains that this question improperly excluded respondents who could not distinguish between "purchasing a ticket directly from American Airlines" and purchasing a ticket "from any of the links." That's not the case. The validation question essentially tracked the question posed in the survey and excluded only people who could not say, immediately after taking the survey, what question they had been attempting to answer. Such people were not, as American suggests, confused by the presence of Sponsor Results. They were not paying attention to the questions themselves. Therefore, their responses would be unreliable and irrelevant.[9]

---

[8] American objects that the validation question did not track the survey question verbatim. The validation question did, however, include all of the operative language from the survey question, namely, "purchase a ticket directly from American Airlines." The other answers were clearly distinguishable and did *not* track what respondents were asked to do in the survey.

[9] Indeed, Dr. Englis's survey would have benefited from such a validation question. Verbatim responses from survey respondents that Dr. Englis classified as "confused" show that the respondents were not confused by the websites or the links presented on them, but by the questions that Dr. Englis's team was posing. For example, one respondent answered this way when asked why he or she had chosen globe-travels.com as a link that would lead to an American Airlines company website: "I guess it wouldn't; it would take you to globe-travels.com." (Opp. App. 215-21 (Englis Rpt., Ex. G (Test 1, Qn 1 (Q3_1)).) Another explained the same response this way: "I don't think that it'll take me right up to the [American] website, but I think that it'll bring me to a screen with other airlines and maybe I can get tickets on there." (Opp. App. 223-26 (Englis Rpt., Ex. I (Test 2, Qn 1 (Q3_18))).) These and other verbatim explanations from respondents Dr. Englis counted as "confused" show the danger of indiscriminately including respondents who did not focus on the question being asked. Some of Dr. Englis's survey respondents were savvy about the Yahoo! search results page but confused by the questions being posed.

Second, American objects that Dr. Cunningham did not independently validate the survey participants, but merely "relied on her vendor." Dr. Cunningham selected two reputable Internet panels. One, MarketTools, Inc., notes in their literature that they have worked with "400+ of Fortune 500" companies. (Opp. App. 079-80 (Cunningham Decl., Ex. 11).) The other, Toluna, Inc., lists Microsoft, Atari and British Airways among their survey clients. (Opp. App. 075-76 (*Id.*, Ex. 9).) Moreover, both Internet panel companies use sophisticated technology, including "digital fingerprinting," to screen their participants and to guard against "professional survey takers."[10] (Dr. Englis also relied on his vendor, Discovery National Qualitative Network, to conduct telephone call validations of the survey respondents after the survey. (Opp. App. 202 (Englis Rpt. at 10, n.35).)

## VI. DR. CUNNINGHAM APPROPRIATELY AVOIDED TRICK QUESTIONS ABOUT WHETHER AMERICAN ENDORSED OR APPROVED OF ITS OWN AGENTS' WEBSITES

American complains that "Cunningham failed to ask the Internet respondents any questions that would gauge affiliation, endorsement, or sponsorship confusion," a complaint that ignores American's close association with the advertisers whose Sponsored Results it accuses. American created a distribution network that relies on third-party agents to sell tickets over the Internet in parallel with AA.com. In particular, American has appointed as its agents

---

[10] For example, MarketTools' panelists must provide accurate data, which Market Tools verifies through extensive databases, or they cannot join. Market Tools also uses "digital fingerprinting to eliminate and blacklist fraudulent respondents," and "powerful filtering technology that determines whether a given respondent is a duplicate, or professional survey taker and eliminates such undesirable respondents from the database." (Opp. App. 084-86 (Cunningham Decl., Ex. 12 at 3-5), *see also* (Opp. App. 089-96 (Cunningham Decl., Exs. 13 and 14).) Likewise, Toluna, Inc. confirmed to Dr. Cunningham that it has "several standards, best practices and deterrents in place to not only identify but also to discourage professional respondents from becoming members of the panel." (Opp. App. 077-78 (Cunningham Decl. Ex. 10).)

Cheapoair.com, Cheaptickets.com, Orbitz.com, and Globe-travels.com – all travel companies with Sponsor Results in Dr. Cunningham's survey instrument. (Opp. App. 228-30 (Plaintiff American Airlines, Inc.'s Objection and Responses to Yahoo's First Set of Requests for Admission, Responses to Request Nos. 23, 36, and 55).) An agent is by definition affiliated with or endorsed by its principal. Thus, a respondent who answered "yes" to a question whether American endorsed any of these websites would not be confused. He or she would be correct. Asking an "endorsement" question does not measure confusion; in fact it measures nothing of relevance to this case, given American's affiliation with the advertisers it is most concerned about.

