American Airlines, Inc. v. Yahoo! Inc. et al

Doc. 229



FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT. WORTH DIVISION

2009 NOV 25 PM 2:38

CLERK OF COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORTH WORTH DIVISION**

| | |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>               Plaintiff,<br><br>   -v.-<br><br>YAHOO! INC., and OVERTURE SERVICES, INC.<br>d/b/a YAHOO! SEARCH MARKETING,<br><br>             Defendants. | No. 4-08-8CV-626-A |

### PLAINTIFF'S SUMMARY OF DEPOSITIONS FOR NOVEMBER 30 HEARING ON MOTION FOR SANCTIONS

In accordance with the Court's November 19, 2009 Order, Plaintiff American

Airlines, Inc. ("American") submits the attached agreed summaries, except as indicated

of depositions for use at the November 30, 2009 hearing in this case.

L. Cornett

M. Kronthal

R. Lange - Yahoo! objects to the sentence in American's Lange deposition summary on page 2, line __, based on the objections made on the record during the relevant questioning, including lack of foundation and calls for speculation. Other than that, Yahoo! agrees with the summary.

T. Mayer

R. Ramaswamy

B. King

Respectfully submitted,

_signature_

Frederick Brown (admitted *pro hac vice*)
Jason Stavers (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Phone: (415) 393-8200
Fax: (415) 986-5309

Howard S. Hogan (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539

Dee J. Kelly
State Bar No. 11217000
Dee J. Kelly, Jr.
State Bar No. 11217250
Lars L. Berg
State Bar No. 00787072
Scott R. Wiehle
State Bar No. 24043991
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Phone: (817) 332-2500
Fax: (817) 878-9280

*Attorneys for Plaintiff American Airlines, Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered on November 25, 2009 to Defendant's counsel, as follows, in accordance with the Federal Rules of Civil Procedure:

David F. Chappell
Scott A. Fredricks
CANTEY HANGER LLP
Cantey Hanger Plaza
600 West Sixth Street, Suite 300
Fort Worth, Texas 76102
(via hand delivery)

Michael A. Jacobs
Lynn M. Humphreys
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
(via overnight delivery)

_signature_

Lars L. Berg

**American Airlines, Inc. v. Yahoo! Inc.**

**Deposition Summary: Larry Cornett**

American Airlines, Inc. ("American") took the deposition of Mr. Cornett on November 6, 2009, pursuant to a Rule 30 notice of subpoena and the Court's August 4, 2009 Order.  Mr. Cornett is a Vice President at Yahoo!, Inc. ("Yahoo!") [14:25-15:2], and he has worked there since June of 2006.  Since he began at Yahoo, he has managed the team that has responsibility for the design of the search engine results page ("SERP").  [11:25-14:21]

Recently Mr. Cornett, together with Yahoo! employees from Kartik Ramakrishnan's Product Operations group, has developed a process for obtaining and evaluating ideas for changes to the design of the SERP.  One of the steps in evaluating any change to the SERP is to run "bucket tests," in which the idea is tested with a small percentage of users to see how well it performs in terms of clicks, or click through rate. [32:21-33:2]  Yahoo! has run over 50 of these tests in the past year alone.  [33:16-34:8]  Mr. Cornett is one of three Yahoo! employees who had to approve the recent change in background color of the SERP from blue to yellow.  [35:22-36:10.]

Mr. Cornett testified about a recent change that Yahoo! has made to the SERP, the change in the color of the sponsor results portion of the SERP from blue to yellow.  [34:9-21.]  He testified that bucket testing was done in connection with this change, and that test tracked various metrics including "abandonment," which is the number of times a user runs a search, but exits the SERP without clicking anything  [41:4-6.] , and "dwell time," a measure of how long a user stays on a page after clicking a link.  [41:19-20.]  Mr. Cornett was not aware of any analysis that was done on the impact the change from blue to yellow would have on consumers' understanding of the difference between sponsor results and algorithmic results.  [45:17-24.]