Even for unauthorized sales, the "endorsement" question can be problematic. As another court in this district recently explained, "confusion that stems solely from the fact that" a website is selling another's trademarked product "is not legally relevant." *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 849 (N.D. Tex. 2009). Because it is not legally relevant, survey evidence that captures such confusion "might confuse the jury" and is properly excluded. *Id.* The *Mary Kay* court held that "responses of interviewees who believed affiliation existed solely because the website sells Mary Kay products are inadmissible." *Id.* at 848. In this case, a question asking respondents whether the Sponsored Search advertisers were "affiliated with" or "endorsed by" American Airlines would have captured nothing but "legally irrelevant confusion." *See Id.* at 849. Dr. Cunningham's survey assessed the only type of confusion at issue in this case.

Dr. Englis's survey demonstrates the pitfall an endorsement inquiry presents in this case. Dr. Englis testified, once he understood that Yahoo!'s advertisers globe-travels.com, airline.bookcheaptickets.com, and buy-cheaptickets.com all sold American Airlines tickets, that *he* did not know whether or not American "endorsed" these websites. (Opp. App. 170-79 (Englis

Depo. at 65:6-74:24).) If American's own survey expert cannot ascertain whether American

endorses, sponsors, or is affiliated with an advertiser, what basis does he have for categorizing as

"confused" respondents who answer the question affirmatively?

Avoiding this mistake, Dr. Cunningham asked Respondents two very direct and

straightforward questions directly applicable to the facts in this case: (1) If you wanted to go to

the American Airlines website, which of the links would you click on? and (2) If you wanted to

buy a ticket directly from American Airlines, which of the links would you click? As discussed

above, these questions get to the issue of initial interest confusion. It is impossible to see what

"important question" American believes Dr. Cunningham failed to ask – and American's motion

never tells us.[11]

## VII. AMERICAN'S PERSONAL ATTACK ON DR. CUNNINGHAM'S PROFESSIONAL AND ACADEMIC CREDENTIALS IS UNFOUNDED

As a last resort, American attempts to discredit Dr. Cunningham by misstating her

testimony and mischaracterizing her background and experience.

---

[11] The cases cited by American do not support its argument. Two of them are not survey cases. *See Group Health Plan, Inc. v. Philip Morris USA*, 344 F.3d 753, 760-61 (8th Cir. 2003) (discussing expert testimony whether smoking would have been safer absent tobacco companies' alleged conspiracy); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1322-23 (11th Cir. 2003) (non-survey expert testimony regarding antitrust issues). American's jump citation to *Sears Roebuck & Co. v. Menard*, 2003 U.S. Dist. LEXIS 951, at *9-11 (N.D. Ill. Jan. 22, 2003), suggests, incorrectly, that Dr. Cunningham did not ask follow-up questions, namely, "why do you say that?" As her report makes clear, however, she did include such questions and the verbatim responses from Respondents are telling about their perceptions of Sponsor Results. Finally, in *Learning Network, Inc. v. Discovery Commc'ns, Inc.*, 153 F. Supp. 2d 785, 790 (D. Md. 2001), respondents were shown merely printouts of webpages without identifying website address information and the survey failed to ask any question that would test the critical question of what website the respondent thought he had seen. Here, Dr. Cunningham asked the only questions that matter.

American erroneously contends that Dr. Cunningham lacked qualifications in the field of Internet research. American misstates her testimony when it says that she does not conduct Internet surveys for her academic research. (Mot. at 14.) Dr. Cunningham testified that she has not received grants or awards related to internet research (Opp. App. 009 (Cunningham Depo. 19:8-11)) but that she has recently published two monographs on topics specific to Internet research. (One is in print, the second upcoming.) Both monographs are a result of research conducted by Dr. Cunningham and her graduate student(s) in the areas of Internet buying behavior and search engine advertising. (App. 2 (Cunningham Rpt. ¶2).) Furthermore, she testified that, as chair of the Department of Communications at the University of Texas, she made a proposal four years ago that resulted in the development of an online internet panel with 35,000 participants, similar to the panels used in her survey here and available to her department's faculty and students "to gather data on how people behave when using the Web to look at advertisements, . . . ." (Opp. App. 233-46 (Cunningham Rpt. Excerpt); Opp. App. 015-16 (Cunningham Depo. 109:10-110:20).)