Mr. Cornett testified that he understood the term "navigational query" to mean a query that matches exactly a domain, such as the name of a company followed by ".com." [53:15-54:4]  He testified that he had heard people at Yahoo! express the opinion that Yahoo! was "over-monetizing" the SERP, but he could not recall any specific individuals. [78:12-79:22]  Finally, Mr. Cornett testified that in his time at Yahoo!, he had not seen any specific research or analysis on the ability of users to discern differences between sponsor results and algorithmic results. [45:25-46:5.]

Mr. Cornett was not told of this litigation until early October of this year, and early October was the first time he was told to retain documents in connection with this litigation. [49:6-50:2]  His custodial documents had been collected in connection with this litigation approximately a couple of weeks before his deposition. [50:11-21]

**American Airlines, Inc. v. Yahoo! Inc.**

**Deposition Summary: Joshua Grossnickle**

American Airlines, Inc. ("American") took the deposition of Mr. Grossnickle on November 13, 2009, pursuant to a Rule 45 subpoena. Mr. Grossnickle is a former Yahoo!, Inc. ("Yahoo!") employee who worked at Yahoo! from approximately 2001 through approximately August of 2008. He worked in a market research capacity, and was Vice President of Consumer Insights when he left Yahoo!. For the first two years of his tenure at Yahoo!, Mr. Grossnickle was a senior research analyst responsible for evaluating the effectiveness of Yahoo!'s advertising. For the last four years of his tenure at Yahoo!, his responsibilities included research into how customers understand some of Yahoo!'s non-search products. [15:24-16:22].

Mr. Grossnickle testified that he was a primary contributor to the authorship of a presentation called "Project Goldmine Phase 1 Recommendations, July 20th, 2007" and conducted or had conducted market survey research as a part of Project Joe, which was a subset of Project Goldmine. [34:19] [34:1-35:2]. In connection with Project Goldmine and Project Joe, Yahoo! developed several analyses related to the profitability of users and its search advertising programs: (a) Yahoo! developed an economic profile for all individual anonymous IDs on its network, and that this profile included a measurement of the revenue generated by each of these users for Yahoo!, including revenue through sponsored search; (b) As of July 20, 2007, Yahoo! has calculated that 10% of Yahoo!'s U.S. users are generate 173% of Yahoo!'s economic profit, while over half lose the company money [37:1]; and (c) As of July 20, 2007, Yahoo! has calculated that baby boomers (defined as users between the ages of 45 and 61) are its most profitable demographic group of users and the group that is most likely to click on sponsor results. [Ex. 1603].

Mr. Grossnickle was also a primary author of a study of Yahoo!'s users called Money Makers. In that study, Yahoo! determined that users who click the most frequently on sponsor results are "less savvy" about the Internet. Of the users who click on 6 or more sponsor results, the Money Makers study found, only 34% of them correctly identified the sponsor results at the North placement of the search engine results page as advertisements. [61:10-62: 9]. At least part of the survey also allowed users to enter responses to questions in their own words. [57:17-57:19]. There were 5,011 Money Makers surveys completed by Yahoo! users. Mr. Grossnickle retained the data from this survey on his laptop, and his understanding is that it was still on his laptop when he left the company and returned his latop to his supervisor in August, 2008. [66:22-67:5].

**American Airlines, Inc. v. Yahoo! Inc.**

**Deposition Summary: Michael Kronthal**

American Airlines, Inc. ("American") took the deposition of Mr. Kronthal on November 3, 2009 in his individual capacity and pursuant to a Rule 30(b)(1) notice of deposition. Since April 2006, Mr. Kronthal has functioned as the Director of the Insights Team for the search product group at Yahoo!, Inc. ("Yahoo!"). [6:8-14; 19:19-25] The insights team is a group of researchers that support the marketing and product development of the Yahoo! search product, which includes researching the consumer experience with Yahoo!'s search engine. [6:15-19; 12:15-22] There are other insights teams at Yahoo!, including teams that support the applications product group, the advertising products group, the integrated consumer experience group, the corporate media and brand research group, as well as insights groups that support the global research programs and data mining capability. All of the insights groups are managed by the Senior Vice President of Consumer Marketing and Insights, Nick Besbeas. [7:4-8:6]