American also attempts to suggest that Dr. Cunningham is not qualified to conduct a survey regarding consumer confusion because she has not previously "conducted a trademark survey for use in litigation" or "published any articles regarding trademark confusion." Dr. Cunningham is being offered as a survey expert, however, not as an expert on trademark law. It is irrelevant whether she recognizes specific legal terms or has previously testified in a trademark case.[12] Dr. Cunningham has done "multiple surveys" relevant to this case, in that they

---

[12] American also asserts that Dr. Cunningham should have been familiar with the *Reference Guide on Survey Research* by Shari Seidman Diamond, published in the Federal Judicial Center's Reference Manual on Scientific Evidence (2d ed. 2000). (Opp. App. 121-168.) Again, American misstates her testimony. Counsel asked Dr. Cunningham whether she was

(Footnote continues on next page.)

dealt with "perceptions of advertising, advertising messages, [and] marketing messages, in areas in which allegedly there was a question about whether or not the advertising prompted specific behavior from consumers." (Opp. App. 010 (Cunningham Depo. at 44:4-11).)

Indeed, the case on which American relies refutes rather than supports American's attack on Dr. Cunningham's credentials. In *Wallach v. Longevity Network, Ltd.*, No. CV 04-2404 SJO (RZx), 2006 WL 5106206, at *2 (C.D. Cal. Apr. 26, 2006), the court would not allow a multi-level marketing distributor who posted an Internet poll on his website to submit the poll results as confusion survey evidence, and would not allow him to offer himself as an expert on confusion in a trademark infringement case on the strength of a single "probability in statistics" course he took while studying for his 2-year degree from Heald Business College. (Opp. App. 267 (*Longevity Network, Ltd. v. Wallach*, U.S. P.T.O Trademark Trial and Appeal Bd. Cancellation No. 92030340 at 21 (Mar. 23, 2004).).) By contrast, Dr. Cunningham has her Ph.D. in marketing, thirty years of research experience, and is chair of her department at the University of Texas. (Opp. App. 233-246 (Cunningham Rpt. Excerpt).) She is more than sufficiently qualified to testify as an expert in this case.

---

(Footnote continued from previous page.)

familiar with the "Federal Judicial Center Manual for *Complex Litigation*" (Opp. App. 011 (Cunningham Depo. at 47:7-8) (emphasis added), and Dr. Cunningham testified that she was not sure, just by the title. When asked whether she had heard of Professor Shari Diamond, she testified that she knew Professor Diamond's name but did not recall whether she had read any of her articles or chapters (Opp. App.011-12 (Cunningham Depo. 47:18-48:1).) As Dr. Cunningham clarifies in her Declaration here, however, following the deposition she went back and reviewed her materials and realized that she is familiar with Ms. Diamond's chapter on Survey Research that is published in the Reference Manual of Scientific Evidence (which she owns and has read and referred to in her work). (Opp. App. 019-20 (Cunningham Decl. ¶ 8).)

## CONCLUSION

For all of the foregoing reasons, the Court should deny Plaintiff's motion to exclude the

expert report of Dr. Isabella Cunningham.

Dated: November 25, 2009

Respectfully submitted,

_(signature)_

David F. Chappell
Texas State Bar No. 04141000
Scott A. Fredricks
Texas State Bar No. 24012657
CANTEY HANGER LLP
Cantey Hanger Plaza
600 West Sixth Street, Suite 300
Fort Worth, Texas 76102
Telephone: (817) 877-2800
Fax: (817) 877-2807

Michael A. Jacobs (*pro hac vice*)
D. Anthony Rodriguez (*pro hac vice*)
Alison M. Tucher (*pro hac vice*)
Brooks M. Beard (*pro hac vice*)
Lynn M. Humphreys (*pro hac vice*)
Daniel P. Muino (*pro hac vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Fax: (415) 268-7522

Attorneys for Defendants
YAHOO! INC. and OVERTURE SERVICES,
INC. d/b/a YAHOO! SEARCH MARKETING

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on Plaintiff's counsel, as indicated below, on the 25th day of November 2009:

Dee J. Kelly      *Via Hand Delivery*
Dee J. Kelly, Jr.
Lars L. Berg
KELLY HART & HALLMAN, LLP
201 Main Street, Suite 2500
Fort Worth, TX  76102

Frederick Brown     *Via Federal Express*
George A. Nicoud III
Jason Stavers
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105

Howard S. Hogan     *Via Federal Express*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036

_____
Scott A. Fredricks