As a director, Mr. Kronthal's primary responsibility is it to support the growth and management of members of the search insights team and to make sure his team delivers value to the search business in terms of providing an understanding of Yahoo!'s consumers and how to do a better job of meeting their needs. [20:1-12] The members of Ms. Kronthal's team are Raj Ramaswamy, Prasad Kantamneni, Raj Gopal Prasad, Anne Binhack, Stacy All, and Isabelle Peyrichoux. [15:21-16:18] Mr. Ramaswamy is the Insight Director or Insight Researcher and his focus is on Yahoo!'s understanding of consumers and to help market the search product to those consumers. Mr. Ramaswamy has reported to Mr. Kronthal for two years. [17:10-12] Mr. Kantamneni is a staff researcher who focuses on how consumers interact with the search results page. [17:16-24]

Mr. Kronthal has a list of research projects that his team has undertaken in association with outside vendors.  Yahoo! maintains the insights portal (or internal website) where his team generally posts its final reports and where many of his team's final reports may be located. [34:13-36:7]  Mr. Kronthal keeps track of his team's ongoing projects by having weekly or biweekly status meeting, for which he publishes agendas.  The published agendas are kept on his hard drive.  Mr. Kronthal takes additional agenda items during the meeting.  He does not know if those additional agenda items are  captured electronically or in written notes by others.  [37:12-38:3]

Mr. Kronthal's team conducts consumer intent research.  For example, the team conducts research on whether a user has a navigational, informational, or commercial intent.  Navigational intent is the intent of the user to navigate to a particular website.  Informational intent is the intent of the user to seek a particular piece of information.  Commercial intent is the intent of the user to make a purchase decision.  [50:21-54:19]  The determinations of searcher intent are made by Ron Lange's team or the search editorial team, with whom Mr. Kronthal shares his research. Mr. Kronthal's team also gets narrative verbatims from consumers, which are a consumer's expression of his thoughts about Yahoo! search.  These verbatims can be captured electronically during studies conducted over the Internet or during studies where Yahoo! videotapes user responses.  There is no central repository for these narratives, but individual researchers keep these comments, and Mr. Kronthal has kept some of them on his hard drive or in his email. [56:13-59:17]  Mr. Kronthal's group also does lab studies, log analyses, field studies, eye tracking studies, editorial testing and bucket testing.  [64:14-65:10]  A lab study is where representatives sample of consumers are observed.  A log analysis is an analysis of the record of queries entered by a consumer and which results they clicked.  A field study is where the

researcher visits the consumer in their natural environment. [68:5-7] Eye tracking studies plot the location that the consumer looks at on the search page. [64:14-19] Editorial testing is the process Yahoo! uses to judge the relevance of the results. [65:4-6] A bucket test is where multiple version of the search results page are presented to a sample of consumers and their behavior is analyzed. [68:14-69:22]

Yahoo! has retained Keynote, a research vendor, to assist in its analyses. Mr. Kronthal believes that Yahoo! has used Keynote during the last six years. [69:23-70:24] The number of reports that Yahoo! purchases from Keynote depends on budget and planning decisions. At most, Yahoo! purchased two reports per year, at a cost of $45,000 each. [71:11-72:17] Keynote also provides Yahoo! the data containing consumers' answers to Keynote's research questions, and this data is available to Yahoo! at the Keynote portal (or internal Yahoo! website). This includes the answers to questions about whether or not a consumer has difficulty determining which results are advertisements. [75:11-76:18; 82:11-83:8] These studies are also used to measure performance with competitors and to identify areas where consumer experience can be improved. [83:11-84:19] The Keynote research and reports are shared across the search product and insights organizations, including in some cases with the Senior Vice President of the Search Product Group, Vish Makhijani and Tuoc Luong, in meetings or by email. [78:11-79:7, 81:6-82:10]

In response to a competitive analysis done by Keynote, Yahoo! engaged comScore, Inc. and Nichols Research to understand the Keynote analysis in detail. The Nichols research may or may not have been videotaped. [156:23-158:9] If the videotapes or other visual media were part of the reports provided to Yahoo!, they would be on the insights portal. [157:9-159:13]

Yahoo!'s also retains CFI Group to run the customer satisfaction tracking program. CFI Group generates reports for Mr. Kronthal's group and for the search group every other quarter in some cases and every quarter in other cases, and Mr. Kronthal keeps these electronically. (112:20-113:18.) CFI Group has also provided consumer narrative responses that are stored either with CFI, or on the hard drives of Mr. Kronthal or Mr. Ramaswamy or on the customer satisfaction tracking portal with the verbatims. (113:19-114:9.) The insights team has access to this portal.

Mr. Kronthal discussed with Cherly Dartt and Rebecca Sharpe the results of the North Ad Click Survey Refresh, which found that within that particular sample, 50% of users were still unaware that the north advertisements were paid ads, and the moneymakers study. [121:22-135:11] Those discussions took place over the telephone. Mr. Kronthal recalls sending Ms. Dartt and Ms. Sharpe a copy of the Money Makers study via email, but does not recall whether or not he sent a draft of the 2009 study to Ms. Dartt and Ms. Sharpe via email. (129:16-135:11.)

Mr. Kronthal also created a presentation with his perspective on the impact of advertising on the consumer search experience, which he presented to his superior, Mr. Besbeas, in July 2009. A draft of this presentation is on Mr. Kronthal's hard drive. [137:1-138:21] Mr. Kronthal stated in that report that some of Yahoo!'s efforts to drive click yield only served to "trick" consumers into lower quality clicks that drive low quality traffic to advertisers and that the balance between revenue and user experience was out of balance. Mr. Kronthal believes that consumers are "tricked" because Yahoo!'s current presentation of Sponsor Results was changed to resemble the web or algorithmic results. Mr. Kronthal used the word "trick" in quotations because he believed that, "it is a sort of accidental impact." (142:3-24.) He believed that

consumers were "tricked" because Yahoo changed the sponsor results to resemble the algorithmic results. [139:8-12; 140:18-143:13]

A survey was also conducted to find out why heavy Yahoo! searchers were defecting to competitors. Mr. Kronthal has some of the data from the report, but the raw data and the survey questionnaire would be with Mr. Ramaswamy, who conducted the study. [147:3-148:9]

Mr. Kronthal was asked to image his hard drive the week of October 26, 2009. Prior to that he was interviewed by outside counsel on two occasions. As a result, he provided documents relevant to consumer search and sponsored search a few months ago, including some Keynote studies, consumer mental model reports, and reports about awareness of sponsored results. He does not recall being asked to provide any of the data underlying the reports. [105:19-109:7] Data for some of these reports would be kept with the individuals who led the projects, like Mr. Ramaswamy. [121:22-123:15]

**American Airlines, Inc. v. Yahoo! Inc.**

**Deposition Summary: Ronald Lange**

[*Note: All page:line references are to rough transcript*]

American Airlines, Inc. ("American") took the deposition of Mr. Lange on November 16, 2009 in his individual capacity and pursuant to a Rule 30(b)(1) notice of deposition. For the last six years, Mr. Lange has been the senior director of engineering at Yahoo!, Inc. ("Yahoo!"). [2:11-14; 7:10-11, 20-22] Mr. Lange currently is in charge of the Search Metrics and Analysis group or SAMA, which was formerly called MAP. [66:5-67:12] Mr. Lange's group measures and analyzes the relevance of search results for Yahoo!'s search and advertising products. [7:12-19; 9:11-24] The search engine relevance judgments are stored in a reporting system called R2D2, which is accessible to the analysts on Mr. Lange's team. [9:25-11:1; 16:12-21]

Yahoo! has used up to 160 relevance judges (with smaller numbers of judges in the past), some of whom are employees and some of whom are contract employees, to judge the relevance of search results returned by Yahoo and its competitors when consumers enter search terms into the respective search engines. [15:25-16:1; 22:20-23:3.] Relevance judges make judgments about the user's intent when the user made a search query, based on the judges' understanding of the language used in the query. [39:3-4] Relevance judges are provided training materials and guidelines by Yahoo! on the standards to use for their relevance judgments. [15:24-16:1; 22:20-23:19; 38:16-39:9; 80:20-81:6] One category of relevance judgment made by the judges is whether the consumer's search is "navigational." Yahoo!'s guidelines define a search to be navigational when the majority of users expect only one result as the desired outcome. Those guidelines state that in practice navigational queries are predominantly the name of an organization, such as U.S. Airways, Google, or a query containing the name of an organization

such as ESPN baseball or the name of a web site. The queries that are judged come from the relevance judgment system, called reltest, which is maintained on Yahoo!'s computer servers. [24:15-25:6] The information in the reltest system are individual search results that are extracted from search result pages that have been returned to Yahoo's computers [28:21-29:8] from queries on search engines including Google and Yahoo!. [31:1-6] [26:19-28:17; 28:22-29:2] This information is obtained by a process Yahoo! uses called scraping. Scraping occurs frequently. Scraping involves automated searches by Yahoo!'s computers on search engines and collecting the search results for search queries. [29:15-30:7] Reltest also stores the queries on which judgments are made, including those made on Yahoo itself [31:1-9] Mr. Lange was not asked by Yahoo! to look at the information in the reltest systems for information related to searches for American Airlines terms. [32:10-21.] Both R2D2 and the reltest systems store relevance judgments. [27:24-28:4.] Mr. Lange testified that he did not know whether R2D2 or reltest stored a record of all search terms that were used. [32:22-33:13]

Mr. Lange also participates in bucket tests, which are tests in which a sample of Yahoo! users are given a different version of a product than the rest of Yahoo! users. [11:19-22.] The data from these tests are retained in a reporting system called Venus, which is accessible to Mr. Lange and his team. [11:23-13:9]

Yahoo has engaged comScore, Inc. ("comScore") to collect data from certain computer users about their usage. [106:8-18.] The data received from comScore is a record of the queries entered by the computer users. [106:8-108:3.] Yahoo! uses this data in its own studies, including one that compared the types of queries (navigational queries, for example) entered into Google with the types of queries that were entered into Yahoo!. [108:20-109:7] Yahoo

2

contracted with comScore to provide data from 5,000 users, with an optional increase to 10,000 users, with a delivery target date for the data of 2007. [110:17-111:24]

Personnel in Mr. Lange's group have been asked to capture screenshots or search engine results pages in order to use them in relevance testing. [167:24-168:17] Mr. Lange testified that he did not know where those search engine results pages were kept. [169:3-7.]

Mr. Lange was not asked for a copy of his electronic files until the week of November 9, 2009. He testified that he did not know whether the collection of his electronic files included his emails. [43:19-21.] He did not receive a litigation hold notice until November 2009. Prior to receiving the litigation hold notice, Mr. Lange sometimes discarded emails, but was not asked what types of emails. [43:14-22; 128:3-24]

**American Airlines, Inc. v. Yahoo! Inc.**

**Deposition Summary: Tim Mayer**

American Airlines, Inc. ("American") took the deposition of Mr. Mayer on October 28, 2009, pursuant to a Rule 30 notice of subpoena. Mr. Mayer is a Vice President at Yahoo! Inc. ("Yahoo!"). He started at Overture in 2003 with product management responsibility for the search business, including selling search services. [25:15-26:14]. From May 2004 through early 2008 he had product management and technical responsibility for Yahoo!'s search-related products. From early 2008 through May, 2009 he had business responsibility for Yahoo!'s search-related products, responsible for search distribution and monetization. [27:22-28:12].

During the period that Mr. Mayer had business responsibility for search, one of his direct reports, first David Cheng and then Caroline Tsay, were responsible for "search monetization," which Mr. Mayer described as the manner in which advertisements are displayed to the user— their visual appearance on the search engine results page. Together, Mr. Mayer and Ms. Tsay, and before the time that she reported to Mr. Mayer, Mr. Mayer and Mr. Cheng, were responsible for the look of the text of sponsor results, the size and font, and how they were laid out on the page. [63:2-6] Each worked for Mr. Mayer for approximately one year. Ms. Tsay maintained a written "pipeline" of specific monetization projects. [145:2-7] In the past three to five years, Yahoo! has made over 50 changes to the display of sponsor results, and Mr. Mayer was personally involved in many of the decisions related to those changes. In connection with changes to the appearance of sponsor results, Yahoo! executed various studies, including usability tests on live users in a lab and tests on the live web site involving a small percentage of consumers. [63:18-64:7] Mr. Mayer testified that he or someone who worked for him would be

the person at Yahoo! most knowledgeable about the display of sponsor results such as their font, color, shading, and location. [178:15-21].

In response to questioning by Yahoo!'s counsel, Mr. Mayer testified that Yahoo! has done a lot of research related to the intent of its users and different search terms. [218:25-217:3]research related to the intents of users searching on Yahoo!'s web site. He further testified that Yahoo! tries to make its sponsored search results relevant to the consumer's search query. [225:14-226:24]

Mr. Mayer met with counsel for Yahoo! on October 27 in preparation for his deposition. Mr. Mayer did not believe he had been asked for documents in connection with this litigation as of the date of his deposition (October 28). He testified that some documents he had seen during his deposition seemed to be the same as documents in his own files, which must have been produced from other custodians. While he has received document retention notices in connection with the litigation, he does not remember the dates of those notices. [130:6-12; 176:21-25]. Mr. Mayer testified that he has a long document retention policy (he retains emails that he finds useful, and those which "have some content") and he still retains emails through multiple companies he has worked for. [130:6-131:4]. He has not altered his document retention practices with respect to documents relevant to this litigation.

**American Airlines, Inc. v. Yahoo! Inc.**

**Deposition Summary: Raj Ramaswamy**

American Airlines, Inc. ("American") took the deposition of Mr. Ramaswamy as Yahoo!, Inc.'s ("Yahoo!") corporate designee on October 15, 2009, pursuant to a Rule 30(b)(6) notice. He was designated by Yahoo! on topic number 8 of American's Rule 30(b)(6) notice, relating to "[t]he form, organization, or look by which search results are displayed by [Yahoo] and all studies or analyses of that form, organization, or look...." Mr. Ramaswamy has worked at Yahoo! since May, 2006 in various market research capacities. Initially he worked directly with Yahoo!'s travel business, researching questions to help product development and marketing [p. 9] He had nothing to do with the design, layout, or look and feel of the Yahoo! Travel website. [p. 11] After five months, he transitioned to providing market research to Yahoo! Search, which was still his assignment at the time of his deposition. [p. 12]

Mr. Ramaswamy testified that he was aware of several studies, administered on a companywide basis, not specific to travel [pp. 21-23] that relate to the consumer experience of search and sponsor results. These include a Customer Loyalty Index measured with a third-party provider called CFI, a performance measurement provided by Keynote, a feature tracking study that measures consumer awareness, usage and satisfaction with elements of the search results page including sponsor results. [pp. 10-19; pp. 23-25] There are portions of the Customer Loyalty Index study and the feature tracking study that permit consumers to enter in their own open text submissions on whatever they want to write about. [p. 33] Mr. Ramaswamy testified that he reviews responses, but does not recall any comments in the Consumer Loyalty Index surveys pertaining to someone being confused about ads [p. 22], and testified that he had not, and does not know of anyone who has, "gone back" to review the open text submissions to

determine whether any study participant typed in a complaint about consumer confusion or confusion about sponsor results. [pp. 33-34]

Mr. Ramaswamy also testified that he conducted the North Ad Awareness Study (also called the North Ad Click Survey) in the second quarter of 2009 to update the measure of consumer awareness of the "north" position advertisements in the Money Makers Survey done by Joshua Grossnickle. [pp. 38-45] He was assisted in this study by Sanjay Wahi, who had been involved in the original Money Markers study. [p. 45] At the time of his deposition, he had shared the results of the 2009 study with only four people: Michael Kronthal, Sharad Verma, Cheryl Dartt, and Rebecca Sharpe, but he intended to show it to other stakeholders for Yahoo! sponsored search, including David Ku, Chi Chao and Larry Cornett. [p. 47; 111] He confirmed that the document marked as Exhibit 503 contained the data that was collected in the survey. [p. 51]

100768432_2.DOC

**American Airlines, Inc. v. Yahoo! Inc.**

**Deposition Summary: Bradley King**

American Airlines, Inc. ("American") took the deposition of Mr. King, a former employee of Yahoo!, Inc. ("Yahoo!") on September 24 in his individual capacity and pursuant to a Rule 45 subpoena, which also required Mr. King to produce documents. The deposition was concluded on October 1. Mr. King started at Yahoo! in 2004 as a "vertical," or specialist, in the area of online travel. Mr. King was the director (later senior director and then managing director) of the travel vertical at Yahoo! until he left Yahoo! in December 2008. His role was to advise Yahoo!'s sales force and its top travel-industry customers how they could do more and better online advertising. Mr. King's role was to be subject matter expert in the area of online travel. [10:6-24; 16:17-20; 34:7-21] Mr. King attended some presentations with Yahoo's major travel clients in approximately 100 quarterly reviews. [38:7-11] Mr. King attended at least one presentation with American Airlines and participated in others by phone. Mr. King routinely retained on his Yahoo!-issued computer electronic copies of reviews that he attended. [38:16-19] Mr. King or people who reported to him worked on client accounts including airlines, hotel chains, car rental companies, cruise lines, meta search engines, and online travel agencies. [35:16-36:22]

In response to the subpoena from American, Mr. King provided all of his Yahoo!-related documents to his counsel, who also represents Yahoo!, in electronic form from his home computer, where he periodically backed up all of the files on his Yahoo!-provided laptop during his employment with Yahoo!. Mr. King estimated that he provided about 10 gigabytes of files to counsel in response to the subpoena. [13:23-14:2] The files on his Yahoo! laptop were organized by folders under a client's name with subfolders split-out by fiscal quarters. He

retained some share of voice reports, which showed the number of searches on a given keyword, revenue reports, and reports that addressed impressions. This folder structure was provided to counsel. [13:7-16:24; 19:25-22:19; 102:2-7] Mr. King did not retain his emails from his time at Yahoo! on his hard drive at home, and probably deleted emails daily while at Yahoo!. [23:6-24:14] Prior to leaving Yahoo!, Mr. King was interviewed about information related to this litigation, but he was not asked to provide any documents or ESI or change his retention practices and he does not recall getting a litigation hold notice. Prior to American's subpoena, he was not asked about what files he had at home [24:19-27:22] When Mr. King departed Yahoo!, he returned his laptop to Yahoo! and completed some forms indicating that he had retuned all of his Yahoo-issued materials, although he discarded his Yahoo!-issued Blackberry, because it was "on its last leg." [17:16-18:23]

Mr. King saw organization charts from time to time while at Yahoo!, including a chart or charts for the direct business team, whose structure changed two to three years after Mr. King started at Yahoo! Mr. King did not agree he regularly used org charts in the course of his business at Yahoo!, but that they were used. [29:3-29:9; 31:15-25]

Mr. King used a personal instant messaging tool for personal and business purposes on a daily basis, but did not retain these messages. [116:14-117:24]

Mr. King used comScore and Compete each to do one travel-focused study that looked at consumer behavior and what their behavior would look like depending on the type of keywords they searched on from the beginning to the end of a search. There probably were email exchanges about these studies, and the slides of the studies were sent to him by email. [67:8-23; 73:13-75:9] Mr. King probably presented one of these studies to his team and believes he presented it to his superior, Ann Frisbie. [76:19-77:6]

Yahoo! had an internal reporting tool called STATS, which could show (for an individual keyword) the number of searches conducted, impressions (Mr. King did not remember the definition of "impression"), the average click-through rate, and cost per click averages (pp.79-80). Probably thousands of STATS reports were available to Mr. King, although he used four or five. [96:16-18] STATS also contained data that would show a non-American advertiser's bids on American trademarks as keywords, as well as the associated impressions, click-through rates, revenue and ad text. The data mentioned above was generally available for at least several months. [78:11-15; 79:15-18; 96:25-98:7] Impressions, click-through rates, and cost per click were some of the metrics discussed from time-to-time with clients at quarterly business reviews. [51:7-52:21; 80:14-18]

Typically, online travel agencies, including for example, Expedia, Orbitz and Travelocity, ran hundreds of thousands of different ads at any particular time, and could have hundreds of those ads with different titles, different ad text, and triggered by different keywords. [113:20-114:7]